UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NUMBER 17-24223-CV-KMW

**A.T.O. Golden Construction Corp**

                              **Plaintiff**

        vs.

Allied World Insurance Company
**and Pete Vicari General Contractor, LLC**

                Defendant
_____

TRIAL HELD 1-28-2019
BEFORE THE HONORABLE KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT COURT JUDGE
_____

APPEARANCES:

FOR PLAINTIFF:          TIMOTHY S. TAYLOR, ESQ.
                        VANESSA A. VAN CLEAF, ESQ.


**FOR DEFENDANT**
Allied World            BRUCE D. PARTINGTON, ESQ.
                        KEITH L. BELL, JR., ESQ.

**FOR DEFENDANT**
**Pete Vicari**            JONATHAN P. COHEN, ESQ.
                        **KELSEY K. BLACK, ESQ.**

REPORTED BY:            PATRICIA SANDERS, RPR
                        United States Court Reporter
                        400 North Miami Avenue, Suite 11-3
                        Miami, FL  33128
                        T: 305.523.5528
                        patricia_sanders@flsd.uscourts.gov.

1                              **I N D E X**

2                          DIRECT        CROSS        REDIRECT

3    **ROBERT MICK**              **35**           **78**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      THE COURT:  Bring in the jury, please.

2      COURT SECURITY OFFICER:  All rise, please.

3      THE COURT:  Everyone may be seated.  Ladies and

4  gentlemen of the jury, as I told you during our jury selection

5  you would hear from the attorneys in both opening and closing

6  during the course of the trial.

7      So, you will now hear from each side as they give you

8  their opening statement -- it is not argument -- it is their

9  belief about the evidence that you will be hearing in the case.

10  So, I will now ask that you give your complete attention to

11  counsel as they give you their opening statements in the case.

12      On behalf of the plaintiff.

13      MR. TAYLOR:  Thank you, Your Honor.  Ladies and

14  gentlemen, good afternoon.  My name is Timothy Taylor.  I

15  represent A.T.O. Golden Construction in this case.

16      And before we begin I would like to personally thank

17  you as the Judge has for doing your civics duty.  We know that

18  there are other things you could be doing and we greatly

19  appreciate your taking the time to hear the case.

20      What this case is about is very simple.  This case is

21  about non payment. What you will hear is the Civic Tower

22  Project consisted of two towers 17 and 18 story towers over in

23  Allapattah.

24      My client A.T.O. Golden Construction subcontracted out

25  work for interior demolition, drywall and those kinds of things

12:18  1   with a direct contract with the defendant Pete Vicari General

01:21  2   Contractor as well as there is a bond that has been issued by

01:21  3   the other defendant Allied World Insurance Company.

01:21  4          What you will hear during trial from the witnesses and

01:21  5   the evidence presented is that my client performed its work,

12:19  6   provided its payment applications and certified them to the

01:21  7   general contractor.

01:21  8          The general contractor then reviewed and certified

01:21  9   those payment applications and submitted them to the owner and

01:21  10  the architect.

01:21  11         The architect certified the general contractor payment

01:21  12  applications which also had our A.T.O. Golden Construction

01:21  13  payment applications attached that the work was performed.

01:21  14         And the owner had its construction lender, a company

01:21  15  by the name of CVRE come out to the project site, walk the job,

01:21  16  inspect all the work, and approve the payment for the work in

01:21  17  place.

01:22  18         You will also hear that the owner didn't pay the

01:22  19  defendant Pete Vicari General Contractor for my client's work.

01:22  20  What did not happen is Pete Vicari refused -- they did not pay

01:22  21  my client.

01:22  22         They just refused to pay.  So you are probably

01:22  23  wondering why did that occur?  Really, the case starts in late

01:22  24  2016 went Pete Vicari General Contractors, a Louisiana company,

01:22  25  was awarded $34 million in contracts for renovation of these

two towers. The construction was to begin on February 8th,
2017.  The problem was as of February 1st, a week before
construction was to start, they had no local management and
they did not have sufficient subs and suppliers in place to get
the job off the ground and running.

Compounding that fact is, we have an owner contract
for $34 million that had a $10,000 a day damage clause for
delays in completion of this job.

So Pete Vicari General Contractor in an effort to
scramble and get this job off the ground contacted a gentleman
by the name of Robert Mick.  Mr. Mick will testify here today.

Mr. Mick has 40 years of construction industry
experience and he owns several companies in the construction
industry.  He owns a labor management company and he owns a
labor force company.

Because of Mr. Mick's resources and his ability to
bring those to the project to get it going, it seemed like a
perfect match for this general contractor Pete Vicari General
Contractors.

He hired Robert Mick to be the senior project manager
on this job.  He also hired another company called Zpaces,
which was a labor force to immediately start the interior
demolition.

All of this was done -- Mr. Vicari knew of Robert
Mick's ownership in these companies.  He approved the work to

1    be performed and paid Zpaces for the work. He was so pleased

2    with Zpaces work that he asked Zpaces to increase the scope of

3    their contract from simple interior demolition to now include

4    kitchen cabinets, doors, flooring, as well as the interior

5    demolition.

6        The problem was with the increased scope of work, that

7    would require a license contracting firm.  Zpaces was not a

8    license contracting firm and Robert Mick informed Pete Vicari

9    General Contractors of this --

10       THE COURT:  Counsel, please speak into the microphone

11   so that Ms. Sanders can make a record.

12       MR. TAYLOR:  So he was going to have to acquire

13   another licensed contractor to perform the additional scope of

14   work.  A.T.O. Golden.

15       So Zpaces acquired Allied and Allied was presented to

16   Pete Vicari General Contractors to enter into these

17   subcontractors for the increased scope of work.

18       Mr. Vicari agreed to this relationship and entered

19   into the contracts with A.T.O. Golden to perform the work and

20   Zpaces would be the labor force behind A.T.O. Golden.

21       The two contracts were entered into in March of 2017,

22   A.T.O. started their work.  Everything is going smoothly.

23   A.T.O. is responsible for submitting payment applications on a

24   monthly basis.  So A.T.O. submits their payment applications in

25   March.

01:25  1          The same process is afforded to these payment

01:25  2   applications.  Certification by A.T.O. Golden, certification by

01:25  3   Pete Vicari General Contractor, then certification by the

01:25  4   architect, then the inspection by the construction lender upon

01:25  5   which they make the determination whether to approve payment

01:25  6   and then the owner makes payment.

01:25  7          This process occurs in March, it occurs in April, it

01:25  8   occurs in May, it occurs in June, it occurs in July; and all of

01:25  9   these payment applications were approved and paid for and

01:26  10  actual paid to A.T.O. Golden.

01:26  11         So this dispute does not start to arise until August

01:26  12  of 2017.  A.T.O.'s performance on this job was so good that

01:26  13  Pete Vicari General Contractor increased their -- the

01:26  14  subcontract they entered into in March of 2017 by almost

01:26  15  double.

01:26  16         The amount of work they gave them, they doubled by

01:26  17  July and they continued to give them more work because they had

01:26  18  the labor necessary to get the job done and they did in it in a

01:26  19  professional manner and the owner was pleased.

01:26  20         Although A.T.O. was performing their work correctly,

01:26  21  all was not well on the project.  During this time there was a

01:26  22  major subcontractor that got into a dispute with Pete Vicari

01:24  23  General Contractors which ultimately resulted in the contractor

01:24  24  leaving the job.

01:24  25

01:27 1          But it put the project behind by two to three months.

01:27 2   It also created project costs overruns by over a million

01:27 3   dollars.  Now, that had nothing to do with my client.

01:27 4          What it did create was a toxic environment on the

01:27 5   project site.  Mr. Vicari was under a lot of stress.  He was

01:27 6   creating a very tense environment -- without getting into the

01:27 7   specifics the witnesses will testify as to certain alterations

01:27 8   that may have occurred.

01:27 9          Ultimately, Robert Mick had to confront Mr. Vicari and

01:27 10  tell him the working conditions on the job site did not get

01:25 11  better, he was going to take another job and move on.

01:27 12         Mr. Vicari did not like this so he terminated Mr. Mick

01:27 13  without cause.  And then, on Mr. Mick's last day he informed

01:27 14  Mr. Vicari that he was going to go back to work with the two

01:27 15  companies A.T.O. and Zpaces.

01:27 16         As you can imagine this created quite the conflict.

01:27 17  After Mr. Mick went back to work with A.T.O. and Zpaces that is

01:28 18  when the payments stopped.

01:28 19         A.T.O. continued to work and in August they submitted

01:28 20  their August payment application at the end of the month,

01:28 21  certified it, it was inspected by Pete Vicari General

01:28 22  Contractors and certified.

01:28 23         It was certified by the architect and went to CVRE.

01:28 24  CVRE came out to the project site, inspected the work and

01:28 25  approved payment and then paid Pete Vicari General Contractors.

01:26  1  But Pete Vicari General Contractors would not pay A.T.O.

01:26  2  Golden.   When A.T.O. demanded to know why they were not being

01:28  3  paid, they did not get any answer.   They got the run around.

01:28  4        They were told don't worry about it you will be paid.

01:28  5  A.T.O. kept working.   When they turned in their September

01:28  6  payment applications, Pete Vicari General Contractors made up

01:28  7  excuses that they were late, they were not accepting them, they

01:28  8  were improper, they were not going to submit them to the owner.

01:28  9  A.T.O. could only take so much.

01:29  10        As of October 12th they were left with no other option

01:29  11  but to issue a default notice under the subcontract to Pete

01:29  12  Vicari General Contractors and demand payment.

01:29  13        Pete Vicari General Contractors did not respond to the

01:29  14  default notice.   They did not give them a reason whey they were

01:29  15  not paying.   They did not complain about their work.   You will

01:29  16  not hear one witness testify that A.T.O.'s work was deficient.

01:27  17        And you will not hear one witness say that A.T.O.

01:29  18  delayed this job in any way.   Because A.T.O. did not get a

01:29  19  response to this default notice and they were still without

01:29  20  payment -- in fact, they had not paid since July -- for the

01:29  21  July work they performed.

01:29  22        They terminated these contracts on October 17, 2017.

01:29  23  It is not until they terminate these subcontracts that all of a

01:29  24  sudden Pete Vicari General Contractors starts creating excuses

01:30  25  on why they are not going to pay.

01:30  1        For the first time after we terminated these

01:30  2  subcontracts you will hear that Pete Vicari General Contractors

01:30  3  has taken exception to Zpaces working on the job.  They will

01:30  4  say that they did not approve Zpaces to work on the job.

01:30  5        You will hear that Zpaces had 30 to 40 employees a

01:30  6  week out there.  You will hear that they did their work timely,

01:27  7  which was all accepted and paid for by the owners, and for

01:27  8  whatever reason now that the subcontracts were terminated, now

01:28  9  Pete Vicari General Contractors says well, I did not approve

01:30  10  Zpaces so I am not paying.

01:30  11        You will hear a defense from Pete Vicari General

01:30  12  Contractors saying that Robert Mick did not tell me he was an

01:30  13  owner of Zpaces.

01:30  14        The documentary evidence will refute that out of hand.

01:30  15  You will hear a defense that A.T.O. overbilled their

01:30  16  quantities.  They overbilled the work they were seeking payment

01:30  17  for.

01:30  18        You will have to judge the credibility of these

01:30  19  witnesses.  You will have to judge the credibility of documents

01:31  20  in evidence.  What you will see is that this inspection process

01:31  21  was detailed.  There were many layers of involvement.

01:31  22        A lot of people went through the payment applications

01:31  23  to scrutinize the work and approve it.  It was certified by

01:31  24  A.T.O., certified by Pete Vicari General Contractors, certified

01:31  25  by the architect, certified by the construction lender

01:31  1   inspector, and paid by the owner.  Pete Vicari General

01:31  2   Contractors is holding my client's money.  They are not paying.

01:31  3   So at the close of the trial, ladies and gentlemen, I will ask

01:31  4   for a judgment and a verdict so that my client gets paid.

01:31  5          As of right now my client has not been paid $403,000.

01:31  6   It is a long time coming.  This work was performed well over a

01:31  7   year ago.

01:32  8          They have been waiting to have their day in court and

01:32  9   we appreciate the fact that you guys are here to sit as jurors

01:32  10  in this case and to determine the responsibility and liability

01:32  11  of the parties in this case.  Thank you.

01:32  12          THE COURT:  Thank you.  On behalf of defendant.

01:32  13          MR. PARTINGTON:  May it please the Court, counsel,

01:32  14  ladies and gentlemen of the jury.  If it were that simple we

01:32  15  would not be here.

01:32  16          We will ask you to consider two questions as you hear

01:32  17  all the evidence in this case.  Those two questions are this:

01:32  18  First, whether or not A.T.O. should be paid for work it did not

01:32  19  do.

01:32  20          Question two, is whether it should be paid when the

01:32  21  contracturally specified things that have to happen before they

01:32  22  get paid have not happened.

01:33  23          This is not a question but it is a third thing that

01:33  24  you will have to pay attention to as you listen to the evidence

01:33  25  and that is the chronology.

01:33  1       What happened when, who did what went and when did

01:33  2  things happen. Let me back up a little and tell you a little

01:33  3  bit about the project and Pete Vicari General Contractors.

01:33  4  Pete Vicari General Contractors is a general contractor from

01:33  5  New Orleans.

01:33  6       It was requested to do these jobs here in Miami and it

01:33  7  arranged to do the jobs in Miami. There were delays in the

01:33  8  closing of the construction financing which is why the things

01:33  9  did not get started until February.

01:33  10      The projects were on a tight timeline.  They had to be

01:33  11  finished by the end of 2017. There are a variety of reasons why

02:01  12  that did not happen but I will get to that.  But they are

02:01  13  important for you to know today and over the course of this

01:34  14  trial.

01:34  15      A little more about the projects.  These are two

01:34  16  apartment towers -- and the renovations were very

02:02  17  substantial -- the first building, Civic Tower is the larger of

02:02  18  the two buildings.  It has 196 apartment units and it is a 17

02:02  19  story building.

02:02  20      Civic Senior Tower has 151 apartment units and it is

02:02  21  an 18 story building.  What the renovation was in general terms

02:02  22  was literally the entire removal of the exterior of the

02:03  23  building and replacing it, so when it was removed, you could

01:34  24  see into the building from the outside.

01:34  25

01:34 1     The exterior was to be replaced by these three story

02:34 2 tall prefabricated panels that would be hung on the building

01:34 3 with a crane.  That is ultimately the subcontractor that Mr.

01:35 4 Taylor referred to that we had some problems with.  And I will

01:35 5 get to that briefly.

02:36 6     Inside the building the apartments were basically

02:36 7 going to be gutted, flooring and cabinets and doors removed.

02:36 8 All of those things had to be replaced.  That was the scope of

01:35 9 work for the overall project.

02:38 10     And important in any construction project are the

02:38 11 contracts.  And these contracts were -- these projects were

02:38 12 under -- there are two projects.  So there are two building

02:38 13 that are close to each other but they are under two separate

01:35 14 contracts.

01:35 15     There is the contract between Pete Vicari General

01:35 16 Contractors and the owner upstream and then there are the

01:35 17 contracts between Pete Vicari General Contractors and A.T.O.

01:35 18 downstream.

01:35 19     A.T.O. was not the only subcontractor and neither was

01:35 20 the exterior one.  There were a number of them.  And the

01:35 21 structure of the owner contractor agreement, between us and the

02:40 22 owner upstream were in this particular case cost plus with a

01:36 23 GNP.

01:36 24     That means that Pete Vicari General Contractors gets

02:41 25 reimbursed for what it spends, plus a mark up that covers it's

01:36 1   overhead and some profit.  The GNP term that I have used is a

03:16 2   guarantee maximum price.  So what that means is that if it

01:36 3   costs more than that to do the work, PVGC does not get paid for

01:36 4   it.  So it is cost plus with a guaranteed maximum price.

01:36 5        These particular types of contracts.  Cost plus with a

01:36 6   guaranteed maximum price because the contractor is essentially

01:36 7   spending the owner's money, have a particular provision that is

01:36 8   important.

01:36 9        And you will see it eventually.  But it says this, the

01:36 10  contractor accepts the relationship of trust and confidence

01:36 11  established by this agreement in convenance with the owner to

03:18 12  cooperate with the architect and exercise the contractor's

03:18 13  skill and judgment in furthering the interest of the owner to

03:18 14  furnish sufficient business administration and supervision to

03:21 15  furnish at all times an adequate supply of workers and material

03:21 16  and to perform the work in an expeditious and economical manner

03:22 17  consistent with the owner's interest.

01:37 18       And you will hear some abbreviations and terms you

01:37 19  will probably not be familiar with.  And you will hear the term

01:37 20  A 102, which is kind of the front end document which is the

03:24 21  cost plus document.

03:24 22       And there is another document called the A 201, which

01:37 23  is confusing because the numbers are precisely reversed, but

01:37 24  the A 201 is a document called the general conditions.  It is a

01:37 25  much longer document with a lot of other terms and conditions

in it; some of which is important for this case.  But what I
just read to you is out of the front end document, the A 102.

PVGC gets these projects and is looking for personnel
in Miami to serve as job site superintendent and project
manager.  They ultimately hired Robert Mick to be the project
manager.

And Mr. Mick -- you will hear from Mr. Vicari during
the interview started telling Mr. Vicari look, I can be the
project manager, I can provide all the labor and do all the
work.

And Mr. Vicari said no, no, no you have to be either
the project manager or the subcontractor; you cannot be both.
For two reasons; one that is our company policy, and it is also
a conflict of interest for the project manager to be a
subcontractor and two, because there is a specific provision in
our contract with the owner that prohibits this.

In this particular case the funding for this project
was not coming from just a traditional lender, it was also
coming from public, State and Federal funding for the
rehabilitation of these apartment buildings.

So, Mr. Vicari gives Mr. Mick a choice, you can be a
project manager or you can be a subcontractor.  Mr. Mick says I
want to be a project manager so they go ahead.

So the project starts and this company called Level Z
shows up.  One of Mr. Mick's job was to find subcontractors.

01:39  1    There were a lot of subcontractors that were involved but part

01:39  2    of his job was to find subcontractors.  He bring this group

01:39  3    Level Z onto the job who starts doing work.

01:39  4        It turns out Level Z is this company -- and you will

01:39  5    hear it is called Zpaces -- so Zpaces shows up and they start

01:40  6    doing work.  Mr. Vicari finds out that Zpaces or Level Z is

01:40  7    owned by Mr. Mick.  He says, this is not going to work and that

01:40  8    is why Level Z was never given a subcontract.

01:40  9        I will get into that more in a moment but I wanted to

01:40  10   talk about that particular contractural provision.  Here is

01:40  11   what it says.

01:40  12       It says "consistent with FHFC regulations under no

01:40  13   circumstances shall the contractor contract with any

01:40  14   subcontractor supplier or any other person or entity providing

01:40  15   labor, work services or furnishing materials or equipment to

03:31  16   the project who is a related party to the contractor."

01:41  17       For purposes of section 7.8 the term related party

01:41  18   shall mean a parent, subsidiary, affiliate or other entity

01:41  19   having common ownership or management with the contractor, any

04:24  20   entity in which the contract -- in which any stockholder and/or

04:24  21   management employee of -- the contractor owns any interest in

04:24  22   excess of ten percent in the aggregate of any person or entity

04:25  23   which has the right to control the business or the affairs of

04:25  24   the contractor."

04:25  25

04:25  1        Sort of confusing but it is exactly what I was just

04:25  2  talking about.  And you can understand why that would present

04:25  3  itself as a conflict of interest.

04:25  4        So that relationship was a problem and so Mr. Vicari

01:41  5  says -- he says I will find another subcontractor to take over

01:41  6  this work.  Along comes A.T.O. Golden.

01:42  7        What was happening in the background -- which we

01:42  8  believe the evidence will show the opposite of what was

01:42  9  suggested -- this is where it is important to pay attention to

01:42  10  the chronology.

01:42  11        There is some information about Zpaces that will be

01:42  12  presented to you in March.  But there is not any after March.

01:42  13  That will become important for reasons that you will see.

01:42  14        So, in March this comes to light.  Mr. Vicari says you

01:42  15  have to get somebody else to do this scope of work, Zpaces

04:32  16  cannot do that because you own an interest in it, it is a

04:32  17  conflict, and it puts me in breach of my contract with the

01:42  18  owner.

01:42  19        So Mr. Mick and a woman by the name of Amalia Logunova

01:42  20  who -- I left something out, I'm sorry, I have to go back.

01:42  21  There was a contract signed between PVGC and Mr. Mick's

01:42  22  company, a company called Ecolific Technologies to provide

01:42  23  these project manager services.

01:43  24        In that agreement you will see that Ecolific

01:43  25  Technologies has what is called a fiduciary duty to PVGC.  You

1   will hear what that means.  It describes it as a fiduciary

2   duty.  Let me get back to where I was; I'm sorry for the

3   detour.

4           So, Mr. Mick while he owned Zpaces acquires this

5   A.T.O. business which was a company that was out of business,

6   was dissolved, owned by a guy named Luis Torres who you will

7   hear from I expect.

8           In any event, Ms. Logunova had no experience in

9   construction.  She had been his personal assistant and done

10   some other things but no experience to speak of in

11   construction.

12           So Mr. Mick buys A.T.O. and transfers his interests in

13   A.T.O. and Zpaces to Ms. Logunova.  Does not tell PVGC that

14   that is what has happened.

15           Interestingly in this deal Mr. Mick -- although you

16   will hear he has no more interest in the company -- he had a

17   right to demand that interest back at any time for no money.

18   So he had a continuing right as things go forward to say give

19   me back Zpaces, gave me back A.T.O. at any time.

20           From PVGC's perspective what they see is this new

21   subcontractor shows up, A.T.O., to do the scope of work.  So

22   there are some negotiations over a contract, the actual

23   subcontract gets signed, and then moving forward to June, there

24   start to be rumors about some relationship between Mr. Mick and

25   A.T.O. Golden.

01:44  1          Mr. Vicari hears these rumors and says this was

01:45  2  supposed to have been solved a long time ago.  He said I will

01:45  3  give you an affidavit that says -- Mr. Mick says I have no

01:45  4  interest in A.T.O. Golden and Ms. Logunova also gives an

01:45  5  affidavit that says I have no interest in A.T.O. Golden.

01:45  6          What is not in the affidavit is, oh, by the way Mr.

01:45  7  Mick has the ability to demand it all come back to him at any

01:45  8  time.

01:45  9          While this is going on in June -- April -- March is

01:45  10  this disaster with this other subcontractor.  To make a long

01:45  11  story short -- actually two companies, one that was making the

01:45  12  panels and one that was going to put them on the building.

01:45  13          They were related companies.  It turns out they had no

01:45  14  idea what they were doing -- they were on the job three months

04:34  15  and the project was about two or three months behind over that

01:45  16  three-month period in their work.

01:45  17          It was a disaster as you can imagine working on that

01:45  18  schedule with a project this size it created a lot of time

01:46  19  requirement for the other management -- actually for all the

01:46  20  management of PVGC.

01:46  21          I want to take a little detour and talk about how

01:46  22  payments work on a construction project.  All of these projects

01:46  23  were being billed on what is called a percentage of completion

01:46  24  basis.

01:46  25

01:46 1        So the project is broken up into lots of little line

01:46 2    items on something called a schedule of values.  Each one of

04:35 3    those items has a value assigned to it.

01:46 4        For example, one item might be remove the cabins from

01:46 5    all this particular type of apartment.  Another line item might

04:36 6    be replace the cabinets, and so each of those has a value.  The

01:46 7    subcontractor bills PVGC and PVGC bills the owner based on the

01:46 8    percentage of the work that is completed.

01:46 9        So for example, if the line item were to paint four

01:46 10   rooms that were the same size, each of those rooms would be

01:47 11   25 percent.  So you would finish one bill 25 percent, next

01:47 12   fifty percent and so on.

01:47 13       There are well over a hundred of these line items

01:47 14   because of the nature of the product.  So the way it works is

01:47 15   that the subcontractors submit their applications to the owner

04:36 16   -- I'm sorry, to the contractor -- the contractor then ideally

01:47 17   does some level of review and then it gets bundled up and sent

01:47 18   to the owner for payment.

01:47 19       The normal process you will hear for PVGC is the way

01:47 20   this was supposed to work and the way it always works for them

01:47 21   is that -- let's say the payment application has to go to the

01:47 22   owner on the 25th of the month, PVGC tells the subcontractors I

01:47 23   need your applications for payment by the 20th.

01:47 24       Here's what has to happen.  You send it to me and in

01:48 25   our office in New Orleans we do some basic checks, make sure

the numbers are right, the contract amount on the schedule of

values.  Be sure the general math is correct.  Then we send it

to our project manager at the job site -- Mr. Mick at the

beginning of the project -- who then verifies the percentages

of completion because they can't verify that from New Orleans.

So, he checks to see here is where we are, is this

correct, then it comes back and then it is bundled up and sent

to the owner.

These percentages of completion, there are not always

perfect agreement on those.  You might say I think I am

25 percent complete and the contractor says I think you are 20

or they think they are 30 percent.

There may be disagreement but you are working towards

100 percent.  So if there is a disagreement between 20 and

25 percent the next month you may get to 35 percent.

So, that five percent does not vanish, you just get

paid for it later -- if that makes sense.  So, you will see

adjustments over time in the A.T.O. applications for payment to

take account for these things.

Sometimes you will find out that the amount billed in

say month three was incorrect, you are now on month five so

there needs to be an adjustments because you are ultimately now

not where you thought you would be.  This analysis has to

happen for each item on the schedules of values.

01:49  1          In any event, ideally it is all bundled up and sent to

01:49  2    the owner and is paid.   Typically in this case thirty days

01:49  3    later.   That normal process if it happens on time allows an

01:49  4    opportunity for a review of the work.

01:49  5          A.T.O. was a different story.   A.T.O.'s applications

01:49  6    for payment were routinely late which compresses the time

01:50  7    period -- because the contractor has to get it to the owner or

01:50  8    they may not be paid, and A.T.O. is not the only one.

01:50  9          The A.T.O. applications for payment routinely had

01:50  10   basic math errors that prevented them from going to the job

01:50  11   site to be checked.

01:50  12         And so -- that was a routine problem.   That became

01:50  13   important in August, which is the first payment application

01:50  14   that led to the deterioration of this relationship.

05:01  15         There is also something that happens on these

05:01  16   construction projects that is called change orders.

05:02  17         And what that is, is if the scope of work that is

01:50  18   assigned to a particular subcontractor changes, there is

01:50  19   documentation that has to happen to document that.

01:50  20         There has to be communication with the subcontractor

01:50  21   in a timely manner for the contractor to be able to document

01:50  22   that and get paid for it by the owner.

01:50  23         That's also an important part of the payment

01:51  24   application.   Those change orders have to be done and put on

01:51  25   the application for payment.

01:51 1   But that has to happen as a result of communication

01:51 2   and there were lots of communication problems about change

01:51 3   orders on this product too.

01:51 4        So, we move forward now to July.  A.T.O.'s scope was

01:51 5   growing because Mr. Mick the project manager is saying they can

01:51 6   do more and so their scope of work is growing.

01:51 7        There is a provision in the owner contractor agreement

05:02 8   that says no single subcontractor can have more than a certain

01:51 9   percentage of this work.

01:51 10       So the owner says these change orders are making

01:51 11  A.T.O.'s scope a lot bigger, I need more information.  I need

01:51 12  information about the actual costs of these change orders.  So

01:51 13  PVGC says we need information on the backup -- what those

01:51 14  change orders, A.T.O. are costing you.

01:52 15       And A.T.O. says we are not telling you.  It is a trade

01:52 16  secret what we are paying our employees, which at the time PVGC

01:52 17  thought were A.T.O.'s employees were actually Zpaces employees.

05:03 18       And you can think about why they may not have told

05:03 19  them.  But that eventually came to a head.  The owner was

01:52 20  saying we have to have these costs.  PVGC is saying to A.T.O.

01:52 21  you have to tell us your costs; A.T.O. saying no.

01:52 22       So now we move into August.  Late August Mr. Mick left

01:52 23  the project.  The subcontractor application for payment from

01:52 24  A.T.O. was due on the 20th.  Mr. Mick the project manager who

01:52 25  had this right to demand all the interest in A.T.O. back is no

01:53   1   longer on the job.  The application for payment has very

01:53   2   substantial errors in it yet again.  PVGC is on a very tight

05:04   3   timetable to get everything bundled up and sent to the owner.

05:04   4          By the time A.T.O. gets all of their math fixed, PVGC

05:04   5   has already sent the application for payment in to the owner

05:04   6   because they had not gotten it right.

05:04   7          And so there is a little bit of excitement surrounding

01:53   8   that issue.  And PVGC is able to say to the owner, hey, we just

01:53   9   got A.T.O.'s application for payment fixed, can you let us

01:53   10  remove and resubmit our application to you, and they said,

01:53   11  sure.

01:53   12         If you remember the process I told you earlier about

01:53   13  the subcontractor applications for payment you will notice I

01:53   14  left something out, and I left it out intentionally because it

05:06   15  did not happen.

05:06   16         And what didn't happen on the August application for

01:53   17  payment was the application for payment with A.T.O. going to

01:54   18  the job site and being checked and then coming back to be

01:54   19  verified and included in the application for payment.

01:54   20         It did not happen for two reasons.  One, was because

01:54   21  of the compressed timeframe and, two, Mr. Mick had left so

05:06   22  there was not a project manager in place at that particular

05:06   23  time.

05:06   24         So what happened next?  PVGC hires another project

01:54   25  manager, a guy name Jorge Ayala, and you will hear from Mr.

01:54  1   Ayala.   Mr. Ayala has 30 years experience in construction and

01:54  2   working as a project manager.

01:54  3           He will tell you when I come on a project, especially

01:54  4   one underway, I have to understand what is happening and what

01:54  5   has happened.

01:54  6           So I take all of the subcontractors' applications for

01:54  7   payment and I walk the building and try to figure out are they

01:54  8   their percentage complete.  Is this where it is supposed to be.

01:54  9   It is just a way of getting his arms around the problem. -- not

01:55  10  the problem but the project.

01:55  11          He came on the job on August 28th -- maybe 29, one or

01:55  12  the other -- he started the process that he always does.  He

01:55  13  immediately says A.T.O. has billed for work that is not here.

01:55  14          They have billed for work they have not done.  They

01:55  15  say, okay, keep going, and he keeps finding more and more and

01:55  16  more.  And this is all before any payment comes from the owner

05:07  17  for the month of August.  So he is relaying this to Mr. Vicari

05:08  18  and other people in management at PVGC and this process goes

01:55  19  on.

01:55  20          Finally the payment comes in for the owner for

01:55  21  everything -- including what had been bundled at the last

01:55  22  minute -- included from A.T.O. Golden.

01:55  23          But PVGC says -- tells the owner we have a problem

01:55  24  with one of these applications for payment, we think there is

01:56  25  overbilling.

01:56  1        They said, okay, just figure it out.  And that is

01:56  2   what PVGC did.  It is not correct -- you will hear evidence --

01:56  3   that it is not correct, that there was no communication between

01:56  4   PVGC and A.T.O. on this at all.

01:56  5        In fact, you will hear that A.T.O. had a project

01:56  6   manager whose name is Milos Skiljevic.  And George spoke with

02:33  7   Milos Skiljevic and said, come sit with me and let me show you

05:08  8   what I have on the computer.

05:08  9        I took all of this data and walked around the

05:08  10  building, looked at all of the line items and here's where I

01:56  11  think you are.

01:56  12        And Mr. Skiljevic -- he said I think you have

01:56  13  overbilled -- and Mr. Skiljevic said, you are right, we have

01:56  14  overbilled.

01:56  15        So A.T.O. did not get paid.  There was continuing

01:56  16  discussion and you will hear from Mr. Ayala I just told them to

01:56  17  get caught up with what they billed for.

01:56  18        They thought everything was going fine.  Yes, they had

01:57  19  to work and get caught up.  We then get to September and the

05:09  20  application for payment comes in, this is now September 23rd --

05:09  21        I know I'm backtracking a little because I was just at

01:57  22  September 26th.  But September 23rd the application for payment

01:57  23  comes in.

01:57  24        Again it comes in and it has substantial errors.  And

01:57  25  A.T.O. says we are going to withdraw that application for

05:10  1  payment because we realize it has some mistakes in it. We

05:10  2  realize that you have raised questions about how far along we

01:57  3  are and we will resubmit it after we get all of this sorted

01:57  4  out.

01:57  5          You will see an e-mail where A.T.O. says that Mr. Mick

01:57  6  wrote that e-mail.  It did not come from him, but he is the one

01:57  7  that wrote it.

01:57  8          So we have the August payment application that Mr.

05:11  9  Ayala has determined is over paid substantially.  And then we

01:57  10  have September that was then submitted and withdrawn.  We then

01:58  11  move to October.

01:58  12          October 17th -- on October 17th A.T.O. knowing now

01:58  13  that they -- the overbilling has been recognized and says we

05:11  14  demand that you pay for all of August and September and all

01:58  15  these change orders that have not been approved and properly

01:58  16  submitted, we want all of this in two days or we quit.  They

01:58  17  quit two days later.

01:58  18          Then we move ahead to October 27 after they had been

01:58  19  off the job for ten days and lo and behold now we get an

01:58  20  application for payment from A.T.O. -- a new corrected one for

01:58  21  September and also one for October.

01:58  22          Those were never submitted upstream to the owners

01:58  23  because of the concerns about the overbilling.  After PVGC

01:58  24  finished all of this analysis of every line item including

01:59  25  things for which you will see there was no work done, PVGC

01:59   1   credited back to the owner as a deduction on the next payment

09:36   2   application -- more than about 40 or $50,000 collectively on

01:59   3   both projects that A.T.O. billed in August.

01:59   4           So they gave the money back to the owner through a

01:59   5   credit -- on the December application for payment that is when

01:59   6   it was all straightened out.  PVGC had to hire someone else to

01:59   7   do the rest of the work.

01:59   8           It never got paid back -- or never got paid -- for the

01:59   9   August payment application back from the owner because they

09:38  10   said we have overbilled you.  We are not asking you to pay the

09:38  11   bill because we don't think you owe us that money.

02:00  12           The September and October applications for payment

02:00  13   were never submitted.  One of the things you will hear that is

02:00  14   common in construction in subcontracts because of this issue

09:39  15   and because of a lot of other issues, which is called a pay

09:39  16   when paid or pay as paid clause.

02:00  17           It means what it sounds like.  It means a provision in

02:00  18   the contract -- in this case entered into between two

02:00  19   commercial parties -- PVGC and A.T.O. and says we don't have to

09:47  20   pay you for your work until we get paid for it.

02:00  21           We are not required to fund your operations, you

02:00  22   should have enough capital to do what you need to do.  So, when

09:49  23   we get paid for your work, we will pay you.

09:49  24           And so, as it stands today, PVGC has never been paid

02:00  25   because it credited back the August application for payment.

1    It has never been paid back for the September application for

2    payment, which was never submitted until after A.T.O. left the

3    job site and it has never been paid for the October payment.

4    All of the work going forward had to be done by someone else. I

5    told you about the chronology -- especially on the Zpaces

6    issue.

7            How after March you will not see documentation about

8    Zpaces until it is further along -- until it comes up in June.

9    Another one of the conditions for payment in the subcontract is

10   lien releases and documents from people that are downstream

11   from the subcontractor.

12           And that is important for a couple reasons.  And you

13   will see that the subcontract says if you hire someone

14   downstream from you, you have to tell us because we have a

15   responsibility to the owner for it, but also we have to be sure

16   you are paying them so that does not cause a problem with our

17   work going forward.

18           You will not see a contractural notice or approval

19   --it also says we have the right to approve.  You will not see

20   that with respect to Zpaces anything from A.T.O. to PVGC saying

21   can we use Zpaces.  You will not see that.

22           Also there is supposed to be a lien releases from

23   everyone that is downstream from you with each application for

24   payment saying we have been paid -- or we have been paid -- we

25   waive our right to file a lien because we have been paid.

02:02    1          THE COURT:  Five minutes.

02:02    2          MR. PARTINGTON:  Thank you, Your Honor, and I'm almost

02:02    3   there.  You will not see a lien release from Zpaces after the

02:02    4   initial issues came up in March.  It is entirely absent.  The

02:02    5   only lien releases that A.T.O. turned in were their own.  Here

02:02    6   is where we are.

02:02    7          PVGC does not owe A.T.O. money because A.T.O. billed

02:03    8   for work it did not do.  PVGC had to credit -- the sum total of

02:03    9   about $240,000 to the owner.  PVGC has never been paid for any

02:03   10   work after that because of overbilling.

02:03   11          Then the conditions to payment that were agreed to

02:03   12   between the parties has not been fulfilled, so PVGC does not

02:03   13   owe A.T.O. a nickle.  We have a counterclaim against A.T.O.

02:03   14   Golden.

02:03   15          It has to do with the -- as I told you there is a cost

10:44   16   plus contract.  There is an overhead and profit component to

10:44   17   what we are entitled to be paid.  The 230,000 we credited back

02:03   18   was for A.T.O.'s work.

02:03   19          There is also an additional 14 percent that we would

02:03   20   have been entitled to be paid had we ultimately been entitled

02:03   21   to keep the money for A.T.O.'s work, but we could not because

02:03   22   we overbilled -- they overbilled us and so we had to then

10:46   23   credit it back.  And so that is our counterclaim.

02:04   24          At the end of the week we will ask you to find that

02:04   25   PVGC does not owe A.T.O. any money because A.T.O. overbilled

02:04  1    the conditions for payment have not been fulfilled and A.T.O.

02:04  2    owes us money back.  Thank you.

02:04  3            THE COURT:  Thank you, counsel.

02:04  4            MS. BLACK:  Good afternoon, ladies and gentlemen, I am

02:04  5    Kelsey Black and I have the privilege of representing the

10:47  6    surety in this case Allied World.

02:04  7            I know that counsel has been up speaking for the last

02:04  8    hour, and I am sure you are a little tired, so I will try to

02:04  9    keep it as quick and simple as possible.

02:04  10           I am accompanied by my colleague Jonathan Cohen and

02:04  11   Mr. Keating who is a representative of Allied World Insurance.

02:04  12   Mr. Keating is the head of the Surety Division for Allied.  His

02:05  13   job entails working with general contractors like Pete Vicari

02:05  14   who purchased the bond product.

02:05  15           As you heard Mr. Vicari is the owner of Pete Vicari

02:05  16   General Contractor.  And you will hear that he purchased a

02:05  17   surety bond product from my client Allied World Insurance

02:05  18   Company.

02:05  19           When you hear that Allied World Insurance Company, one

02:05  20   would assume I am talking to you about insurance products, but

02:05  21   I am not.  The surety division calls what are called T bonds

11:00  22   and performance bonds to general contractors.

02:05  23           And so in a modern day construction context, what a

02:05  24   surety does is assures the owner of the project that their land

02:06  25   can't be lien'd by a subcontractor, like the plaintiff here,

02:06  1    for an issue arising out of payment like we have in front of

02:06  2    us. Just like what happened here, the plaintiff can come to

02:06  3    Allied World and say, hey, Mr. Vicari is not paying us, surety,

02:06  4    you need to pay us.  The inquiry does not end there from the

02:06  5    surety's standpoint.

02:06  6            There are a couple of other factors involved that Mr.

01:06  7    Keating explain this to you as the trial goes on how the --

01:06  8    later on in the trial I should say -- how the surety product

02:06  9    works.

02:06  10           It is not insurance, it is a three party relationship.

02:06  11   A relationship between the owner, the surety and the general

02:06  12   contractor.  The biggest difference between insurance and the

02:06  13   surety bond is that the surety does not anticipate a loss.

02:06  14           Because they have the absolute right if they are in

01:07  15   this position where they have to pay money to a claimant to get

02:07  16   it back from Pete Vicari General Contractor and with that right

02:07  17   comes some responsibility.

02:07  18           So, here Pete Vicari General Contractor paid the

02:07  19   surety the payment bond from Allied and then as you heard from

02:07  20   Mr. Taylor and Mr. Partington a dispute arose over whether

02:07  21   certain work was performed and billed for, whether it was not

02:07  22   performed and billed for.

02:07  23           When it became clear to the plaintiff that Pete Vicari

02:07  24   was giving them a hard time on payment, they turned and sued

02:07  25   Allied World and said you need to pay me.

02:07   1          But Allied World -- as Mr. Keating will explain to

02:07   2   you, in a normal surety claim Allied has time to investigate

02:07   3   the claim.

02:07   4          Here on the same day that the plaintiff submitted the

02:07   5   completed proof of claim which is the form of documents that

02:07   6   Mr. Keating requests (inaudible) and they went ahead and sued

02:08   7   us here in Federal Court the very same day.

02:08   8          So the normal investigation process was cut very short

02:08   9   by the lawsuit.  At that point the lawyers get involved -- like

02:08  10   any other lawsuit entails -- and we go through this process

02:08  11   called discovery.

02:08  12          And you will hear through the evidence in this case

02:08  13   what sort of -- as Mr. Partington just explained to you -- the

02:08  14   documentation that they were requesting to show that, yes,

02:08  15   these payment applications showed work that was actually

02:08  16   performed was being billed for.  And that is where the problem

02:08  17   arose.

02:08  18          So, this case does boil down to one simple statement.

02:08  19   You have heard a lot about what the evidence is going to show.

02:08  20   I will not reiterate all the issues from the defense

01:09  21   perspective in this case.

01:09  22          But what I would like to leave you with is a

01:09  23   subcontractor only gets paid for the work it performs.

02:09  24          Thank you and we can get to the evidence in this case.

02:09  25

02:09  1          THE COURT:  Thank you.  All right.  Ladies and

02:09  2    gentlemen, we will take a quick break, you can get your note

02:09  3    pads and get a cup of coffee and we will return in about seven

02:09  4    minutes and start with the evidence in this case.  Don't talk

02:09  5    about the case with each other.

02:09  6          COURT SECURITY:  All rise.

02:09  7                    JURY EXCUSED

02:09  8          THE COURT:  All right.  I am going to give you this

02:09  9    one final public service announcement in descending order.

02:10  10   Counsel, you are speaking way too fast, really fast, and you

02:10  11   are not speaking into the microphone.

02:10  12          So, you all need to slow down and articulate your

02:10  13   words.  Because it appears that counsel on both sides tend to

01:11  14   start speaking and then trail off where we cannot hear you and

01:11  15   then start up again.

02:10  16          And I am telling you this because if you don't Ms.

02:10  17   Sanders will just have blank, blank, blank until she picks up a

02:10  18   word that she can hear.  So slow down, enunciate and speak into

19   the microphone.

20          COURT SECURITY:  All rise.

21                    COURT IN RECESS.

22          THE COURT:  Bring in the jury, please.

23          COURT SECURITY OFFICER:  All rise, please.

02:25  24          THE COURT:  Everyone may be seated.  Mr. Taylor call

02:25  25   your first witness.

02:25  1          MR. TAYLOR:  Plaintiffs call Robert Mick.

02:25  2          THE COURT:  All right.

02:25  3                      WITNESS SWORN

02:25  4          COURTROOM DEPUTY:  Please state your full name for the

02:25  5  record.

02:25  6          THE WITNESS:  Robert Patrick Mick.

02:25  7          THE COURT:  You may proceed, Mr. Taylor.

02:25  8          MR. TAYLOR:  Thank you, Your Honor.

02:25  9  Q.   Mr. Mick, where do you currently reside?

02:25  10  A.   In Orlando, Florida.

02:25  11  Q.   What do you do for employment?

02:25  12  A.   I am the president and CEO of Zpaces.  Currently we are

02:26  13  engaged in a position as director of commercial construction,

02:26  14  senior project manager for Parks Square Homes in Orlando,

02:26  15  Florida.

02:26  16  Q.   Please tell the jury a little about your background in the

02:26  17  construction industry.

02:26  18  A.   I grew up in the construction industry.  My father was in

02:26  19  the tractor business.  I was a general engineering contractor

02:26  20  by the time I was 20 years old in California, relocated to the

02:26  21  State of New York in my mid twenties where I managed a mill

02:26  22  work company and lumber company; a division of a lumber

02:26  23  company.

02:26  24      After that I became a framing contractor, moved to

02:26  25  Connecticut to one of the largest framing contractors in

02:26  1   Connecticut in the mid to late eighties.  After that we formed

02:27  2   a company --

02:27  3         THE COURT:  You are going to have to slow down, speak

02:27  4   into the microphone. Take a deep breath between sentences if

02:27  5   you would.

02:27  6   Q.  Please continue.

02:27  7   A.  -- where we engaged in real estate development, investment

02:27  8   of subdivisions, of single family houses and apartment

02:27  9   complexes and retail shopping centers, commercial properties.

02:27  10        In the mid to late 90's we relocated back to Connecticut

02:27  11  from California and continued building large multi family

02:27  12  complexes as well as shopping centers.

02:27  13        And finally in the late -- 2010, 2011 relocated to -- or my

02:27  14  position relocated to New York where I worked as the senior

02:28  15  project manager for another large developer who was developing

02:28  16  the same types of properties which were mixed use properties,

02:28  17  large apartment complexes and shopping centers and hotels.

02:28  18        And in 2013, 2014 relocated to Florida where I have worked

02:28  19  in Miami for Pasadena Communities as the senior project manager

02:28  20  on a 1172 unit apartment market rental property.

02:28  21        I was with that company three years and then met Mr. Vicari

02:28  22  and took the position as the senior project manager for the

02:28  23  Civic Tower project.

02:28  24  Q.  And do your hold any licenses?

02:28  25  A.  Yes.  I was a general engineering contractor in the State

02:29 1 of California, through the late seventies, and general building

02:29 2 contractor in Connecticut in the eighties, as well as a framing

02:29 3 contractor.

02:29 4 Q.   Do you own a company called Ecolific Technologies?

02:29 5 A.   I do.   I am the sole managing member and president of that

02:29 6 company.

02:29 7 Q.   How long have you held that position?

02:29 8 A.   Since.

02:29 9 Q.   When did you form Ecolific Technologies?

02:29 10 A.   In 2003.

02:29 11 Q.   Generally what certificates does Ecolific Technologies

02:29 12 provide?

02:29 13 A.   Ecolific Technologies was started as a high performance

02:29 14 building envelope technology developer had a brand or a sub

02:29 15 company called Avias Systems which developed (UNINTELLIGIBLE)

12:15 16        THE COURT:   Please slow down and speak clearly so that

12:15 17 Ms. Sanders can make her record.

02:29 18 A.   Basically it was designed to be a company that provided

02:30 19 consulting to services to real estate developers that want to

01:07 20 build high energy efficient buildings.

02:30 21 Q.   Were you contacted by Pete Vicari General Contractors as

02:30 22 well as Ecolific Technologies about the Civic Tower project?

02:30 23 A.   Yes.   Pete Vicari contacted me in late January early

02:30 24 February of 2017 regarding the project called the TM Alexander

02:30 25 and after I became more engaged I found out it was actually

02:30  1   being renamed the Civic Tower, Civic Tower Senior projects.

02:30  2   Q.   What kind of project was the Civic Tower?

02:30  3   A.   These projects were basically rehab, reskin where we remove

02:31  4   the exterior wall panels that surround the building, replace

02:31  5   them and at the same time renovate the interior -- the kitchens

02:31  6   and bathroom flooring, as well as replace the exterior panels.

02:31  7   Q.   What was the value of the renovation project for Civic

02:31  8   Tower?

02:31  9   A.   Initially I was given to believe it was about $19 million

02:31  10  but later found out it was more like 34.

02:31  11  Q.   Had you worked with Pete Vicari General Contractors prior

02:31  12  to the Civic Tower project?

02:31  13  A.   No.

02:31  14  Q.   You testified you met Mr. Vicari after he contacted you

02:31  15  about the project.  Can you describe for the jury about your

02:31  16  first meeting with Mr. Vicari?

02:31  17  A.   I met with Mr. Vicari on the job site at the TM Alexander

02:32  18  building and his son PJ where they outlined the project for me

02:32  19  what they needed have done.  And asked if I had the resources

02:32  20  to help.  They had no one to manage this project.  They had no

02:32  21  resources in Florida whatsoever.

02:32  22       I was kind of taken back but they seemed like good people

02:32  23  and I had the resources available and the time to take on the

02:32  24  project and help them get it done and I knew I could get it

02:32  25  done in time.  I finished building --

02:32  1        THE COURT:  Wait, wait.  I think you answered that

02:32  2   question about three sentences ago.

02:32  3        Let's have another question.

02:32  4   Q.  Did Mr. Vicari tell you when he wanted you to -- did Mr.

02:32  5   Vicari extend an offer of employment?

02:32  6   A.  Not immediately.

02:32  7   Q.  Did he tell you when he -- if he would offer you a

02:33  8   position?  Did he tell you when he needed you to start?

02:33  9   A.  He told me he had a short list of candidates.

02:33  10        THE COURT:  Mr. Mick take a deep breathe.  Slow down.

02:33  11   Mr. Taylor perhaps help your witness.

02:33  12   Q.  Mr. Mick, did you discuss your credentials with Mr. Vicari

02:33  13   once you met with him regarding the project?

02:33  14   A.  At length -- it was a lengthy interview.

02:33  15   Q.  Did he have a copy of your resume?

02:33  16   A.  He did.

02:34  17   Q.  Showing you what is marked as Exhibit 57; do you recognize

02:34  18   this document?

02:34  19   A.  It is the generic cover letter attached to my resume which

02:34  20   is listed on Indeed as well as Monster and the other services

02:34  21   or sites seeking project management personnel.

02:34  22   Q.  Do you recognize the attachment?

02:34  23   A.  Yes.

02:34  24   Q.  What is that?

02:34  25   A.  A copy of my resume.

02:34  1          MR. TAYLOR:  At this time I would like to move into

02:35  2     evidence Plaintiff's 57.

02:35  3          MR. PARTINGTON:  We would object as to hearsay.

02:35  4          THE COURT:  The letter is hearsay.  I take it Mr. Mick

02:35  5     gave this letter to Mr. Vicari?

02:35  6          MR. TAYLOR:  It is not for the truth of the matter,

02:35  7     Your Honor.

02:35  8          THE COURT:  Take the letter out.  I will admit the

02:35  9     resume, Plaintiff's 57.

02:35  10          Mr. Mick, I take it this is a part of your business

02:35  11     you give people various persons interested in employing you.

02:35  12          THE WITNESS:  Yes, Your Honor it is used as a tool so

02:35  13     that --

02:35  14          THE COURT:  It is a part of contract business records.

02:35  15          THE WITNESS:  Yes.

02:35  16          THE COURT:  57 is admitted.

02:35  17     Q.  I will turn to the third page of your resume.  Do you see

02:35  18     the highlighted section?

02:35  19     A.  I do.

02:36  20     Q.  Did you inform Mr. Vicari during a meeting at the project

02:36  21     site of your relationship with a company called Spaces, LLC as

02:36  22     well as --

02:36  23          MR. PARTINGTON:  Objection, leading.

02:36  24          THE COURT:  Overruled.

02:36  25          THE WITNESS:  I did.

02:36  1  Q.  Can you tell us about the conversation regarding the

02:36  2  company you had with Mr. Vicari?

02:36  3  A.  He was specifically interested in whether I had people

02:36  4  available to begin the work immediately in preparation for the

02:36  5  construction work.

02:36  6      I informed him that that's exactly what that company does,

02:36  7  the construction management, project management and labor

02:36  8  needed to do -- certain components of the work that he needed

02:36  9  done.

02:36  10  Q.  And the company you are referencing to Zpaces?

02:37  11  A.  Yes.

02:37  12  Q.  How did Mr. Vicari respond?

02:37  13  A.  He was very enthusiastic.

02:37  14  Q.  Did Mr. Vicari ask whether you could bring your resources

02:37  15  with Zpaces on to the project?

02:37  16  A.  Yes, he was very enthusiastic about me being able to bring

02:37  17  the personnel needed to do the work and manage the project.  In

02:37  18  that conversation I let him know that I had people who could

01:14  19  perform the work needed as superintendent and as project

02:37  20  administration as well as the labor that was needed for the

02:37  21  preparation of the job site, as well as staff the job as

02:37  22  needed, so that all the contractors would be able to have

01:16  23  access to all of the work areas that they needed to work in. So

02:38  24  he was very well informed.

02:38  25  Q.  How long did your initial meeting with Mr. Vicari last?

02:38   1   A.   About an hour and a half.

02:38   2   Q.   What was the next point of contact?

02:38   3   A.   The next day he asked if I could start with the project the

02:38   4   following week.

02:38   5   Q.   How did you respond?

02:38   6   A.   I said, yes.

02:38   7   Q.   Did you have a contract for project management services

01:17   8   with Pete Vicari General Contractors?

02:38   9   A.   Yes, I did.

02:39   10   Q.   Mr. Mick, showing you Exhibit 6.  Can you identify the

02:39   11   exhibit for the jury?

02:39   12   A.   It is a copy of the project management agreement between

02:39   13   myself, Ecolific Technologies and Pete Vicari General

02:39   14   Contractor.

02:39   15   Q.   What date is the agreement dated?

02:39   16   A.   It is dated the 15th of February.

02:39   17   Q.   When did you start working?

02:39   18   A.   I started working on the eighth of February.

02:39   19   Q.   What services were being provided?

02:39   20   A.   Project management services as well as whatever was needed

02:40   21   in order to complete the work.  There are provisions in there

02:40   22   that indicate --

02:40   23        THE COURT:  No, no; it's not in evidence yet.

02:40   24        MR. TAYLOR:  I thought there was no objection.  We

02:40   25   would like to move into evidence Exhibit 6.

02:40   1          THE COURT:  Any objection?

02:40   2          MR. PARTINGTON:  No objection.

02:40   3          THE COURT:  All right.  Exhibit 6 is admitted.

02:40   4   Q.  You said you were working on the job site prior to

02:40   5   February 15th, correct?

02:40   6   A.  Correct.

02:40   7   Q.  Leading up to February 8th, did you have communications

02:40   8   with Pete Vicari General Contractors about staffing needs and

02:40   9   such?

02:40   10  A.  There were several conversations, yes.

02:41   11  Q.  Showing you what has been premarked as Defendant's Exhibit

02:41   12  7.  It is a two page e-mail starting on February 3rd, 2017

02:41   13  between yourself and Mr. Vicari.  Do you see that?

02:41   14  A.  Yes.

02:41   15  Q.  Do you recall preparing this e-mail between yourself and

02:41   16  Mr. Vicari?

02:41   17  A.  It looks like it starts on the third of February.  He is

02:41   18  advising me that --

02:41   19          THE COURT:  No, no; the question is do you recall

02:41   20  preparing the e-mail.

02:41   21          THE WITNESS:  I recall preparing the response to the

02:41   22  e-mail.

02:42   23          MR. TAYLOR:  I would like to move into evidence

02:42   24  Defendant's Exhibit 7.

02:42   25          MR. PARTINGTON:  No objection.

02:42  1          THE COURT:  It is admitted without objection; you may

02:42  2  bring up the screens.

02:42  3  Q.  Can you explain the e-mail from Mr. Vicari to you on

02:42  4  February 3rd?

02:42  5  A.  It seems to be an agreement letter where he agrees to pay

02:42  6  certain wages to me as well as Chris Little and Ted Brown.

02:42  7  Q.  Who is Chris Little and who is Ted Brown?

02:42  8  A.  Chris Little is a licensed architect who is a partner in

02:42  9  Zpaces.  Ted was a person that we worked with for several years

02:42  10  who had an engineering background and a significant amount of

02:42  11  construction experience.

02:43  12  Q.  What roles were they to have on the project?

02:43  13  A.  At the outset Chris was an assistant project manager of one

02:43  14  building and Ted was the superintendent and project engineer --

02:43  15  superintendent on one building and project engineer for both.

02:43  16  Q.  The first page of the last e-mail mail is dated

02:43  17  February 5th, 2017.  Do you recall responding to Pete Vicari

02:43  18  and providing him with a draft of your Ecolific Technologies

02:43  19  contract?

02:43  20  A.  Yes, I do.

02:43  21  Q.  How long after this e-mail on February 5th, 2017, was it

02:44  22  until you began performing services?

02:44  23  A.  Three days.

02:44  24  Q.  What was significant about February 8, 2017?

02:44  25  A.  February 8th was the day the new owner took ownership of

02:44  1   the properties.

02:44  2   Q.  You testified that Chris Little and Ted Brown were also

02:44  3   being hired to manage the project site.  If you could tell the

01:21  4   jury who the management team was going to be on this project

02:44  5   locally?

02:44  6   A.  The local project management team was myself as senior

02:44  7   project manager, Chris Little who is the architect and the

02:44  8   project manager and superintendent on the larger building Civic

02:44  9   Towers.  Ted was to be the superintendent on the senior tower

02:44  10  building which was slightly smaller.  He had extensive

02:44  11  experience in mechanical electrical and plumbing, so he was

01:22  12  also the project engineer.

02:45  13  Q.  As senior project manager did you familiarize yourself with

02:45  14  the contracts between Pete Vicari General Contractors and the

02:45  15  owner of the project?

02:45  16  A.  No. Initially I was not allowed to see the contract between

02:45  17  the owners and Pete Vicari.  I requested it for several weeks.

02:45  18  I believe it was probably over a month before I saw the

02:45  19  contract.

02:45  20  Q.  What was your understanding of how long in duration you had

02:45  21  to get this contract completed for Pete Vicari General

02:45  22  Contractors?

02:45  23  A.  It was my understanding it needed to be done by December

02:45  24  first of 2017.

01:23  25  Q.  Did you have an understanding of the consequences of

01:23 1  delivering the project late beyond December 1st, 2017?

02:46 2  A.   Yes.  He told me he had a $5,000 a day damage penalty for

02:46 3  each building if they were not completed on time.

02:46 4  Q.   So if that is for each building would that be a cumulative

02:46 5  delayed damages of $10,000 a day for the project?

02:46 6  A.   Yes, it would.

02:46 7  Q.   As you started -- began work on this project -- if you

01:26 8  would please tell the jury what you did when you began working

02:46 9  to get this project up and going.

02:46 10 A.   The first thing we had to do was prepare the project for

02:46 11 construction.  So we engaged personnel to do the -- put up the

02:46 12 signs, fences, the barricades and cordon off the areas that

02:46 13 were to be built.

02:46 14      The very next thing that happened was preparation of both

02:47 15 buildings that needed concrete poured for slabs where they

02:47 16 would direct the hoists to lift people up on the side of the

02:47 17 building to perform the work on each floor.  So the concrete

02:47 18 work started immediately as well as preparation of the site.

02:47 19 Q.   Who was engaged to start performing work on the job?

02:47 20 A.   Zpaces.

02:47 21 Q.   What work specifically was Zpaces engaged to perform?

02:47 22 A.   Zpaces was engaged to perform all of the setup, the

02:47 23 interior demolition and eventually there was more work added,

02:47 24 replacing the cabins, the flooring.  There was a significant

02:47 25 list of items that Zpaces needed to perform.

02:48   1   Q.   Showing you what has been marked as Defendant's Exhibit 14.

02:48   2   Do you recall this e-mail?

02:48   3   A.   I do.

02:48   4   Q.   And attached to this e-mail?

02:48   5           THE COURT:   Are you --

02:48   6           MR. TAYLOR:   I would like to move into evidence

02:48   7   Defendant's Exhibit 14.

02:48   8           MR. PARTINGTON:   No objection.

02:48   9           THE COURT:   Defendant's Exhibit 14 is admitted without

02:48   10  objection.

02:48   11  Q.   If you could explain what this e-mail is memorializing?

02:48   12  A.   The initial work done on the project.

02:48   13  Q.   Attached to the e-mail there is a document entitled RP mix

02:49   14  expenses; do you see that?

02:49   15  A.   Yes.

02:49   16  Q.   Please describe this document for the jury.

02:49   17  A.   This document shows the name of people working on the

02:49   18  project and the amount of time that they spent on it for this

02:49   19  period; the amount that they were being paid per day initially,

02:49   20  what they did and where they did it.

02:49   21  Q.   Do you see where I am pointing here?   Can you describe what

02:49   22  is being charged other than labor rates?

02:49   23  A.   There was an overhead and profit added for this.   It looks

02:50   24  like there were some materials from Home Depot; more

02:50   25  descriptions of people -- the work they did and where they did

02:50   1   it.

02:50   2   Q.   This is occurring on February 17th and you said you started

02:50   3   on February 8th.   Who is Joey Baudoin?

02:50   4   A.   Joey Baudoin works in Pete Vicari's office in New Orleans.

02:50   5   I believe she's kind of an assistant administrator and

02:50   6   bookkeeper.

02:50   7   Q.   Did Ms. Baudoin object to you submitting these expenses for

02:50   8   labor and overhead and --

02:50   9   A.   No.

02:50   10  Q.   Did Mr. Vicari ever object to you submitting these

02:51   11  expenses?

02:51   12  A.   He did not.

02:51   13  Q.   Showing you what has been marked as Defendant's Exhibit 18.

02:51   14  I would ask you to take a look at it --

02:51   15          THE COURT:   Can I ask counsel to come over here.   Do

02:51   16  we have a pool of documents -- he is taking it from your

02:51   17  exhibit list -- can I proceed on the assumption you don't have

02:51   18  an objection so we can move this along?

02:52   19          MR. PARTINGTON:   Well, I am not necessarily agreeing

02:52   20  that every document is appropriate for -- each witness will be

02:52   21  appropriate for each document or that any document would be

02:52   22  appropriate, for example, with Mr. Mick.

02:52   23          THE COURT:   I am not following that.   My understanding

02:52   24  is if it is in your listed exhibits you want it to come into

02:52   25  evidence.

02:52  1        Whether Mr. Mick has any personal knowledge or has

02:52  2   seen the document obviously will go to his credibility, but the

02:52  3   ones we have seen so far are e-mail exchanges where he gets the

02:52  4   e-mail.

02:53  5        Let's move forward for now; but tonight before you

02:53  6   leave I am ordering the parties to discuss what things you can

02:53  7   agree to in terms of their admissibility.

02:53  8        So we do not have to continue to go through this

01:32  9   exercise with the jury sitting there.

01:32  10        MR. PARTINGTON:  Yes, Your Honor.

01:33  11        THE COURT:  As to Exhibit 18 is there any objection?

02:54  12        MR. PARTINGTON:  No objection, Your Honor.

02:54  13        THE COURT:  All right.  Defendant's Exhibit 18 will be

02:54  14   admitted.

02:54  15   Q.  All right.  Defendant's Exhibit 18 is up on the screen.  Do

02:54  16   you recognize the document?

02:54  17   A.  Yes.

02:54  18   Q.  You start on the first page with an e-mail from your Zpaces

02:54  19   account as the president and CEO.  Can you describe why this is

02:55  20   being sent?

02:55  21   A.  This is to give Pete Vicari the information for making

02:55  22   payment to Zpaces for the work that the people that work for

02:55  23   Zpaces did on the project.  It contains the bank information

02:55  24   and advises them that insurance certificates would be following

02:55  25   the next day.

Q.  Attached to the document there are conditional lien
waivers -- upon progress -- do you see that?

A.  Yes.

Q.  Who prepared these lien waivers?

A.  I believe they were prepared by someone in Mr. Vicari's
office.

Q.  Can you describe to the jurors what the contract amount and
the highlighted portions that are printed -- that say SOV; what
does that mean?

A.  The SOV is the schedule of values, that is the acronym and
$374,850 was the amount of -- what the amount should have been
as the statement of contract amount.

Q.  When you say the contract amount; what contract?

A.  Initially there was a contract between Zpaces -- which has
a division called Level Z contracting, which does the actual
labor work.

    And the amount of the work that was intended to be done was
priced at $374,850 but for some reason when they went to send
this conditional lien waiver they had changed the amount from
374,850 to 328,950.

    At the time I did not know why it was changed.  I believe
they just added something incorrectly or made a mistake so I
was advising them of that.

Q.  So this was referencing a contract between Level Z and who?

A.  Pete Vicari General Contractor.

02:57 1   Q.   There is an attached invoice for Level Z contracting; do

02:57 2   you see that?

02:57 3   A.   I do.

02:57 4   Q.   Who prepared this invoice?

02:57 5   A.   That was prepared by Pete Vicari's office as well.

02:57 6   Q.   What is being invoiced -- what charges are being invoiced

02:57 7   on this document?

02:57 8   A.   This references demolition labor that was done to remove

02:57 9   kitchen cabins and bath cabins from 16 out of one hundred units

02:58 10  and also to remove flooring and apparently it is for 75 percent

02:58 11  of the flooring removed in 16 of a hundred units.

02:58 12  Q.   The next page is a Level Z contract, demo, drywall and

01:38 13  finish, schedule of values; do you see that?

02:58 14  A.   Yes.

02:58 15  Q.   Can you explain this document for the jurors?

02:58 16  A.   This is the amount of -- this is the scheduled and the

02:58 17  amount of work that was applicable to the Civic Tower Senior

02:58 18  building; and it has a unit price the quantity of units that

02:58 19  were required for the entire contract.

02:58 20       And it outlines on each line what the scope of work is that

02:59 21  is attributable to the quantity and price; and again the total.

02:59 22  So this is what we call a schedule of values.

02:59 23  Q.   All right.   It says client, Pete Vicari General Contractor.

02:59 24  Did you negotiate these numbers with anyone from Pete Vicari

02:59 25  General Contractors?

02:59  1   A.   Yes, PJ on Pete's orders.   He asked me to coordinate these

02:59  2   line items to make sure it was within budget and it was

02:59  3   feasible to be done with these numbers and this is what was

01:40  4   submitted and agreed to by Pete Vicari General Contractor.

02:59  5   Q.   Can you identify what amount it was that you had agreed

02:59  6   upon with Pete Vicari General Contractor?

02:59  7   A.   The total was $1,727,948.25 I think.

02:59  8   Q.   This was negotiated on behalf of which one of your

03:00  9   companies?

03:00  10  A.   Zpaces -- Level Z contracting which is the labor division

03:00  11  of Zpaces.

03:00  12  Q.   There is another conditional waiver and release upon

03:00  13  progress payment.   Do you see that?

03:00  14  A.   Yes, I do.

03:00  15  Q.   Can you please explain for the jury why there are different

03:00  16  numbers on this document?

03:00  17  A.   I don't know why they changed them.   What was submitted to

03:00  18  them was the -- for this part of the work was 283,240.32.   They

03:00  19  came back with this number 237,148.97, which was different, and

03:00  20  I was advising them in this that they have the wrong number

03:00  21  there.

03:00  22  Q.   Is this for the same tower or a different tower?

03:00  23  A.   This is for the -- I believe Civic Tower Senior.

03:01  24  Q.   There is another schedule of values; do you see that?

03:01  25  A.   Yes.



03:01  1    Q.   Can you explain what schedule of values this document
03:01  2    pertains to?
03:01  3    A.   This was for the Civic Tower Senior which was the former TM
01:57  4    Alexander building and just as the previous schedule of values
03:01  5    indicated the work for the Civic Tower this was the schedule of
03:01  6    values for the work on the Civic Tower Senior.
03:01  7    Q.   Did you negotiate these prices with Pete Vicari General
03:01  8    Contractor?
03:01  9    A.   Yes.
03:01  10   Q.   Who from Pete Vicari General Contractor did you negotiate
03:01  11   with?
03:01  12   A.   That would be PJ, Pete's son.
03:01  13   Q.   Were these prices agreed upon?
03:01  14   A.   Yes.
03:02  15   Q.   Mr. Mick, did you provide the requested lien waivers in
03:02  16   order to get paid?
03:02  17   A.   Yes.
03:02  18   Q.   Showing you what has been marked as Plaintiff's Exhibit 59.
03:03  19   Do you recognize this?
03:03  20   A.   Yes.
03:03  21   Q.   What is this?
03:03  22   A.   This is the conditional waiver and release of lien for that
03:03  23   initial amount of work that was done.  This was for the Senior
03:03  24   Tower.
03:03  25   Q.   Which company is providing this waiver --

03:03  1   A.   This is coming from Zpaces and Level Z contracting.

03:03  2   Q.   How much is being charged?

03:03  3   A.   $18,615.39.

03:03  4   Q.   The second page of the document do you recognize the

03:03  5   signature?

03:03  6   A.   Yes, I do.

03:03  7   Q.   Who signed this document?

03:03  8   A.   I did.

03:03  9   Q.   Did you provide this lien waiver to Pete Vicari General

03:03  10  Contractor?

03:03  11  A.   I did.

03:03  12  Q.   Did they pay you?

03:03  13  A.   Yes.

03:03  14  Q.   Did they ever object to the fact that you were having

02:28  15  Zpaces perform work out on the project site?

03:03  16  A.   No, quite the contrary, they were elated that we were able

03:04  17  to perform that level of work so quickly.

03:04  18       MR. TAYLOR:  Based on no objection I would move into

03:04  19  evidence Plaintiff's Exhibits 58 and 59.

03:04  20       MR. BELL:  That is correct, no objection.

03:04  21       THE COURT:  Plaintiff's Exhibits 58 and 59 are

03:04  22  admitted.

03:04  23  Q.   So the jury can see where I am pointing; this is the other

03:04  24  lien waiver?

03:04  25  A.   Yes.

03:04  1    Q.   Do you recognize the document?

03:04  2    A.   I do.

03:04  3    Q.   What is the document?

03:04  4    A.   Again, this is the lien waiver for the same time period for

03:04  5    the Civic Tower.

03:04  6    Q.   So you provided two lien waivers, one for each tower, for

03:04  7    payment on behalf of Zpaces?

03:04  8    A.   Correct.

03:05  9    Q.   Did there come a point in time that Pete Vicari General

03:05  10   Contractor asked to increase the scope of work for Zpaces?

03:05  11   A.   Yes, there was.

03:05  12   Q.   Can you describe for the jury the conversation you had with

03:05  13   Pete Vicari General Contractor.

03:05  14   A.   Sure.  Mr. Vicari had taken the original proposal with the

03:05  15   schedule of values and parsed it into sections and wanted to

03:05  16   award certain parts of it and other parts of it hold and issue

03:05  17   change orders for the work to be done.

03:05  18        Initially the amount of the contract after adding the

03:05  19   additional scope of work increased the total volume of the

02:29  20   contract from what you see in the lien waiver of -- I don't

03:06  21   recall the amounts in the lien waivers -- the 2 or $300,000 for

03:06  22   each building now increased to up to the 1.7 million in the

03:06  23   other building.  I don't recall exactly what the amounts were

03:06  24   for each contract but there were somewhere in the one and a

03:06  25   half to $2 million area each.

03:06  1        So, as that volume increased Pete and I had the

02:30  2  discussion that he would need a licensed contractor.  Zpaces

03:06  3  was not licensed as a general contractor, it was licensed as an

03:06  4  architectural and engineering company and had a labor division

03:06  5  which was not required to be licensed for the type of work they

03:06  6  did.

03:06  7        MR. PARTINGTON:  I would object as to legal opinions

03:06  8  being given.

03:06  9        THE COURT:  I would like to get back to the question,

03:06  10  Mr. Taylor.

03:06  11        The question was did you have a conversation?

03:07  12         Yes.  And I guess I would like to know when and then

03:07  13  what was discussed.  Perhaps if we did that we could avoid some

03:07  14  issues.

03:07  15        MR. TAYLOR:  Yes, Your Honor.

03:07  16  Q.  After you submitted those lien waivers that was on or about

03:07  17  February 22, 2017, when did the conversation occur with Pete

03:07  18  Vicari General Contractors regarding the increased scope of

03:07  19  work?

03:07  20  A.  Within the next several days, three or four days after that

03:07  21  was submitted.

03:07  22  Q.  You testified the scope of work increased significantly, so

02:31  23  based upon the request to increase the scope of work, what did

03:07  24  you discuss with Pete Vicari General Contractors about handling

03:07  25  the increased scope?

03:07 1   A.   I informed him that Zpaces was in the process of licensing

03:07 2   the company with several different candidates and once that was

03:07 3   done it could take on the additional work.

03:08 4           MR. TAYLOR:   I would like to show the witness

03:08 5   Defendant's Exhibit 20 for identification.

03:08 6           THE COURT:   All right; for identification.

03:08 7   Q.   This is an e-mail chain between Bridgette Saddler and

03:08 8   yourself dated Friday, March 3, 2017.

03:08 9   A.   Yes.

03:08 10  Q.   Do you recall having this e-mail transmission with Ms.

03:08 11  Saddler?

03:08 12  A.   Yes.

03:08 13  Q.   Who is Ms. Saddler?

03:08 14  A.   She is another person that works in Mr. Vicari's office in

03:08 15  New Orleans.

03:08 16  Q.   What is this e-mail regarding?

03:08 17  A.   This is a request for.

03:08 18           THE COURT:   General subject matter.

03:08 19           THE WITNESS:   Insurance.

03:08 20           MR. TAYLOR:   I would like to move in Defendant's

03:09 21  Exhibit 20 at this time.

03:09 22           MR. BELL:   No objection.

03:09 23           THE COURT:   Defendant's Exhibit 20 is admitted.

03:09 24  Q.   Mr. Mick, there are two e-mails that go through the first

03:09 25  two pages.   You write on March 3rd in regard to certain

03:09  1    insurance, you write that you will get it done on our GL

03:09  2    company this afternoon (inaudible).

03:09  3              THE COURT:  Keep your voice up counsel.

03:09  4    Q.  -- is temporary any way.  A completely different company

03:09  5    will be contracting this scope of work from here on out as per

03:09  6    our understanding with Pete.  Can you describe what you are

03:09  7    referencing here?

03:09  8    A.  This is regarding the increased scope of work and how that

03:10  9    will be contracted.

03:10  10   Q.  Bridgette Saddler responds on March third 2017 -- I have

03:10  11   highlighted the part of the e-mail I want to focus your

03:10  12   attention to.  She states I have not spoken with Pete yet since

03:10  13   your convo.

03:10  14       And I am sure he will bring me up to speed.  Meanwhile, can

02:34  15   you supply me with the name of the other company we will be

03:10  16   moving forward with so I can get started on my paperwork.

03:10  17       Can you please tell the jury about your conversation with

03:10  18   Pete Vicari regarding this matter?

03:10  19   A.  It was in those days when we were -- we had found a

03:10  20   candidate who was ready and willing to license Zpaces as a

03:10  21   general contractor and Pete and I discussed how we might be

03:11  22   able to do that.

03:11  23       So this pertains to the conversation I had with Pete saying

03:11  24   we were going to be licensing the company.  There were still

03:11  25   some issues to be resolved so there was no complete resolution

03:11 1  other than that we were moving forward with licensing the

03:11 2  company so that we could take on additional work.

03:11 3  Q.  That e-mail was on March third -- I am going to show you

03:11 4  for identification Plaintiff's Exhibit 56 -- do you recognize

03:11 5  this document?

03:11 6  A.  I do.

03:11 7  Q.  Can you describe what this document is?

03:12 8  A.  Well, this appears to be a wire transfer advice saying that

03:12 9  an amount of --

03:12 10         THE COURT:  No, no.

03:12 11 Q.  Is this a wire transfer from Pete Vicari General Contractor

03:12 12 to Zpaces?

03:12 13 A.  Yes.

03:12 14         MR. TAYLOR:  At this time I would like to move in this

03:12 15 wire transfer.

03:12 16         THE COURT:  Any objection?

03:12 17         MR. BELL:  Objection; hearsay.

03:12 18         THE COURT:  Lay a foundation, Mr. Taylor, if you

03:12 19 would.

03:12 20 Q.  As president and CEO of Zpaces, I believe you testified

02:36 21 that you billed for work performed to Pete Vicari on this

03:12 22 project.  Do you recall that testimony?

03:12 23 A.  I do.

03:12 24 Q.  Did Pete Vicari General Contractor pay Zpaces for the work

03:12 25 that are on the previous exhibits?

03:12  1   A.   Yes.

03:12  2   Q.   How did they pay you?

03:12  3   A.   By wire transfer.

03:12  4   Q.   Did you receive a wire transfer confirming -- stating that

03:13  5   Pete Vicari General Contractor paid Zpaces?

02:37  6   A.   Yes.

02:37  7   Q.   And is Exhibit 56 a business record confirmation of the

02:38  8   wire payment from Pete Vicari to Zpaces?

03:13  9   A.   Yes.

03:13  10  Q.   This is on a TD Bank account, is that the Zpaces account?

03:13  11  A.   Yes, it is.

03:13  12       MR. TAYLOR:   I would like to move in Exhibit 56 at

03:13  13  this time.

03:13  14       THE COURT:   Any objection?

03:13  15       MR. BELL:   We maintain our hearsay objection.

03:13  16       THE COURT:   Overruled; Exhibit 56 is admitted.

03:14  17  Q.   Mr. Mick, I asked you some predicate questions for the

03:14  18  Court identifying this exhibit for the jurors.   Can you explain

03:14  19  what is being referenced in this document?

03:14  20  A.   This references the payment made from Pete Vicari General

03:14  21  Contractor to Zpaces, LLC, a wire transfer in the amount of

03:14  22  $40,835.39.

03:14  23  Q.   Is that for the full amount of the work you invoiced on the

03:14  24  previous exhibit?

03:14  25  A.   It is, yes.

03:14  1   Q.  Prior to making payment to Zpaces, did Pete Vicari General

03:14  2   Contractor ever come to you and tell you that Zpaces was no

03:14  3   longer allowed to work on the project?

03:14  4   A.  Never.

03:14  5   Q.  Did anyone from Pete Vicari General Contractors issue a

03:14  6   notice of default under your project management agreement for

02:39  7   having Zpaces working under this project?

03:14  8            MR. BELL:  Objection, leading, Your Honor.

03:14  9            THE COURT:  It is and it will be the last leading

03:15  10  question.  You may answer the question yes or no, Mr. Mick.

03:15  11           THE WITNESS:  What was the question?

03:15  12           THE COURT:  Then we will find a new question.

03:15  13  Q.  Mr. Mick, did Pete Vicari General Contractor put in writing

03:15  14  to you in any form, any objection, to them paying Zpaces on

03:15  15  this project?

03:15  16  A.  No.

03:15  17           MR. BELL:  Objection, leading.

03:15  18           THE COURT:  Overruled.

03:15  19  Q.  Let me show you now for identification Plaintiff's Exhibit

03:16  20  20.

03:16  21           THE COURT:  Any objection?

03:16  22           MR. BELL:  No objection.

03:16  23           THE COURT:  Plaintiff's Exhibit 20 is admitted.  Put

03:16  24  up the screens.

03:16  25  Q.  Plaintiff's Exhibit 20 is a two page e-mail between

03:16  1   yourself and Ms. Saddler.  Can you explain the purpose of this

03:16  2   communication between yourself and Ms. Saddler on March 10,

03:16  3   2017?

03:16  4   A.   This is advising Bridgette Saddler at Pete Vicari General

03:16  5   Contractor's company that Zpaces work will be assumed by A.T.O.

03:17  6   Golden.

03:17  7   Q.   Are you instructing Ms. Saddler about any additional

03:17  8   information?

03:17  9   A.   Simply giving her the State of Florida registration, a copy

03:17  10  of the contractors license and advising her that insurance

03:17  11  certificates would be sent shortly.

03:17  12  Q.   At the top of the page from Ms. Saddler to Ms. Baudoin:

03:17  13  FYI we should have something in the works for Mick's company

03:17  14  come Monday.  Do you see that?

03:17  15  A.   Yes.

03:17  16  Q.   What did you advise Pete Vicari General Contractor as to

03:17  17  the ownership status of A.T.O. Golden?

03:17  18  A.   Pete was told that Zpaces was acquiring the company A.T.O.

03:17  19  Golden, which was a licensed general contractor with the

02:40  20  intention of having the principal license Zpaces eventually.

03:18  21  However, in the interim so the work could proceed on the

03:18  22  project uninhibited we continued the work and A.T.O. Golden

03:18  23  assumed that part of the contract which was still pending.

03:18  24         THE COURT:  The question, Mr. Mick, was what did you

03:18  25  tell PVGC as to the ownership interest of A.T.O. Golden?

03:18  1      THE WITNESS:  Pete was told, as well as PJ and

03:18  2  Bridgette, that Zpaces had acquired A.T.O. Golden and was the

03:18  3  owner of it now.

03:18  4      THE COURT:  All right.

03:18  5  Q.  Now this e-mail exchange was dated March 10, 2017.  When

03:18  6  did A.T.O. Golden beginning working on the project?

03:18  7  A.  Immediately.

03:19  8  Q.  Did Zpaces continue to work on the project?

03:19  9  A.  Yes.

03:19  10  Q.  In what capacity?

03:19  11  A.  Level Z labor division continued to provide the labor to

03:19  12  A.T.O. Golden to continue the work.

03:19  13  Q.  When you informed Pete Vicari General Contractor that

03:19  14  Zpaces had acquired A.T.O. Golden, was there any objection?

03:19  15  A.  Not immediately, no.

03:19  16  Q.  Please explain that response to the jury about not

03:19  17  immediately.

03:19  18  A.  Several days after this had been put into effect Pete came

03:19  19  to me and had concerns about any potential conflict of interest

03:20  20  between Ecolific Technologies or Zpaces or PVGC or any of the

03:20  21  companies doing work on the project.

03:20  22      And asked me if I had any problem divesting in the company.

03:20  23  They were start-ups and did not have any assets per S.E.; so if

03:20  24  it would be okay to transfer my ownership so there would be no

03:20  25  potential conflict of interest, and I agreed.

03:20    1    Q.   That was my next question.   Your response was?

03:20    2    A.   It was not a problem.

03:20    3    Q.   Did you divest your interest in Zpaces -- in ATO for

02:42    4    purposes of this project?

03:20    5    A.   Yes, I did.

03:21    6    Q.   Showing you what has been marked as Defendant's Exhibit 31.

03:21    7    Do you recognize the document?

03:21    8    A.   I do.

03:21    9    Q.   What is this document?

03:21   10    A.   An absolute assignment of membership interest from me to

03:21   11    Amalia Logunova.

03:21   12    Q.   Did you sign this document?

03:21   13    A.   I did.

03:21   14    Q.   Who prepared this document?

03:21   15    A.   I believe Amalia and I prepared it together -- I believe

03:21   16    our attorney in Fort Meyers or Naples assisted with the

03:21   17    preparation of this document.

03:21   18         MR. TAYLOR:   I would like to move in Defendant's

03:21   19    Exhibit 31.

03:22   20         MR. BELL:   No objection.

03:22   21         THE COURT:   It will be admitted.

03:22   22    Q.   Why did you draft this with your attorney and Amalia

03:22   23    Logunova?

03:22   24    A.   Pete requested it; and it was the best thing to do for the

03:22   25    project and the workers on the project so the work could

1   continue and satisfy Pete's concerns.

2   Q.   Did you provide Mr. Vicari with a copy of this document?

3   A.   I believe so, yes.  He asked for it and we provided it.

4   Q.   When did you provide him with a copy of this document?

5   A.   I do not recall when he asked for it.

6   Q.   The document is dated March 20, 2017.  Do you recall how

7   much longer after you executed this document that you provided

8   him a copy of the document?

9   A.   It seems to me it was several weeks before he asked for a

10  copy of it, and we provided it when he asked.

11  Q.   Why is it that you transferred your interest to Amalia

12  Logunova?

13  A.   Pete requested that I transfer my interest so there would

14  be no appearance of any kind of conflict of interest or seem

15  like there was between Ecolific -- the contract I had with him

16  for the project management and Zpaces who was contracted to do

17  the labor.

18  Q.   More specifically why Amalia Logunova?

19  A.   Amalia Logunova helped me form Ecolific Technologies and

20  she has been an integral part of my business activities since

21  2008.

22  Q.   After March 20th did A.T.O. continue to work on the

23  project?

24  A.   Yes.

25  Q.   When did A.T.O. negotiate their subcontracts with Pete

03:23  1   Vicari General Contractor?

03:23  2   A.  I believe they started negotiating immediately.  It took

03:24  3   several weeks for them to come to terms.

03:24  4   Q.  Were you a part of those negotiations?

03:24  5   A.  I was not.

03:24  6   Q.  There are various change orders that were issued on this

03:24  7   project.  Were you a part of the negotiation of any of the

03:24  8   change orders for A.T.O. Golden?

03:24  9   A.  I was not.

03:24  10  Q.  Who on behalf of A.T.O. Golden was negotiating the

02:47  11  subcontracts and change orders?

03:24  12  A.  Amalia Logunova.

03:24  13  Q.  As the senior project manager for Pete Vicari General

03:24  14  Contractor, can you describe for the jury the payment

03:24  15  application process and the procedures that A.T.O. Golden had

03:24  16  to perform in order to get paid on this project?

03:24  17  A.  There is a procedure for submitting for payments for

03:25  18  invoicing a project.  This project used, as do most projects,

02:48  19  the AIA documents, AIA being the acronym for American Institute

02:48  20  of Architects.

03:25  21      And they developed a series of contracts and forms for

03:25  22  contractors to use to bill against the work on projects.  This

03:25  23  particular form is called the G 702, 703.  There are two

03:25  24  numbers associated with the Document.

03:25  25      One is a summary page, which is the G 702 and the G 703 is

03:09  1    the detail page where it lays out the values of each aspect of

03:25  2    the operation.  It is a form very similar to the proposal on

03:25  3    the schedule of values.  So it takes the proposal schedule of

03:25  4    values and puts it onto this AIA G 702 703, sequence of

03:25  5    documents, in order to submit the bill for payment by the

03:26  6    general contractor.

03:26  7        It is the standard in the industry and has been used on

03:26  8    every project literally I have been on for the past 30 years.

03:26  9    Q.  Taking this step by step; would A.T.O. Golden prepare their

03:26  10   own payment applications?

03:26  11   A.  Yes.

03:26  12   Q.  Who would they submit them to?

03:26  13   A.  The payment applications are generally submitted directly

03:26  14   to Pete Vicari General Contractor.

03:26  15   Q.  After Pete Vicari received the payment applications, what

03:26  16   would Pete Vicari General Contractors do?

03:26  17   A.  Pete Vicari --

03:26  18            THE COURT:  Let me stop you there, Mr. Taylor.  We

03:26  19   will take a break, ladies and gentlemen, for about five

03:26  20   minutes.  We are not going to go until five; we are going to go

03:26  21   for another hour.

03:26  22            So have some coffee, have some soda, some water; and

03:27  23   don't talk about the case.

03:27  24            COURT SECURITY:  All rise.

03:27  25                  JURY EXCUSED

03:27  1      THE COURT:  All right.  Mr. Mick, if you would step

03:27  2  into the hallway.

03:27  3                  WITNESS EXCUSED.

03:27  4      THE COURT:  So Mr. Mick says he is not involved in the

03:28  5  A.T.O. negotiation and A.T.O. is submitting these payment plans

03:10  6  to Mr. Vicari.

03:10  7      And so why is Mr. Mick going to tell me what Mr.

03:28  8  Vicari does?  Is he the next person in line as the project

03:28  9  manager; and then he passes it on?

03:28  10     MR. TAYLOR:  Well, what I was trying to elicit -- I

03:11  11  don't want to be leading -- but I think the witness is a little

03:28  12  timid.

03:28  13     THE COURT:  I don't think timid is what I would call

03:11  14  any of the witnesses in this case.

03:28  15     MR. TAYLOR:  I don't want to be leading.  He is the

03:28  16  project manager on this project; so A.T.O. Golden has to submit

03:28  17  the payment applications to the office of Pete Vicari General

03:28  18  Contractor.

03:28  19     That application then goes to the field personnel,

03:28  20  Mick and the superintendent; and the superintendents walks the

03:28  21  job with A.T.O. Golden and they verify --

03:28  22     THE COURT:  We have a witness from A.T.O. Golden, we

03:28  23  have the A.T.O. Golden president, and she will tell us all

03:28  24  about that.

03:29  25     We are not going to go through every witness retelling

03:29  1   us the same thing over and over again. Unless the next words

03:13  2   out of Mr. Mick's mouth are, oh, I got it and then I gave it to

03:29  3   Mr. Vicari, or Mr. Vicari had it for ten days and sent it back

03:29  4   to me, then move on to another topic with Mr. Mick; who

03:29  5   according to both of you will be here for hours.

03:29  6        I have a news flash; not really.  We are going to get

03:29  7   this trial done this week.

03:29  8        All right; seven minutes people.

03:38  9                        RECESS TAKEN

03:38  10        THE COURT:  Bring in the jury, please.

03:38  11        COURT SECURITY OFFICER:  All rise, please.

03:38  12        THE COURT:  Everyone may be seated.

03:39  13        You may continue, Mr. Taylor.

03:39  14   Q.  Mr. Mick, tell the jury what your involvement was with the

03:39  15   approval of A.T.O. Golden payment applications?

03:39  16   A.  There is a process involved.  I am to some degree involved

03:15  17   in it.  When she submits the requisitions they initially come

03:15  18   in on the 20th of the month and they are required to be what is

03:15  19   called pencil rec'd, which is a projection, so we have an idea

03:39  20   of what each subcontractor will be billing.

03:40  21        When she sends in the pencil rec she circulates it to the

03:18  22   project administration team and Pete Vicari's office.  They

03:18  23   then review the quantity -- the superintendent walks the

03:40  24   buildings to make sure the quantities that are going to be

03:40  25   billed are going to be theoretically possible.

03:40  1    That process takes a few days because of the size of the

03:40  2    project.  Then on the 25th of the month the requisition we say

03:40  3    goes hard; it becomes no longer a projection but the actual

03:40  4    bill.  So the quantities are verified by the superintendent in

03:40  5    the field.

03:40  6        So if there are any discrepancies, whether it is A.T.O.

03:40  7    Golden or anyone else, they would bring it to my attention or

03:28  8    PJ's attention and then the requisitions would be corrected and

03:29  9    then submitted for payment.

03:40  10   Q.  Mr. Mick, the question was, what is your involvement in the

03:41  11   payment application process?  I heard you testify as to what

03:41  12   the superintendent's were.  To be clear you are not a

03:41  13   superintendent, correct?

03:41  14   A.  That's correct.

03:41  15   Q.  What was your involvement?

03:41  16   A.  I did say that the superintendent's will check the

03:41  17   quantities --

03:41  18       THE COURT:  No, no; Mr. Mick, focus on the question.

03:41  19   What was your involvement?  What did you do?

03:41  20       THE WITNESS:  To review the quantities that were

03:41  21   submitted by the project administration team.

03:41  22   Q.  After the quantities were received, did you have any

03:41  23   further participation in the payment application approval

03:41  24   process?

03:41  25   A.  No.

Q.  When the construction lender inspector would come to the project, were you a part of that process?

A.  Yes.  The inspector would come to the job site and report to me that they were there for the inspection.  If I was available I would walk the project with the inspector.  If I was not available I would have one of the superintendents do it.

Q.  When you were involved with walking the project with the inspector, do you know who that was?

A.  Monica Bialski.

Q.  Did Ms. Bialski have any others attend the site inspection with her?

A.  Either her immediate manager or her superior.  Once or twice I think it was that she did not have someone with her.

Q.  How long would these site inspections take place?

A.  Generally four to five hours.

Q.  And during this four to five hours, tell the jury how the work was inspected?

A.  Monica would walk every floor, every building for a general idea of the work that was completed and verify the quantities to be accurate that were in the building.

Q.  Did Monica ever inform you during any of her inspections that she was revising the quantities that she inspected?

        MS.. BELL:  Objection, hearsay.

        THE COURT:  Sustained.

Q.  Without going into any testimony, were the quantities ever revised as a result of the CVRE lender inspections?

A.  Not that I know of.

Q.  Once CVRE finished their inspection, were you part of the payment application process?

A.  No.

Q.  Were you involved in any way once the owner paid Pete Vicari General Contractor in the payment of subs and suppliers?

A.  No.

Q.  Were you involved in any way of the payment for any of A.T.O.'s work?

A.  No.

Q.  Approximately how long were you on the project?

A.  Approximately six and a half months.

Q.  You stated you started on February 8th, 2017.  Do you recall when you left?

A.  August 28th.

Q.  Can you describe the circumstances of you leaving the project?

A.  I was terminated for no cause.

Q.  And can you describe that further for the ladies and gentlemen?

A.  I arrived to work on the 28th of August and received a letter saying this was to be my last day on the job and to turn in my keys.

**Q. Did you have a confrontation with Pete Vicari that led to your termination?**

**A. I reluctantly call it a confrontation. I advised Pete that I had another job offer and I needed to consider it.**

**Q. Why were you advising Mr. Vicari that you had another job offer?**

**A. There were issues on the project for several weeks. Mr. Vicari was very volatile and very abusive to subcontractors and employees.**

        **MR. PARTINGTON: Objection, Your Honor, improper character evidence -- it is improper testimony.**

        **THE COURT: Sustained. There are a number of things we need to know. We need to know when -- if this is involving a conversation with Mr. Vicari and Mr. Mick -- we need to know when and where it occurred relative to our August 28th date.**

        **So, ask that question.**

**Q. Mr. Mick, you referenced a conversation you had with Mr. Vicari, please tell the jury the date on which you had this conversation?**

**A. August 21st.**

**Q. Where did it occur?**

**A. In the job trailer where my office was located on the job site.**

**Q. Why was it that you had this conversation in the job trailer on the 21st with Pete Vicari General Contractors?**

03:46  1    A.   I was very frustrated with the way the project was being

03:46  2    managed by Pete Vicari.

03:46  3         MR. PARTINGTON:  Objection; same issue.

03:46  4         THE COURT:  No.  I will allow Mr. Mick to tell what

03:46  5    his motivation for the conversation was.

03:46  6         THE WITNESS:  There was an incident several weeks

03:46  7    before, and there were several since that time.  The thing that

03:47  8    bothered me most -- that particular day, I had recently gone to

03:47  9    the City of Miami to pay an increase in permit fees because

03:47  10   they had estimated originally that the project was going to be

03:47  11   -- put in their documentation for the permits -- the project

03:47  12   was going to cost around $19 million.

03:47  13        MR. PARTINGTON:  Objection, relevance.

03:47  14        THE COURT:  Come sidebar.  So all of this, unless he

03:48  15   was there and witnessed Mr. Vicari say or do something, is all

03:48  16   hearsay.  We don't need to go into all of this hearsay.  It has

03:48  17   nothing to do with this case; especially with the A.T.O. Golden

03:48  18   portion of our case.

03:48  19        MR. TAYLOR:  I think what the witness was going to say

03:48  20   is that it was not just a toxic environment, he was being told

03:48  21   to go down to the building department and correct what others

03:48  22   have contended were fraudulent --

03:48  23        THE COURT:  Stop, stop.  That's the problem here.  I

03:48  24   think I warned all of you --

03:48  25        MR. TAYLOR:  I was not anticipating this testimony;

03:49  1   but I know where he is going.

03:49  2          THE COURT:  Please do not interrupt me.

03:49  3          MR. TAYLOR:  I apologize.

03:49  4          THE COURT:  I will tell you again to please instruct

03:49  5   your witnesses this is not a deposition, and they need to

03:43  6   answer only the questions they are asked.

03:49  7          All we need to know is that he was frustrated and he

03:49  8   told Mr. Vicari X and Mr. Vicari said Y, he came back and he

03:49  9   was terminated, and he felt it was without cause.  That's all

03:49  10  we need.  To the extent you need to lead him in that regard you

03:49  11  may do so.

03:49  12         MR. TAYLOR:  Yes, Your Honor.

03:51  13         THE COURT:  You may proceed as we discussed sidebar.

03:51  14  Q.  Focusing now on what was occurring on the job site, what

03:51  15  was the issue you sought that prompted you to speak with Mr.

03:51  16  Vicari in the job trailer regarding your other -- potentially

03:51  17  this other job offer?

03:51  18         MR. PARTINGTON:  Objection; this is still --

03:51  19         THE COURT:  Why don't you rephrase it; try again.

03:52  20         MR. TAYLOR:  Yes, Your Honor.

03:52  21  Q.  Focusing on what you were experiencing that day; please

03:52  22  describe why you were having this conversation with Mr. Vicari

03:52  23  in the job trailer regarding your potentially leaving?

03:52  24         MR. PARTINGTON:  Same objection -- the why is far too

03:52  25  wide.

03:52  1        THE COURT:  Overruled.  Let's see where we go.

03:52  2        THE WITNESS:  It took place in the job trailer which

03:52  3   is having a large office next to my small office.

03:52  4   (Unintelligible answer by witness)

03:47  5        THE COURT:  Sir, slow down.  Neither I nor the court

03:47  6   reporter understood what you said.

03:52  7        THE WITNESS:  I walked into the office where Mr.

03:52  8   Vicari was and advised him that I was unhappy with the way the

03:52  9   project was being managed and that I had another job offer and

03:52  10  if we were not able to make things better, I would need to

03:52  11  seriously consider it.

03:52  12  Q.  Based on that conversation you had with Mr. Vicari, was

03:53  13  your employment terminated?

03:53  14  A.  I believe it was, yes.

03:53  15  Q.  Did you inform Mr. Vicari where you were going to work

03:53  16  after he was terminating you from the job?

03:53  17  A.  Yes, I did.

03:53  18  Q.  Where did you tell him you were going to work?

03:53  19  A.  For A.T.O. Golden and Zpaces.

03:53  20  Q.  Did you put this in writing to him?

03:53  21  A.  Yes, I did.

03:53  22        MR. TAYLOR:  I would like to put up for identification

03:53  23  Plaintiff's Exhibit 24 --

03:53  24        MR. BELL:  No objection.

03:53  25        THE COURT:  It is admitted.  You may bring up all the

03:53  1  screens.

03:54  2  Q.  All right.  Mr. Mick, looking at Plaintiff's Exhibit 24, do

03:54  3  you recognize that document?

03:54  4  A.  Yes, I do.

03:54  5  Q.  What is the document?

03:54  6  A.  This is an e-mail from me to Pete advising him that I did

03:54  7  not take the job that had been offered to me, that I would be

03:54  8  working with A.T.O. Golden and Zpaces going forward.

03:54  9  Q.  Did Mr. Vicari approach you and have any conversations

03:54  10  about you going back to work with A.T.O. Golden and Zpaces?

03:54  11  A.  No.

03:54  12  Q.  Did he put anything in writing to you regarding you going

03:54  13  back to work for A.T.O. Golden and Zpaces?

03:54  14  A.  No, not that I recall.

03:55  15  Q.  Did you continue work on the Civic Tower project for A.T.O.

03:48  16  and Zpaces?

03:48  17  A.  Absolutely not.

03:49  18  Q.  Why not?

03:55  19  A.  Because the project was toxic -- I did not want to have

03:55  20  anything to do with it.

03:55  21          MR. PARTINGTON:  Objection.

03:55  22          THE COURT:  Overruled.

03:55  23          MR. TAYLOR:  Go ahead, Mr. Mick.

03:55  24          THE COURT:  He answered.  Go to the next question.

03:55  25  Q.  Mr. Mick, how long did you work for A.T.O. Golden and

03:55  1   Zpaces?

03:55  2   A.  Not very long -- eventually -- since Mr. Vicari never paid

03:55  3   the bills that A.T.O. submitted, there was no money to support

03:50  4   employment for anybody.

03:55  5   Q.  And you currently do not work for A.T.O. Golden?

03:55  6   A.  That's correct; I do not.

03:56  7          MR. TAYLOR:  No further questions at this time.

03:56  8          THE COURT:  Cross examination.

03:57  9          MR. BELL:  May I approach, Your Honor.

03:57  10         THE COURT:  You may.

03:57  11  Q.  Good afternoon, Mr. Mick.

03:57  12  A.  Good afternoon.

03:57  13  Q.  I have handed you a stack of documents that have been

03:57  14  marked for identification purposes.  Also, they are two-sided

03:57  15  so take note of that when we start to discuss certain of the

03:57  16  documents, okay?

03:57  17  A.  Yes.

03:57  18  Q.  Mr. Taylor asked you questions about Zpaces and the lien

03:58  19  waivers that were submitted in February.  Do you recall that?

03:58  20  A.  Yes.

03:58  21  Q.  You testified lien waivers were drafted and delivered to

03:58  22  PVGC and ultimately signed by you?

03:58  23  A.  I believe PVGC developed the lien waivers and sent them to

03:58  24  me for signature.

03:58  25  Q.  These lien waivers were in the name of Level Z; is that

03:58   1   correct?

03:58   2   A.   Yes.   Zpaces Level Z.

03:58   3   Q.   Is the same -- Zpaces does not appear on the lien waiver

03:58   4   itself does it?

03:58   5   A.   It does on the -- one of them did.   The final ones that

03:58   6   were sent in did not have Zpaces on them, just Level Z

03:58   7   Contracting.

03:58   8   Q.   Those are the only two lien waivers that Zpaces or Level Z

03:58   9   or any variation of those companies ever submitted to PVGC on

03:58   10  the Civic Tower Senior projects, correct?

03:58   11  A.   Zpaces -- Level Z contracting was the only division that

03:59   12  worked on the project.

03:59   13          THE COURT:  No, no.   Listen to the question, Mr. Mick.

03:59   14          Were those the only two lien waivers ever submitted?

03:59   15          THE WITNESS:  Yes, Your Honor.

03:59   16  Q.   So, Mr. Mick, to be clear, after February 2017, Zpaces

03:59   17  never submitted any further lien waivers to PVGC did it?

03:59   18  A.   Not that I know of.

03:59   19  Q.   And lien waivers are very important on a construction

03:59   20  project like this, correct?

03:59   21  A.   Yes.

03:59   22  Q.   Why are lien waivers important?

03:59   23  A.   They protect the owner's interest and prevent liens from

03:59   24  being put on the project for payments that have been made.

03:59   25  Q.   So the owner knows that every entity and person working on

03:59  1  the project has been paid before the owner pays the general

03:59  2  contractor?

03:59  3  A.   Not necessarily.

03:59  4  Q.   In large part is that the case, Mr. Mick?

03:59  5  A.   Yes.

04:00  6  Q.   And as the project manager what was your role in making

03:52  7  sure that lien waivers were obtained for all of the entities

03:52  8  that were working on the project?

04:00  9  A.   My position was only to review the submissions, the pay

04:00  10 applications put in.   I was not there to review lien waivers.

04:00  11 That was handled administratively from Pete's office.

04:00  12 Q.   Mr. Mick, Mr. Taylor asked questions about your senior

04:00  13 project management services contract; do you recall that?

04:00  14 A.   Yes.

04:00  15 Q.   That contract specifically provides that pursuant to an

04:00  16 agreement you had a fiduciary duty to PVGC; is that right?

04:00  17 A.   Yes.

04:00  18 Q.   That means that you had a duty to protect the interest of

04:01  19 PVGC while you were serving as project manager, correct?

04:01  20 A.   That's correct.

04:01  21 Q.   As project manager you eventually became familiar with the

04:01  22 contracts that PVGC had with the owner for the project?

04:01  23 A.   Correct.

04:01  24 Q.   You testified you were familiar -- you became familiar with

04:01  25 the liquidated damages provisions in those contracts?

04:01  1   A.  Yes.

04:01  2   Q.  You were also familiar with the provision in the contract

04:01  3   that prohibited related party transactions, weren't you?

04:01  4   A.  Yes.

04:01  5   Q.  You as project manager were familiar with all of the terms

04:01  6   of owners contract with PVGC?

04:01  7   A.  Yes and no.  There was a lot of boilerplate information

04:01  8   that I did not need to know.  But the basic tenants of the

04:01  9   contract I did know.

04:01  10  Q.  You also knew that there was a flow down provision in the

03:55  11  owner contract with PVGC?

04:02  12  A.  I am not familiar with that.

04:02  13  Q.  Any contract that PVGC entered into with a subcontractor

04:02  14  would include the terms of the contract between PVGC and the

04:02  15  owner -- did you understand that to be the case, Mr. Mick?

04:02  16  A.  My understanding was that only the general conditions part

04:02  17  of the contract with the owner was applicable to the

04:02  18  subcontractors.

04:02  19  Q.  At least that part in your -- as far as your understanding

04:02  20  would flow down to the subcontractors?

04:02  21  A.  Yes.

04:02  22  Q.  Part of your job as project manager was to make sure that

04:02  23  PVGC was not in breach of its contract with the owner; isn't

04:02  24  that right?

04:02  25  A.  No, I can't say that.  I did not have that level of control

04:02    1    with PVGC.

04:03    2    Q.   Please turn to page 20 in the stack of documents I have

04:03    3    handed you.

04:03    4            THE COURT:   What would this be marked as?

04:03    5            MR. BELL:   It is Defendant's Exhibit 20.   I believe it

04:03    6    has been entered into evidence.

04:03    7            THE COURT:   If it is already in evidence then up we go

04:03    8    on to the screen.

04:04    9    Q.   Mr. Mick, do you recall discussing this e-mail thread with

04:04   10    Mr. Taylor?

04:04   11    A.   I do.

04:04   12    Q.   This is the culmination of the issue that came to light

04:04   13    which required Zpaces to be replaced by a completely different

03:55   14    company from here, per your discussion with Pete; is that

03:55   15    right?

04:04   16    A.   I am not sure I understand the question.

04:04   17    Q.   Would you please read for me the last sentence of your

04:04   18    response to Ms. Saddler which begins on the page with the

04:04   19    exhibit marker on it and ends the top of the second page.

04:04   20    A.   This is temporary anyway.   A completely different company

04:05   21    will be contracting this scope of work from here on out as per

04:05   22    our understanding with Pete.

04:05   23    Q.   So, the arrangement that was temporary was Zpaces

04:05   24    involvement in the project, right?

04:05   25    A.   No.   This was referring to Zpaces licensing, and that

83

04:05   1   Zpaces had purchased another company that had the general

04:05   2   contractor's license that Pete Vicari needed to continue

04:05   3   performing the work.

04:05   4   Q.   So this e-mail from Ms. Saddler is asking you for

04:05   5   information related to Zpaces' liability insurance, correct?

04:05   6   A.   Yes.

04:05   7   Q.   And if you will turn pack to the previous page.  Prior to

04:05   8   what you just read, you said basically can you let this slide

04:05   9   for now; is that right?

04:05   10  A.   I don't recall saying let it slide --

04:06   11  Q.   Mr. Mick, just go ahead and read for me starting at we have

04:06   12  been using.

04:06   13  A.   We have been using a personal auto policy as there are no

04:06   14  vehicles owned by the company.  However, we will be changing

04:06   15  insurers because Geico does not offer $1 million coverage for

04:06   16  personal vehicles.  Can you let this slide for now, I will get

04:06   17  it done --

04:06   18  Q.   All right.  And then you say this is temporary anyway,

04:06   19  correct?

04:06   20  A.   This is temporary anyway.

04:06   21  Q.   And what was temporary was Zpaces involvement in the

04:06   22  project.

04:06   23  A.   No; that's not what it says.

04:07   24  Q.   Do you advise Ms. Saddler that a completely different

04:07   25  company would be taking over from here?

1  A.   A completely different company will be contracting the

2  scope of work from here on out as per our understanding with

3  Pete.

4  Q.   And the scope of work was the scope of work that A.T.O.

5  Golden ultimately contracted?

6  A.   Correct.

7  Q.   And Zpaces never signed a construction contract for that

8  scope of work, did it?

9  A.   Zpaces never signed a construction contract for that scope

10  of work, however, it did do the work.

11  Q.   Zpaces did the work on the project under the A.T.O.

12  construction contract, correct?

13  A.   Correct.

14  Q.   And it never submitted a single lien waiver for that work

15  after February 2017, did it?

16  A.   No.

17  Q.   Please turn to tab 23 in the stack I handed you.  This is

18  Defendant's Exhibit 23.

19       THE COURT:  Well, before you put it up, is that in

20  evidence?

21       MR. TAYLOR:  We have no objection.  I believe it is

22  already in evidence.

23       THE COURT:  All right.  Defendant's Exhibit 23 if it's

24  been admitted is being readmitted and you may put it up on the

25  screen, sir.

04:08  1    Q.  Do you recall testifying about this exhibit some time ago?

04:08  2    A.  I do.

04:08  3    Q.  You advised Ms. Saddler at PVGC the company that would be

04:09  4    assuming Zpaces work will be A.T.O. Golden?

04:09  5    A.  That's correct.

04:09  6    Q.  By assuming you meant taking over for Zpaces?

04:09  7    A.  Assuming the balance of the work that Zpaces had started.

04:09  8    However, it was well known that Zpaces owned A.T.O. Golden, so.

04:09  9    Q.  It's well known that Zpaces owned A.T.O. Golden?

04:09  10   A.  Correct.

04:09  11   Q.  In fact at this time A.T.O. Golden was owned by a gentleman

04:09  12   by the name of Luis Torres, correct?

04:09  13   A.  That's correct.

04:09  14   Q.  Please turn to page 26.  This has been marked as

04:09  15   Defendant's Exhibit 26 for identification purposes.

04:09  16   A.  All right.

04:10  17   Q.  Do you recognize this document?

04:10  18   A.  I do.

04:10  19   Q.  This is an e-mail from you to Ms. Saddler, correct?

04:10  20   A.  That's correct.

04:10  21   Q.  Attaching certain proposals prepared by A.T.O. Golden?

04:10  22   A.  That's correct.

04:10  23   Q.  Did you send this e-mail, Mr. Mick?

04:10  24   A.  Yes.

04:10  25           MR. BELL:  Defense moves Exhibit 26 into evidence.

04:10  1       THE COURT:  Any objection?

04:10  2       MR. TAYLOR:  No objection.

04:10  3       THE COURT:  Defendant's Exhibit 26 is admitted.

04:10  4   Q.  You just testified that it was well known that A.T.O.

04:10  5   Golden was owned by Zpaces?

04:10  6   A.  It was.

04:10  7   Q.  Is that correct, Mr. Mick?

04:10  8   A.  It was owned by Zpaces --

04:10  9       THE COURT:  No, no.  Listen to the question Mr. Mick.

04:10  10      THE WITNESS:  Yes.

04:10  11  Q.  That was your testimony?

04:10  12  A.  Yes.

04:10  13  Q.  In fact, A.T.O. Golden was opened by Luis Torres at this

04:10  14  time?

04:10  15  A.  At this point in time, yes.

04:10  16  Q.  And on March 13th you e-mail PVGC proposals prepared by

04:11  17  A.T.O. Golden; is that right?

04:11  18  A.  Yes.

04:11  19  Q.  In the e-mail you advise PVGC that they may contact Luis

04:11  20  directly about this matter?

04:11  21  A.  That's correct.

04:11  22  Q.  Nowhere in this e-mail did you mention that you would be

04:11  23  involved in this process with Zpaces going forward, correct?

04:11  24  A.  Not in this e-mail.

04:11  25  Q.  You don't advise Pete Vicari that Zpaces will be acquiring

04:11  1   A.T.O. Golden, do you?

04:11  2   A.  No, that was a verbal conversation I had with Mr. Vicari.

04:11  3          THE COURT:  Listen to the question, Mr. Mick; in this

04:11  4   e-mail.

04:11  5          THE WITNESS:  No.

04:11  6   Q.  You never advised Pete Vicari General Contractor in writing

04:11  7   at all that Zpaces would be acquiring A.T.O. Golden?

04:11  8   A.  I believe there is something -- I don't recall -- I believe

04:11  9   we did have something in writing.  I don't know if there were

04:11  10  text messages sent back and forth.

04:11  11      We had several conversations about it.  There should be

04:12  12  something in evidence that points to that.

04:12  13  Q.  Please turn to tab 30.  This is Defendant's Exhibit 30

04:12  14  marked for identification purposes.  Do you recognize this

04:12  15  document?

04:12  16  A.  Yes.

04:12  17  Q.  This is an e-mail from you to Ms. Logunova, correct?

04:12  18  A.  Yes.

04:12  19  Q.  And you are submitting to her a letter of agreement to

04:14  20  purchase the corporation?

04:14  21  A.  That's correct.

04:12  22  Q.  Do you recall sending this e-mail?

04:12  23  A.  I do.

04:12  24          MR. BELL:  Defense moves Exhibit 30 into evidence.

04:12  25          MR. TAYLOR:  No objection.

04:12   1          THE COURT:   Defendant's Exhibit 30 is admitted.

04:12   2   Q.   Am I correct that this is the document by which Zpaces

04:13   3   effectuated its acquisition of the company A.T.O.?

04:13   4   A.   Yes.

04:13   5   Q.   You never sent this document to PVGC either, did you?

04:13   6   A.   No.

04:13   7   Q.   The consideration that Zpaces paid to A.T.O. Golden for the

04:13   8   acquisition of the shares of the company of $1; is that right?

04:15   9   A.   $1, plus other good and valuable considerations.

04:13   10  Q.   Isn't it true you retained the right to take back your

04:13   11  interest in Zpaces -- actually strike that.   I will address

04:13   12  that in a moment.

04:13   13       Wasn't this in and of itself a violation of PVGC's related

04:14   14  party transaction provision in its contract with the owner?

04:14   15  A.   No.

04:14   16  Q.   Mr. Taylor asked question about an assignment of your

04:14   17  interest in Zpaces; do you recall?

04:14   18  A.   Yes.

04:14   19  Q.   That assignment was prepared at or around the time this

04:14   20  letter agreement was prepared; is that right?

04:14   21  A.   A few days after, yes.

04:14   22  Q.   First Zpaces buys A.T.O. Golden for $1, plus other good and

04:14   23  valuable considerations, correct?

04:14   24  A.   Yes.

04:14   25  Q.   And subsequent to that, you transfer any interest you have

04:14  1   in Zpaces and A.T.O. Golden to Ms. Logunova?

04:14  2   A.   That's correct.

04:16  3   Q.   Who was your personal assistant at Ecolific Technologies?

04:16  4   A.   Yes.

04:15  5   Q.   Ecolific Technologies was the project manager for PVGC?

04:15  6   A.   That's correct.

04:15  7   Q.   And had a fiduciary duty to protect PVGC's interest on the

04:15  8   project?

04:15  9   A.   Absolutely.

04:15  10  Q.   As for the assignment of your interest in these companies

04:15  11  to Ms. Logunova, am I correct in saying that you retained the

04:15  12  right to request the return of those interests at a later date?

04:15  13  A.   Yes.

04:17  14  Q.   And ultimately you did have those interests returned to you

04:17  15  in part, correct?

04:15  16  A.   Yes.

04:15  17  Q.   49 percent of Zpaces to be exact?

04:15  18  A.   Yes.

04:15  19  Q.   And now you own 49 percent of Zpaces once again?

04:15  20  A.   Yes.

04:15  21  Q.   And the consideration for that transaction was $10, plus

04:15  22  other good and valuable considerations, correct?

04:15  23  A.   Yes.

04:16  24  Q.   If you would turn to tab 32, which has been marked for

04:16  25  identification purposes as Defendant's Exhibit 32.   Do you

recognize this document, Mr. Mick?

A.  Not really.

Q.  It appears to be an e-mail to --

THE COURT:  No, no; I thought he said that he did not recall the document.

Do you recognize it?

THE WITNESS:  It looks like a generic e-mail.

THE COURT:  Did you write it?

THE WITNESS:  No.

THE COURT:  I think we will move on to another exhibit.

Q.  Mr. Mick, after you effectuated the acquisition of Zpaces by A.T.O. Golden and transferred your interest to Ms. Logunova, your assistant at Ecolific, you created a G-mail account for A.T.O. Golden to use, didn't you?

A.  Yes.

Q.  Just so I am clear, as of the date you transferred your interest in Zpaces and A.T.O to Ms. Logunova, it was your intention that Ms. Logunova would then manage any aspect of the construction project that those entities contracted with PVGC to work; is that correct?

A.  Yes.

Q.  You would agree with me that Ms. Logunova was not qualified to manage a construction project at that time, wouldn't you?

A.  I would agree that she was qualified to administer ((sic))

04:18  1   any kind of a company as long as she has the support and the

04:18  2   knowledge to put people around her, as any CEO would for any

04:18  3   company, rely on their administrative staff and rely on the

04:18  4   people working for a company that know how to actually do the

04:18  5   work.

04:18  6   Q.  Do you recall giving a deposition in this case?

04:18  7   A.  Yes.

04:18  8   Q.  It occurred on August 6th, 2018.

04:19  9   A.  Okay.

04:19  10         MR. BELL:  May I approach, Your Honor.

04:19  11         THE COURT:  You may.

04:19  12  Q.  Do you recall me asking you in your deposition; how would

04:19  13  you rate Ms. Logunova on a scale of one to ten with respect to

04:19  14  her experience and qualifications to undertake a construction

04:19  15  project?

04:19  16         MR. TAYLOR:  Objection; that is not the question that

04:19  17  was asked the witness previously -- it's an improper

04:19  18  impeachment.

04:19  19         THE COURT:  If you would give Mr. Taylor the line and

04:19  20  page; and then let's read it and ask him, do you remember being

04:19  21  asked this question and giving this answer?

04:19  22         MR. BELL:  Page 26, lines 2 through 7.

04:19  23         THE COURT:  Very good.

04:20  24  Q.  The question was; how would you rate Ms. Logunova on a

04:19  25  scale of one to ten with respect to her experience and

04:19  1   qualifications to undertake a construction project?

04:20  2       The answer was; I would say that Amalia Logunova is not

04:20  3   qualified to manage a construction project.  I could not give

04:20  4   her a rating?

04:20  5           THE COURT:  Do you remember being asked that question

04:20  6   and giving that answer?

04:20  7           THE WITNESS:  No, I do not.

04:20  8   Q.  Amalia Logunova is also, in your opinion, not qualified to

04:20  9   serve as a superintendent of a construction project?

04:20  10  A.  That's correct.

04:20  11  Q.  These projects -- in whatever scope she was involved -- was

04:20  12  the first construction project she had ever managed; is that

04:20  13  right?

04:20  14  A.  Yes.

04:20  15  Q.  And one of the first things that Ms. Logunova did in order

04:21  16  to assist her in managing the construction project on behalf of

04:21  17  A.T.O. Golden was to hire Milos Skiljevic, correct?

04:21  18  A.  Eventually she hired Milos Skiljevic.  She started with

04:21  19  Luis Torres.

04:21  20  Q.  And Milos Skiljevic was involved in the preparation of

04:21  21  A.T.O.'s payment applications wasn't he?

04:21  22  A.  I don't know.  I believe so.

04:21  23  Q.  Sitting here today, sir, isn't it true that A.T.O.'s daily

04:21  24  reports are the only documentary evidence that A.T.O. Golden

04:21  25  actually did the work that it performed on the construction

1    project?

2    A.   I don't know.

3    Q.   Other than payment applications --

4    A.   I don't know.  The payment applications and whatever system

5    that she had in place that was instituted by her administrative

6    team would have been the one that quantified the amount to be

7    billed in each payout.

8    Q.   Following up on something I asked you about earlier.  Your

9    current ownership interest in Zpaces is 49 percent; you are

10   also the Zpaces CEO, right?

11   A.   Yes.

12   Q.   And A.T.O. Golden is claiming in this litigation it is owed

13   hundreds of thousands of dollars from PVGC, right?

14   A.   Yes.

15   Q.   And A.T.O. Golden owes Zpaces about $350,000; is that

16   correct?

17   A.   Correct.

18   Q.   If A.T.O. Golden prevails in this litigation it will pay

19   Zpaces the money that it owes it, won't it?

20   A.   I don't know.

21   Q.   You will benefit financially if A.T.O. Golden prevails in

22   this litigation, won't you?

23   A.   Yes.

24   Q.   Sitting here today Zpaces has no outstanding labor bills

25   related to the Civic Tower project, does it?

04:23  1    A.  No longer -- they have all been paid.

04:23  2    Q.  It does not owe any of the workers that did any work on the

04:23  3    project?

04:23  4    A.  That's correct.

04:23  5    Q.  Sitting here today the money that A.T.O. Golden would pay

04:23  6    Zpaces would be entirely profit for Zpaces?

04:23  7    A.  Not entirely, but a significant portion of it would be,

04:23  8    yes.

04:23  9    Q.  Please turn to tab 97.  They were in order in the stack so

04:23  10   it should be the next exhibit or close to it.

04:23  11          THE COURT:  Is this Defendant's Exhibit 97?

04:23  12          MR. BELL:  Yes, Your Honor.

04:23  13          THE COURT:  Okay.

04:23  14   Q.  Do you recognize this document?

04:23  15   A.  I do.

04:23  16   Q.  It is an e-mail from you to various people at PVGC

04:23  17   attaching a document?

04:23  18   A.  Yes.

04:24  19          MR. BELL:  We would seek to move into evidence

04:23  20   Defendant's Exhibit 97.

04:24  21          THE COURT:  Any objection?

04:24  22          MR. TAYLOR:  It is hearsay -- the objection is

04:24  23   hearsay.

04:24  24          THE COURT:  I don't have the big binder.  Could you

04:24  25   put it on the ELMO just for the Court to see and not on the

04:24  1   public or the jury monitor.

04:24  2         Overruled; Defendant's Exhibit 97 is admitted.

04:24  3   Q.   Mr. Mick, at some point in June of 2017, Pete Vicari

04:25  4   expressed some concern to you about the question of whether you

04:25  5   had an ownership interest in A.T.O. Golden; do you recall that?

04:25  6   A.   Yes.

04:25  7   Q.   At that time in June of 2017 you had the right to demand

04:25  8   back your ownership interest in A.T.O. Golden from Amalia

04:25  9   Logunova, correct?

04:25  10  A.   I don't know if demand is the word.

04:25  11  Q.   You transferred it to her for $10, plus other good and

04:25  12  valuable considerations, right?

04:25  13  A.   Yes.

04:25  14  Q.   And you had the right to demand it back pursuant to an

04:25  15  agreement you entered into, didn't you?

04:25  16  A.   There was a right to buy it back.  I don't recall any

04:25  17  language that said demand it back, but I could be mistaken.

04:25  18  Q.   So in June of 2017 you had a reversionary interest in the

04:25  19  company A.T.O. Golden?

04:25  20  A.   I don't know what a reversionary interest is, but if it

04:26  21  means I had the right to buy it back then, yes, I did.

04:26  22  Q.   And Mr. Vicari was concerned about the issue of you

04:26  23  potentially having an ownership interest in a subcontractor

04:26  24  working on the project while at the same time serving as a

04:26  25  project manager in June of 2017, right?

04:26  1   A.  I don't know what Mr. Vicari's concerns were.

04:26  2   Q.  You do know that he asked you to prepare an affidavit

04:26  3   related to the status of your interest in the company A.T.O.

04:26  4   Golden?

04:26  5   A.  Yes.

04:26  6   Q.  And in response to that request you prepared this document,

04:26  7   correct?

04:26  8   A.  That's correct.

04:26  9   Q.  And this document says affiant has absolutely no ownership

04:26  10  interest whatsoever in A.T.O. Golden?

04:26  11  A.  That's correct.

04:26  12  Q.  That was not an accurate statement at the time you signed

04:27  13  this affidavit was it?

04:27  14  A.  Yes, it was.

04:27  15          THE COURT:  All right.  Ladies and gentlemen, we are

04:27  16  going to break for the day.  It's been a long day so I will try

04:27  17  to get you out of here before traffic is too horrible.

04:27  18          So, you are going to go home tonight and your spouse,

04:27  19  your partner, your roommate is going to ask, so how was your

04:27  20  day today?

04:27  21          Oh, it was fine, I went to court and I got picked as a

04:27  22  juror in a Federal trial.  Really?  What is the case about?

04:28  23  And that's it for that conversation.

04:28  24          You can't talk about the case at all.  You cannot

04:28  25  talk to each other about the case and you cannot talk to anyone

1   you know about the case.  You cannot talk in person or on line,

2   and you cannot look anything up or read anything about the

3   case.

4           So, go home, have a good dinner, get a good night's

5   rest and be back here in the jury room at 9:15 to continue

6   hearing testimony.

7           Give yourselves a little wiggle room knowing the

8   traffic that is Miami trying to get downtown in the morning.

9   Have a good evening; and I will see you back at 9:15 ready to

10  resume our case.

11          COURT SECURITY:  All rise.

12              JURY EXCUSED

13          THE COURT: All right. Mr. Mick, if you could step

14  outside to one of the ante-rooms. Don't go out into the common

15  area because the jurors will be walking by.

16              WITNESS EXCUSED

17          THE COURT:  How much longer do you think you will be,

18  20, 30 minutes?

19          MR. BELL:  I have less than five minutes.

20          THE COURT: Very good.  If you would stay a few minutes

21  and discuss the exhibits and see if you can agree to their

22  admission, particularly where they are business records and

23  they will come in through either plaintiff or defense.

24          There are those where there will obviously be some

25  disagreement, and that's fine, but if you have some agreement

04:31  1   we can move along with those and then we will deal with the

04:31  2   rest as they come up.

04:31  3            MR. BELL:  If I might, Judge.

04:31  4            THE COURT:  Yes.

04:31  5            MR. BELL:  Mr. Taylor and I have had a very good

03:14  6   working relationship with respect to things like this. And I

04:31  7   think part of the issue that I was having with the earlier part

04:31  8   of his direct is a number of his exhibits were late added to

04:31  9   his exhibit list and so I had a hard time finding them in our

04:31  10  data base.

04:31  11           THE COURT:  Okay. I have the exhibit list that I got

04:31  12  over the weekend and there are no add-on's to the exhibit list

04:31  13  as I understood it.

04:32  14           MR. BELL: That's correct, Your Honor.

04:32  15           THE COURT:  All right.  So I would ask you to stay and

04:32  16  review those exhibits so that any concerns can be addressed and

04:32  17  we won't have to take it up in front of the jury tomorrow.

04:32  18           Who will be your witnesses tomorrow?

04:32  19           MR. TAYLOR: I will be calling Amalia Logunova. And if

04:32  20  I complete her testimony I believe I would be calling Joey

04:32  21  Baudoin, which is the defense corporate rep.

04:33  22           THE COURT: How long will she take?

04:33  23           MR. TAYLOR: I don't know how long she will take -- I

04:33  24  suspect the cross examination of Ms. Logunova may be longer

04:33  25  than Mr. Mick, and we have been going on two hours and some

04:33   1   change. She is the corporate rep of plaintiff and she has to

04:33   2   explain certain things so her direct will be longer than Mr.

04:33   3   Mick's.

04:33   4           THE COURT:  It seems to me if she's the CEO of A.T.O.

04:34   5   all or most of the documents can come in through her. So that

04:34   6   is something you should be able to talk about tonight as well.

04:34   7           MR. PARTINGTON:  Your Honor, there may be things for

04:34   8   example that A.T.O. Golden in their case may say I will agree

04:34   9   that can be admitted but I don't want to admit it for a variety

04:34   10  of reasons and wish to wait --

04:34   11          THE COURT:  Well, I don't understand that since I have

04:34   12  explained to the jury -- and I will tell them at the end -- it

04:34   13  does not matter who puts a document in and it does not matter

04:34   14  when it comes in it is still evidence that is to be considered.

04:35   15  So I'm not sure why we are having this issue.

04:35   16          MR. PARTINGTON: Well, there may be some -- we had some

04:35   17  discussions about putting everything in, and we could not reach

04:35   18  agreement on that.

04:35   19          I could not sit and list them for you now but there

04:35   20  are some things that I may not want to put in -- for directed

04:36   21  verdict purposes -- so they are not in evidence. And so if we

03:15   22  can agree it is admissible at this point where we are not

03:15   23  necessarily putting everything in at this point -- I'm not sure

04:36   24  if that makes sense.

04:36   25          THE COURT:  If Mr. Taylor wants to have it in for his

04:36   1   case to, you know, prove his case and it is admissible in all

04:36   2   other regards then I'm not sure I understand what you are

04:36   3   saying.

04:36   4           And since I am confused I am doing what my mentor and

04:36   5   colleague Judge Seitz told me; I am giving the problem back to

03:16   6   you.  Because if I am confused then the people confusing me are

04:36   7   you since you are the only folks in the room.

03:18   8           All right. I want you to discuss the exhibits for the

03:18   9   next few minutes and if you cannot reach accord we will take it

03:18   10  up tomorrow morning.

03:18   11          COURT SECURITY OFFICER:  All rise.

        12                  COURT IN RECESS

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

- - -

**C E R T I F I C A T E**

    I hereby certify that the foregoing is an accurate transcription of proceedings in the above-entitled matter.


                                         /S/PATRICIA SANDERS

_____                        _____

DATE FILED                        PATRICIA SANDERS, RPR

**$**

**$1,727,948.25** [1] - 52:7
**$10** [2] - 89:21, 95:11
**$10,000** [2] - 5:7, 46:5
**$18,615.39** [1] - 54:3
**$19** [2] - 38:9, 74:12
**$240,000** [1] - 30:9
**$300,000** [1] - 55:21
**$34** [2] - 4:25, 5:7
**$350,000** [1] - 93:15
**$374,850** [2] - 50:11, 50:18
**$40,835.39** [1] - 60:22
**$403,000** [1] - 11:5
**$5,000** [1] - 46:2
**$50,000** [1] - 28:2

**/**

**/S/PATRICIA** [1] - 101:6

**1**

**1** [4] - 83:15, 88:8, 88:9, 88:22
**1-28-2019** [1] - 1:9
**1.7** [1] - 55:22
**10** [2] - 62:2, 63:5
**100** [1] - 21:14
**102** [2] - 14:20, 15:2
**11-3** [1] - 1:19
**1172** [1] - 36:20
**12th** [1] - 9:10
**13th** [1] - 86:16
**14** [4] - 30:19, 47:1, 47:7, 47:9
**151** [1] - 12:20
**15th** [2] - 42:16, 43:5
**16** [2] - 51:9, 51:11
**17** [3] - 3:22, 9:22, 12:18
**17-24223-CV-KMW** [1] - 1:2
**17th** [3] - 27:12, 48:2
**18** [6] - 3:22, 12:21, 48:13, 49:11, 49:13, 49:15
**196** [1] - 12:18
**1st** [2] - 5:2, 46:1

**2**

**2** [3] - 55:21, 55:25, 91:22
**20** [13] - 21:11, 21:14, 35:20, 57:5, 57:21, 57:23, 61:20, 61:23,

61:25, 65:6, 82:2, 82:5, 97:18
**2003** [1] - 37:10
**2008** [1] - 65:21
**201** [2] - 14:22, 14:24
**2010** [1] - 36:13
**2011** [1] - 36:13
**2013** [1] - 36:18
**2014** [1] - 36:18
**2016** [1] - 4:24
**2017** [26] - 5:2, 6:21, 7:12, 7:14, 9:22, 12:11, 37:24, 43:12, 44:17, 44:21, 44:24, 45:24, 46:1, 56:17, 57:8, 58:10, 62:3, 63:5, 65:6, 72:15, 79:16, 84:15, 95:3, 95:7, 95:18, 95:25
**2018** [1] - 91:8
**20th** [4] - 20:23, 23:24, 65:22, 69:18
**21st** [2] - 73:20, 73:25
**22** [1] - 56:17
**23** [3] - 84:17, 84:18, 84:23
**230,000** [1] - 30:17
**237,148.97** [1] - 52:19
**23rd** [2] - 26:20, 26:22
**24** [2] - 76:23, 77:2
**25** [4] - 20:11, 21:11, 21:15
**25th** [2] - 20:22, 70:2
**26** [5] - 85:14, 85:15, 85:25, 86:3, 91:22
**26th** [1] - 26:22
**27** [1] - 27:18
**283,240.32** [1] - 52:18
**28th** [4] - 25:11, 72:17, 72:23, 73:15
**29** [1] - 25:11

**3**

**3** [1] - 57:8
**30** [9] - 10:5, 21:12, 25:1, 67:8, 87:13, 87:24, 88:1, 97:18
**305.523.5528** [1] - 1:20
**31** [2] - 64:6, 64:19
**32** [2] - 89:24, 89:25
**328,950** [1] - 50:20
**33128** [1] - 1:20
**34** [1] - 38:10
**35** [2] - 2:3, 21:15
**374,850** [1] - 50:20
**3rd** [3] - 43:12, 44:4, 57:25

**4**

**40** [3] - 5:12, 10:5, 28:2
**400** [1] - 1:19
**49** [3] - 89:17, 89:19, 93:9

**5**

**56** [4] - 59:4, 60:7, 60:12, 60:16
**57** [4] - 39:17, 40:2, 40:9, 40:16
**58** [2] - 54:19, 54:21
**59** [3] - 53:18, 54:19, 54:21
**5th** [2] - 44:17, 44:21

**6**

**6** [3] - 42:10, 42:25, 43:3
**6th** [1] - 91:8

**7**

**7** [3] - 43:12, 43:24, 91:22
**7.8** [1] - 16:17
**702** [3] - 66:23, 66:25, 67:4
**703** [3] - 66:23, 66:25, 67:4
**75** [1] - 51:10
**78** [1] - 2:3

**8**

**8** [1] - 44:24
**8th** [5] - 5:1, 43:7, 44:25, 48:3, 72:15

**9**

**90's** [1] - 36:10
**97** [4] - 94:9, 94:11, 94:20, 95:2
**9:15** [2] - 97:5, 97:9

**A**

**A.T.O** [134] - 1:3, 3:15, 3:24, 4:12, 6:14, 6:19, 6:20, 6:22, 6:23, 6:24, 7:2, 7:10, 7:20, 8:15, 8:17, 8:19, 9:1, 9:2, 9:5, 9:9, 9:17, 9:18, 10:15, 10:24, 11:18,

13:17, 13:19, 17:6, 18:5, 18:12, 18:13, 18:19, 18:21, 18:25, 19:4, 19:5, 21:18, 22:5, 22:8, 22:9, 23:14, 23:15, 23:20, 23:21, 23:24, 23:25, 24:4, 24:17, 25:13, 25:22, 26:4, 26:5, 27:12, 27:20, 28:3, 28:19, 29:2, 29:20, 30:5, 30:7, 30:13, 30:25, 31:1, 62:5, 62:17, 62:18, 62:22, 62:25, 63:2, 63:6, 63:12, 63:14, 65:22, 65:25, 66:8, 66:10, 66:15, 67:9, 68:5, 68:16, 68:21, 68:22, 68:23, 69:15, 70:6, 74:17, 76:19, 77:8, 77:10, 77:13, 77:15, 77:25, 78:3, 78:5, 84:4, 84:11, 85:4, 85:8, 85:9, 85:11, 86:17, 87:1, 87:7, 88:3, 88:7, 88:22, 89:1, 90:13, 90:15, 90:18, 92:17, 92:24, 93:12, 93:15, 93:18, 93:21, 94:5, 95:5, 95:8, 95:19, 96:3, 96:10, 99:4, 99:8
**A.T.O.'s** [12] - 7:12, 9:16, 22:5, 23:4, 23:11, 23:17, 24:9, 30:18, 30:21, 72:11, 92:21, 92:23
**abbreviations** [1] - 14:18
**ability** [2] - 5:16, 19:7
**able** [8] - 22:21, 24:8, 41:16, 41:22, 54:16, 58:22, 76:10, 99:6
**above-entitled** [1] - 101:4
**absent** [1] - 30:4
**absolute** [2] - 32:14, 64:10
**absolutely** [3] - 77:17, 89:9, 96:9
**abusive** [1] - 73:8
**accepted** [1] - 10:7
**accepting** [1] - 9:7
**accepts** [1] - 14:10
**access** [1] - 41:23
**accompanied** [1] - 31:10

**accord** [1] - 100:9
**according** [1] - 69:5
**account** [5] - 21:19, 49:19, 60:10, 90:14
**accurate** [3] - 71:21, 96:12, 101:3
**acquire** [1] - 6:12
**acquired** [3] - 6:15, 63:2, 63:14
**acquires** [1] - 18:4
**acquiring** [2] - 62:18, 86:25, 87:7
**acquisition** [2] - 88:3, 88:8, 90:12
**acronym** [2] - 50:10, 66:19
**activities** [1] - 65:20
**actual** [5] - 7:10, 18:22, 23:12, 50:15, 70:3
**add** [1] - 98:12
**add-on's** [1] - 98:12
**added** [4] - 46:23, 47:23, 50:22, 98:8
**adding** [1] - 55:18
**additional** [6] - 6:13, 30:19, 55:19, 57:3, 59:2, 62:7
**address** [1] - 88:11
**addressed** [1] - 98:16
**adequate** [1] - 14:15
**adjustments** [2] - 21:18, 21:22
**administer** [1] - 90:25
**administration** [4] - 14:14, 41:20, 69:22, 70:21
**administrative** [2] - 91:3, 93:5
**administratively** [1] - 80:11
**administrator** [1] - 48:5
**admissibility** [1] - 49:7
**admissible** [2] - 99:22, 100:1
**admission** [1] - 97:22
**admit** [2] - 40:8, 99:9
**admitted** [16] - 40:16, 43:3, 44:1, 47:9, 49:14, 54:22, 57:23, 60:16, 61:23, 64:21, 76:25, 84:24, 86:3, 88:1, 95:2, 99:9
**advice** [1] - 59:8
**advise** [4] - 62:16, 83:24, 86:19, 86:25
**advised** [4] - 73:3, 76:8, 85:3, 87:6

**advises** [1] - 49:24
**advising** [7] - 43:18, 50:23, 52:20, 62:4, 62:10, 73:5, 77:6
**affairs** [1] - 16:23
**affiant** [1] - 96:9
**affidavit** [5] - 19:3, 19:5, 19:6, 96:2, 96:13
**affiliate** [1] - 16:18
**afforded** [1] - 7:1
**afternoon** [5] - 3:14, 31:4, 58:2, 78:11, 78:12
**aggregate** [1] - 16:22
**ago** [4] - 11:7, 19:2, 39:2, 85:1
**agree** [6] - 49:7, 90:23, 90:25, 97:21, 99:8, 99:22
**agreed** [6] - 6:18, 30:11, 52:4, 52:5, 53:13, 63:25
**agreeing** [1] - 48:19
**agreement** [15] - 13:21, 14:11, 17:24, 21:10, 23:7, 42:12, 42:15, 44:5, 61:6, 80:16, 87:19, 88:20, 95:15, 97:25, 99:18
**agrees** [1] - 44:5
**ahead** [5] - 15:23, 27:18, 33:6, 77:23, 83:11
**AIA** [3] - 66:19, 67:4
**Alexander** [3] - 37:24, 38:17, 53:4
**Allapattah** [1] - 3:23
**Allied** [15] - 1:6, 1:15, 4:3, 6:15, 31:6, 31:11, 31:12, 31:17, 31:19, 32:3, 32:19, 32:25, 33:1, 33:2
**allow** [1] - 74:4
**allowed** [2] - 45:16, 61:3
**allows** [1] - 22:3
**almost** [2] - 7:14, 30:2
**alterations** [1] - 8:7
**Amalia** [12] - 17:19, 64:11, 64:15, 64:22, 65:11, 65:18, 65:19, 66:12, 92:2, 92:8, 95:8, 98:19
**American** [1] - 66:19
**amount** [22] - 7:16, 21:1, 21:20, 44:10, 47:18, 47:19, 50:7, 50:11, 50:12, 50:13, 50:17, 50:19, 51:16,

51:17, 52:5, 53:23, 55:18, 59:9, 60:21, 60:23, 93:6
**amounts** [2] - 55:21, 55:23
**analysis** [2] - 21:23, 27:24
**announcement** [1] - 34:9
**answer** [7] - 9:3, 61:10, 75:6, 76:4, 91:21, 92:2, 92:6
**answered** [2] - 39:1, 77:24
**ante** [1] - 97:14
**ante-rooms** [1] - 97:14
**anticipate** [1] - 32:13
**anticipating** [1] - 74:25
**anyway** [3] - 82:20, 83:18, 83:20
**apartment** [8] - 12:16, 12:18, 12:20, 15:20, 20:5, 36:8, 36:17, 36:20
**apartments** [1] - 13:6
**apologize** [1] - 75:3
**appear** [1] - 79:3
**appearance** [1] - 65:14
**aPPEARANCES** [1] - 1:11
**applicable** [2] - 51:17, 81:17
**application** [29] - 8:20, 20:21, 22:13, 22:24, 22:25, 23:23, 24:1, 24:5, 24:9, 24:10, 24:16, 24:17, 24:19, 26:20, 26:22, 26:25, 27:8, 27:20, 28:2, 28:5, 28:9, 28:25, 29:1, 29:23, 66:15, 68:19, 70:11, 70:23, 72:5
**applications** [29] - 4:6, 4:9, 4:12, 4:13, 6:23, 6:24, 7:2, 7:9, 9:6, 10:22, 20:15, 20:23, 21:18, 22:5, 22:9, 24:13, 25:6, 25:24, 28:12, 33:15, 67:10, 67:13, 67:15, 68:17, 69:15, 80:10, 92:21, 93:3, 93:4
**appreciate** [2] - 3:19, 11:9
**approach** [3] - 77:9, 78:9, 91:10
**appropriate** [3] -

48:20, 48:21, 48:22
**approval** [3] - 29:18, 69:15, 70:23
**approve** [6] - 4:16, 7:5, 10:4, 10:9, 10:23, 29:19
**approved** [4] - 5:25, 7:9, 8:25, 27:15
**April** [2] - 7:7, 19:9
**architect** [8] - 4:10, 4:11, 7:4, 8:23, 10:25, 14:12, 44:8, 45:7
**Architects** [1] - 66:20
**architectural** [1] - 56:4
**area** [2] - 55:25, 97:15
**areas** [2] - 41:23, 46:12
**argument** [1] - 3:8
**arise** [1] - 7:11
**arising** [1] - 32:1
**arms** [1] - 25:9
**arose** [2] - 32:20, 33:17
**arranged** [1] - 12:7
**arrangement** [1] - 82:23
**arrived** [1] - 72:23
**articulate** [1] - 34:12
**aspect** [2] - 67:1, 90:19
**assets** [1] - 63:23
**assigned** [2] - 20:3, 22:18
**assignment** [4] - 64:10, 88:16, 88:19, 89:10
**assist** [1] - 92:16
**assistant** [5] - 18:9, 44:13, 48:5, 89:3, 90:14
**assisted** [2] - 64:16
**associated** [1] - 66:24
**assume** [1] - 31:20
**assumed** [2] - 62:5, 62:23
**assuming** [3] - 85:4, 85:6, 85:7
**assumption** [1] - 48:17
**assures** [1] - 31:24
**ATO** [1] - 64:3
**attached** [6] - 4:13, 39:19, 47:4, 47:13, 50:1, 51:1
**attaching** [2] - 85:21, 94:17
**attachment** [1] - 39:22
**attend** [1] - 71:11
**attention** [6] - 3:10,

11:24, 17:9, 58:12, 70:7, 70:8
**attorney** [2] - 64:16, 64:22
**attorneys** [1] - 3:5
**attributable** [1] - 51:21
**August** [7] - 7:11, 8:19, 8:20, 22:13, 23:22, 24:16, 25:11, 25:17, 27:8, 27:14, 28:3, 28:9, 28:25, 72:17, 72:23, 73:15, 73:20, 91:8
**auto** [1] - 83:13
**available** [4] - 38:23, 41:4, 71:5, 71:6
**Avenue** [1] - 1:19
**Avias** [1] - 37:15
**avoid** [1] - 56:13
**award** [1] - 55:16
**awarded** [1] - 4:25
**Ayala** [5] - 24:25, 25:1, 26:16, 27:9

## B

**background** [3] - 17:7, 35:16, 44:10
**backtracking** [1] - 26:21
**backup** [1] - 23:13
**balance** [1] - 85:7
**Bank** [1] - 60:10
**bank** [1] - 49:23
**barricades** [1] - 46:12
**base** [1] - 98:10
**based** [4] - 20:7, 54:18, 56:23, 76:12
**basic** [3] - 20:25, 22:10, 81:8
**basis** [2] - 6:24, 19:24
**bath** [1] - 51:9
**bathroom** [1] - 38:6
**Baudoin** [5] - 48:3, 48:4, 48:7, 62:12, 98:21
**became** [6] - 22:12, 32:23, 35:24, 37:25, 80:21, 80:24
**become** [1] - 17:13
**becomes** [1] - 70:3
**began** [3] - 44:22, 46:7, 46:8
**begin** [3] - 3:16, 5:1, 41:4
**beginning** [2] - 21:4, 63:6
**begins** [1] - 82:18
**behalf** [6] - 3:12,

11:12, 52:8, 55:7, 66:10, 92:16
**behind** [3] - 6:20, 8:1, 19:15
**behold** [1] - 27:19
**belief** [1] - 3:9
**bELL** [1] - 54:20
**BELL** [22] - 1:15, 57:22, 59:17, 60:15, 61:8, 61:17, 61:22, 64:20, 71:24, 76:24, 78:9, 82:5, 85:25, 87:24, 91:10, 91:22, 94:12, 94:19, 97:19, 98:3, 98:5, 98:14
**benefit** [1] - 93:21
**best** [1] - 64:24
**better** [2] - 8:11, 76:10
**between** [25] - 13:15, 13:17, 13:21, 17:21, 18:24, 21:14, 26:3, 28:18, 30:12, 32:11, 32:12, 36:4, 42:12, 43:13, 43:15, 45:14, 45:16, 50:14, 50:24, 57:7, 61:25, 62:2, 63:20, 65:15, 81:14
**beyond** [1] - 46:1
**Bialski** [2] - 71:10, 71:11
**big** [1] - 94:24
**bigger** [1] - 23:11
**biggest** [1] - 32:12
**bill** [5] - 20:11, 28:11, 66:22, 67:5, 70:4
**billed** [13] - 19:23, 21:20, 25:13, 25:14, 26:17, 28:3, 30:7, 32:21, 32:22, 33:16, 59:21, 69:25, 93:7
**billing** [1] - 69:20
**bills** [4] - 20:7, 78:3, 93:24
**binder** [1] - 94:24
**bit** [2] - 12:3, 24:7
**BLACK** [2] - 1:17, 31:4
**Black** [1] - 31:5
**blank** [3] - 34:17
**boil** [1] - 33:18
**boilerplate** [1] - 81:7
**bond** [5] - 4:2, 31:14, 31:17, 32:13, 32:19
**bonds** [2] - 31:21, 31:22
**bookkeeper** [1] - 48:6
**bothered** [1] - 74:8
**brand** [1] - 37:14
**breach** [2] - 17:17, 81:23
**break** [3] - 34:2,

67:19, 96:16
**breath** [1] - 36:4
**breathe** [1] - 39:10
**Bridgette** [4] - 57:7, 58:10, 62:4, 63:2
**briefly** [1] - 13:5
**bring** [11] - 3:1, 5:17, 16:2, 34:22, 41:14, 41:16, 44:2, 58:14, 69:10, 70:7, 76:25
**broken** [1] - 20:1
**Brown** [3] - 44:6, 44:7, 45:2
**BRUCE** [1] - 1:15
**budget** [1] - 52:2
**build** [1] - 37:20
**building** [31] - 12:17, 12:19, 12:21, 12:23, 12:24, 13:2, 13:6, 13:12, 19:12, 25:7, 26:10, 36:11, 37:1, 37:14, 38:4, 38:18, 38:25, 44:14, 44:15, 45:8, 45:10, 46:3, 46:4, 46:17, 51:18, 53:4, 55:22, 55:23, 71:19, 71:21, 74:21
**buildings** [5] - 12:18, 15:20, 37:20, 46:15, 69:24
**built** [1] - 46:13
**bundled** [5] - 20:17, 21:7, 22:1, 24:3, 25:21
**business** [10] - 14:14, 16:23, 18:5, 35:19, 40:10, 40:14, 60:7, 65:20, 97:22
**buy** [2] - 95:16, 95:21
**buys** [2] - 18:12, 88:22
**BY** [1] - 1:18

## C

**cabinets** [3] - 6:4, 13:7, 20:6
**cabins** [4] - 20:4, 46:24, 51:9
**California** [3] - 35:20, 36:11, 37:1
**candidate** [1] - 58:20
**candidates** [2] - 39:9, 57:2
**cannot** [8] - 15:12, 17:16, 34:14, 96:24, 96:25, 97:1, 97:2, 100:9
**capacity** [1] - 63:10
**capital** [1] - 28:22
**case** [39] - 1:2, 3:9,

3:11, 3:15, 3:19, 3:20, 4:23, 11:10, 11:11, 11:17, 13:22, 15:1, 15:17, 22:2, 28:18, 31:6, 33:12, 33:18, 33:21, 33:24, 34:4, 34:5, 67:23, 68:14, 74:17, 74:18, 80:4, 81:15, 91:6, 96:22, 96:24, 96:25, 97:1, 97:3, 97:10, 99:8, 100:1
**caught** [2] - 26:17, 26:19
**centers** [3] - 36:9, 36:12, 36:17
**CEO** [6] - 35:12, 49:19, 59:20, 91:2, 93:10, 99:4
**certain** [10] - 8:7, 23:8, 32:21, 41:8, 44:6, 55:16, 57:25, 78:15, 85:21, 99:2
**certificates** [3] - 37:11, 49:24, 62:11
**certification** [3] - 7:2, 7:3
**certified** [10] - 4:6, 4:8, 4:11, 8:21, 8:22, 8:23, 10:23, 10:24, 10:25
**certify** [1] - 101:3
**chain** [1] - 57:7
**change** [12] - 22:16, 22:24, 23:2, 23:10, 23:12, 23:14, 27:15, 55:17, 66:6, 66:8, 66:11, 99:1
**changed** [3] - 50:19, 50:21, 52:17
**changes** [1] - 22:18
**changing** [1] - 83:14
**character** [1] - 73:11
**charged** [2] - 47:22, 54:2
**charges** [1] - 51:6
**check** [1] - 70:16
**checked** [2] - 22:11, 24:18
**checks** [2] - 20:25, 21:6
**choice** [1] - 15:21
**Chris** [6] - 44:6, 44:7, 44:8, 44:13, 45:2, 45:7
**chronology** [3] - 11:25, 17:10, 29:5
**circulates** [1] - 69:21
**circumstances** [2] - 16:13, 72:18

**City** [1] - 74:9
**Civic** [20] - 3:21, 12:17, 12:20, 36:23, 37:22, 38:1, 38:2, 38:7, 38:12, 45:8, 51:17, 52:23, 53:3, 53:5, 53:6, 55:5, 77:15, 79:10, 93:25
**civics** [1] - 3:17
**claim** [3] - 33:2, 33:3, 33:5
**claimant** [1] - 32:15
**claiming** [1] - 93:12
**clause** [2] - 5:7, 28:16
**CLEAF** [1] - 1:13
**clear** [4] - 32:23, 70:12, 79:16, 90:17
**clearly** [1] - 37:16
**client** [8] - 3:24, 4:5, 4:21, 8:3, 11:4, 11:5, 31:17, 51:23
**client's** [2] - 4:19, 11:2
**close** [3] - 11:3, 13:13, 94:10
**closing** [2] - 3:5, 12:8
**coffee** [2] - 34:3, 67:22
**COHEN** [1] - 1:17
**Cohen** [1] - 31:10
**colleague** [2] - 31:10, 100:5
**collectively** [1] - 28:2
**coming** [5] - 11:6, 15:18, 15:19, 24:18, 54:1
**commercial** [3] - 28:19, 35:13, 36:9
**common** [3] - 16:19, 28:14, 97:14
**communication** [5] - 22:20, 23:1, 23:2, 26:3, 62:2
**communications** [1] - 43:7
**Communities** [1] - 36:19
**companies** [9] - 5:13, 5:25, 8:15, 19:11, 19:13, 52:9, 63:21, 79:9, 89:10
**company** [51] - 4:14, 4:24, 5:14, 5:15, 5:21, 15:13, 15:24, 16:4, 17:22, 18:5, 18:16, 35:22, 35:23, 36:2, 36:21, 37:4, 37:6, 37:15, 37:18, 40:21, 41:2, 41:6, 41:10, 53:25, 56:4, 57:2, 58:2, 58:4,

58:15, 58:24, 59:2, 62:5, 62:13, 62:18, 63:22, 82:14, 82:20, 83:1, 83:14, 83:25, 84:1, 85:3, 88:3, 88:8, 91:1, 91:3, 91:4, 95:19, 96:3
**Company** [4] - 1:6, 4:3, 31:18, 31:19
**complain** [1] - 9:15
**complete** [6] - 3:10, 21:11, 25:8, 42:21, 58:25, 98:20
**completed** [5] - 20:8, 33:5, 45:21, 46:3, 71:20
**completely** [5] - 58:4, 82:13, 82:20, 83:24, 84:1
**completion** [4] - 5:8, 19:23, 21:5, 21:9
**complexes** [2] - 36:9, 36:12, 36:17
**component** [1] - 30:16
**components** [1] - 41:8
**compounding** [1] - 5:6
**compressed** [1] - 24:21
**compresses** [1] - 22:6
**computer** [1] - 26:8
**concern** [1] - 95:4
**concerned** [1] - 95:22
**concerns** [5] - 27:23, 63:19, 65:1, 96:1, 98:16
**concrete** [2] - 46:15, 46:17
**conditional** [4] - 50:1, 50:19, 52:12, 53:22
**conditions** [7] - 8:10, 14:24, 14:25, 29:9, 30:11, 31:1, 81:16
**confidence** [1] - 14:10
**confirmation** [1] - 60:7
**confirming** [1] - 60:4
**conflict** [7] - 8:16, 15:14, 17:3, 17:17, 63:19, 63:25, 65:14
**confront** [1] - 8:9
**confrontation** [2] - 73:1, 73:3
**confused** [2] - 100:4, 100:6
**confusing** [3] - 14:23, 17:1, 100:6
**Connecticut** [4] - 35:25, 36:1, 36:10, 37:2

**consequences** [1] - 45:25
**consider** [3] - 11:16, 73:4, 76:11
**consideration** [2] - 88:7, 89:21
**considerations** [4] - 88:9, 88:23, 89:22, 95:12
**considered** [1] - 99:14
**consisted** [1] - 3:22
**consistent** [2] - 14:17, 16:12
**Construction** [4] - 1:3, 3:15, 3:24, 4:12
**construction** [37] - 4:14, 5:1, 5:3, 5:12, 5:13, 7:4, 10:25, 12:8, 13:10, 18:9, 18:11, 19:22, 22:16, 25:1, 28:14, 31:23, 35:13, 35:17, 35:18, 41:5, 41:7, 44:11, 46:11, 71:1, 79:19, 84:7, 84:9, 84:12, 90:20, 90:24, 91:14, 92:1, 92:3, 92:9, 92:12, 92:16, 92:25
**consulting** [1] - 37:19
**contact** [2] - 42:2, 86:19
**contacted** [4] - 5:10, 37:21, 37:23, 38:14
**contains** [1] - 49:23
**contended** [1] - 74:22
**context** [1] - 31:23
**continue** [10] - 36:6, 49:8, 63:8, 63:12, 65:1, 65:22, 69:13, 77:15, 83:2, 97:5
**continued** [5] - 7:17, 8:19, 36:11, 62:22, 63:11
**continuing** [2] - 18:18, 26:15
**contract** [46] - 4:1, 5:6, 6:3, 13:15, 15:16, 16:13, 16:20, 17:17, 17:21, 18:22, 21:1, 28:18, 30:16, 40:14, 42:7, 44:19, 45:16, 45:19, 45:21, 50:7, 50:12, 50:13, 50:14, 50:24, 51:12, 51:19, 55:18, 55:20, 55:24, 62:23, 65:15, 80:13, 80:15, 81:2, 81:6, 81:9, 81:11, 81:13, 81:14, 81:17, 81:23, 84:7, 84:9,

84:12, 88:14
**contracted** [4] - 58:9, 65:16, 84:5, 90:20
**contracting** [10] - 6:7, 6:8, 50:15, 51:1, 52:10, 54:1, 58:5, 79:11, 82:21, 84:1
**Contracting** [1] - 79:7
**Contractor** [33] - 1:6, 4:2, 4:19, 5:9, 7:3, 7:13, 31:16, 32:16, 32:18, 42:14, 50:25, 51:23, 52:4, 52:6, 53:8, 53:10, 54:10, 55:10, 55:13, 59:11, 59:24, 60:5, 60:21, 61:2, 61:13, 62:16, 63:13, 66:1, 66:14, 67:14, 68:18, 72:8, 87:6
**contractor** [33] - 4:7, 4:8, 4:11, 5:18, 6:13, 7:23, 12:4, 13:21, 14:6, 14:10, 16:13, 16:16, 16:19, 16:21, 16:24, 20:16, 21:11, 22:7, 22:21, 23:7, 32:12, 35:19, 35:24, 36:25, 37:2, 37:3, 56:2, 56:3, 58:21, 62:19, 67:6, 80:2
**contractor's** [2] - 14:12, 83:2
**Contractor's** [1] - 62:5
**Contractors** [34] - 4:24, 5:19, 6:9, 6:16, 7:23, 8:22, 8:25, 9:1, 9:6, 9:12, 9:13, 9:24, 10:2, 10:9, 10:12, 10:24, 11:2, 12:3, 12:4, 13:16, 13:17, 13:24, 37:21, 38:11, 42:8, 43:8, 45:14, 45:22, 51:25, 56:18, 56:24, 61:5, 67:16, 73:25
**contractors** [6] - 31:13, 31:22, 35:25, 41:22, 62:10, 66:22
**contracts** [13] - 4:25, 6:19, 6:21, 9:22, 13:11, 13:14, 13:17, 14:5, 45:14, 66:21, 80:22, 80:25
**contractual** [2] - 16:10, 29:18
**contracturally** [1] - 11:21
**contrary** [1] - 54:16
**control** [2] - 16:23,

81:25
**convenance** [1] - 14:11
**conversation** [16] - 41:1, 41:18, 55:12, 56:11, 56:17, 58:17, 58:23, 73:14, 73:17, 73:19, 73:24, 74:5, 75:22, 76:12, 87:2, 96:23
**conversations** [3] - 43:10, 77:9, 87:11
**convo** [1] - 58:13
**cooperate** [1] - 14:12
**coordinate** [1] - 52:1
**copy** [8] - 39:15, 39:25, 42:12, 62:9, 65:2, 65:4, 65:8, 65:10
**cordon** [1] - 46:12
**Corp** [1] - 1:3
**corporate** [2] - 98:21, 99:1
**corporation** [1] - 87:20
**correct** [53] - 21:2, 21:7, 26:2, 26:3, 43:5, 43:6, 54:20, 55:8, 70:13, 70:14, 74:21, 78:6, 79:1, 79:10, 79:20, 80:19, 80:20, 80:23, 83:5, 83:19, 84:6, 84:12, 84:13, 85:5, 85:10, 85:12, 85:13, 85:19, 85:20, 85:22, 86:7, 86:21, 86:23, 87:17, 87:21, 88:2, 88:23, 89:2, 89:6, 89:11, 89:15, 89:22, 90:21, 92:10, 92:17, 93:16, 93:17, 94:4, 95:9, 96:7, 96:8, 96:11, 98:14
**corrected** [2] - 27:20, 70:8
**correctly** [1] - 7:20
**cost** [6] - 13:22, 14:4, 14:5, 14:21, 30:15, 74:12
**costing** [1] - 23:14
**costs** [5] - 8:2, 14:3, 23:12, 23:20, 23:21
**counsel** [9] - 3:11, 6:10, 11:13, 31:3, 31:7, 34:10, 34:13, 48:15, 58:3
**counterclaim** [2] - 30:13, 30:23
**couple** [2] - 29:12,

32:6
**course** [2] - 3:6, 12:13
**court** [3] - 11:8, 76:5, 96:21
**COURT** [119] - 1:1, 1:10, 3:1, 3:2, 3:3, 6:10, 11:12, 30:1, 31:3, 34:1, 34:6, 34:8, 34:20, 34:21, 34:22, 34:23, 34:24, 35:2, 35:7, 36:3, 37:16, 39:1, 39:10, 40:4, 40:8, 40:14, 40:16, 40:24, 42:23, 43:1, 43:3, 43:19, 44:1, 47:5, 47:9, 48:15, 48:23, 49:11, 49:13, 54:21, 56:9, 57:6, 57:18, 57:23, 58:3, 59:10, 59:16, 59:18, 60:14, 60:16, 61:9, 61:12, 61:18, 61:21, 61:23, 62:24, 63:4, 64:21, 67:18, 67:24, 68:1, 68:4, 68:13, 68:22, 69:10, 69:11, 69:12, 70:18, 71:25, 73:12, 74:4, 74:14, 74:23, 75:2, 75:4, 75:13, 75:19, 76:1, 76:5, 76:25, 77:22, 77:24, 78:8, 78:10, 79:13, 82:4, 82:7, 84:19, 84:23, 86:1, 86:3, 86:9, 87:3, 88:1, 90:4, 90:8, 90:10, 91:11, 91:19, 91:23, 92:5, 94:11, 94:13, 94:21, 94:24, 96:15, 97:11, 97:13, 97:17, 97:20, 98:4, 98:11, 98:15, 98:22, 99:4, 99:11, 99:25, 100:11, 100:12
**Court** [5] - 1:19, 11:13, 33:7, 60:18, 94:25
**COURTROOM** [1] - 35:4
**cover** [1] - 39:19
**coverage** [1] - 83:15
**covers** [1] - 13:25
**crane** [1] - 13:3
**create** [1] - 8:4
**created** [4] - 8:2, 8:16, 19:18, 90:14
**creating** [2] - 8:6, 9:24
**credentials** [1] - 39:12
**credibility** [3] - 10:18,

10:19, 49:2
**credit** [3] - 28:5, 30:8, 30:23
**credited** [3] - 28:1, 28:25, 30:17
**cross** [2] - 78:8, 98:24
**CROSS** [1] - 2:2
**culmination** [1] - 82:12
**cumulative** [1] - 46:4
**cup** [1] - 34:3
**current** [1] - 93:9
**cut** [1] - 33:8
**CVRE** [5] - 4:15, 8:23, 8:24, 72:2, 72:4

**D**

**daily** [1] - 92:23
**damage** [2] - 5:7, 46:2
**damages** [2] - 46:5, 80:25
**data** [2] - 26:9, 98:10
**date** [5] - 42:15, 73:15, 73:18, 89:12, 90:17
**DATE** [1] - 101:8
**dated** [6] - 42:15, 42:16, 44:16, 57:8, 63:5, 65:6
**days** [12] - 22:2, 27:16, 27:17, 27:19, 44:23, 56:20, 58:19, 63:18, 69:3, 70:1, 88:21
**deal** [2] - 18:15, 98:1
**December** [3] - 28:5, 45:23, 46:1
**deduction** [1] - 28:1
**deep** [2] - 36:4, 39:10
**default** [4] - 9:11, 9:14, 9:19, 61:6
**defendant** [4] - 4:1, 4:3, 4:19, 11:12
**Defendant** [1] - 1:7
**DEFENDANT** [2] - 1:14, 1:16
**Defendant's** [24] - 43:11, 43:24, 47:1, 47:7, 47:9, 48:13, 49:13, 49:15, 57:5, 57:20, 57:23, 64:6, 64:18, 82:5, 84:18, 84:23, 85:15, 86:3, 87:13, 88:1, 89:25, 94:11, 94:20, 95:2
**defense** [7] - 10:11, 10:15, 33:20, 85:25, 87:24, 97:23, 98:21
**deficient** [1] - 9:16
**degree** [1] - 69:16

**delayed** [2] - 9:18, 46:5
**delays** [2] - 5:8, 12:7
**delivered** [1] - 78:21
**delivering** [1] - 46:1
**demand** [9] - 9:12, 18:17, 19:7, 23:25, 27:14, 95:7, 95:10, 95:14, 95:17
**demanded** [1] - 9:2
**demo** [1] - 51:12
**demolition** [6] - 3:25, 5:23, 6:3, 6:5, 46:23, 51:8
**department** [1] - 74:21
**deposition** [3] - 75:5, 91:6, 91:12
**Depot** [1] - 47:24
**DEPUTY** [1] - 35:4
**descending** [1] - 34:9
**describe** [12] - 38:15, 47:16, 47:21, 49:19, 50:7, 55:12, 58:6, 59:7, 66:14, 72:18, 72:21, 75:22
**describes** [1] - 18:1
**descriptions** [1] - 47:25
**designed** [1] - 37:18
**detail** [1] - 67:1
**detailed** [1] - 10:21
**deterioration** [1] - 22:14
**determination** [1] - 7:5
**determine** [1] - 11:10
**determined** [1] - 27:9
**detour** [2] - 18:3, 19:21
**developed** [3] - 37:15, 66:21, 78:23
**developer** [2] - 36:15, 37:14
**developers** [1] - 37:19
**developing** [1] - 36:15
**development** [1] - 36:7
**difference** [1] - 32:12
**different** [10] - 22:5, 52:15, 52:19, 52:22, 57:2, 58:4, 82:13, 82:20, 83:24, 84:1
**dinner** [1] - 97:4
**direct** [4] - 4:1, 46:16, 98:8, 99:2
**DIRECT** [1] - 2:2
**directed** [1] - 99:20
**directly** [2] - 67:13, 86:20
**director** [1] - 35:13

**disagreement** [3] - 21:13, 21:14, 97:25
**disaster** [2] - 19:10, 19:17
**discovery** [1] - 33:11
**discrepancies** [1] - 70:6
**discuss** [6] - 39:12, 49:6, 56:24, 78:15, 97:21, 100:8
**discussed** [3] - 56:13, 58:21, 75:13
**discussing** [1] - 82:9
**discussion** [3] - 26:16, 56:2, 82:14
**discussions** [1] - 99:17
**dispute** [3] - 7:11, 7:22, 32:20
**dissolved** [1] - 18:6
**DISTRICT** [3] - 1:1, 1:1, 1:10
**divest** [1] - 64:3
**divesting** [1] - 63:22
**DIVISION** [1] - 1:2
**Division** [1] - 31:12
**division** [7] - 31:21, 35:22, 50:15, 52:10, 56:4, 63:11, 79:11
**Document** [1] - 66:24
**document** [52] - 14:20, 14:21, 14:22, 14:24, 14:25, 15:2, 22:19, 22:21, 39:18, 47:13, 47:16, 47:17, 48:20, 48:21, 49:2, 49:16, 50:1, 51:7, 51:15, 52:16, 53:1, 54:4, 54:7, 55:1, 55:3, 59:5, 59:7, 60:19, 64:7, 64:9, 64:12, 64:14, 64:17, 65:2, 65:4, 65:6, 65:7, 65:8, 77:3, 77:5, 85:17, 87:15, 88:2, 88:5, 90:1, 90:5, 94:14, 94:17, 96:6, 96:9, 99:13
**documentary** [2] - 10:14, 92:24
**documentation** [4] - 22:19, 29:7, 33:14, 74:11
**documents** [10] - 10:19, 29:10, 33:5, 48:16, 66:19, 67:5, 78:13, 78:16, 82:2, 99:5
**dollars** [2] - 8:3, 93:13
**done** [22] - 5:24, 7:18,

18:9, 22:24, 25:14, 27:25, 29:4, 38:19, 38:24, 38:25, 41:9, 45:23, 47:12, 50:17, 51:8, 52:3, 53:23, 55:17, 57:3, 58:1, 69:7, 83:17
**doors** [2] - 6:4, 13:7
**double** [1] - 7:15
**doubled** [1] - 7:16
**down** [10] - 33:18, 34:12, 34:18, 36:3, 37:16, 39:10, 74:21, 76:5, 81:10, 81:20
**downstream** [4] - 13:18, 29:10, 29:14, 29:23
**downtown** [1] - 97:8
**draft** [2] - 44:18, 64:22
**drafted** [1] - 78:21
**drywall** [2] - 3:25, 51:12
**due** [1] - 23:24
**duration** [1] - 45:20
**during** [8] - 3:4, 3:6, 4:4, 7:21, 15:7, 40:20, 71:17, 71:22
**duty** [6] - 3:17, 17:25, 18:2, 80:16, 80:18, 89:7

## E

**e-mail** [38] - 27:5, 27:6, 43:12, 43:15, 43:20, 43:22, 44:3, 44:16, 44:21, 47:2, 47:4, 47:11, 47:13, 49:3, 49:4, 49:18, 57:7, 57:10, 57:16, 58:11, 59:3, 61:25, 63:5, 77:6, 82:9, 83:4, 85:19, 85:23, 86:16, 86:19, 86:22, 86:24, 87:4, 87:17, 87:22, 90:3, 90:7, 94:16
**e-mails** [1] - 57:24
**early** [1] - 37:23
**Ecolific** [15] - 17:22, 17:24, 37:4, 37:9, 37:11, 37:13, 37:22, 42:13, 44:18, 63:20, 65:15, 65:19, 89:3, 89:5, 90:14
**economical** [1] - 14:16
**effect** [1] - 63:18
**effectuated** [2] - 88:3, 90:12

**efficient** [1] - 37:20
**effort** [1] - 5:9
**eighth** [1] - 42:18
**eighties** [2] - 36:1, 37:2
**Either** [1] - 71:13
**either** [3] - 15:11, 88:5, 97:23
**elated** [1] - 54:16
**electrical** [1] - 45:11
**elicit** [1] - 68:10
**ELMO** [1] - 94:25
**employee** [1] - 16:21
**employees** [5] - 10:5, 23:16, 23:17, 73:9
**employing** [1] - 40:11
**employment** [4] - 35:11, 39:5, 76:13, 78:4
**end** [7] - 8:20, 12:11, 14:20, 15:2, 30:24, 32:4, 99:12
**ends** [1] - 82:19
**energy** [1] - 37:20
**engaged** [7] - 35:13, 36:7, 37:25, 46:11, 46:19, 46:21, 46:22
**engineer** [3] - 44:14, 44:15, 45:12
**engineering** [4] - 35:19, 36:25, 44:10, 56:4
**entails** [2] - 31:13, 33:10
**enter** [1] - 6:16
**entered** [6] - 6:18, 6:21, 7:14, 28:18, 81:13, 82:6, 95:15
**enthusiastic** [2] - 41:13, 41:16
**entire** [2] - 12:22, 51:19
**entirely** [3] - 30:4, 94:6, 94:7
**entities** [2] - 80:7, 90:20
**entitled** [5] - 30:17, 30:20, 47:13, 101:4
**entity** [5] - 16:14, 16:18, 16:20, 16:22, 79:25
**enunciate** [1] - 34:18
**envelope** [1] - 37:14
**environment** [3] - 8:4, 8:6, 74:20
**equipment** [1] - 16:15
**errors** [3] - 22:10, 24:2, 26:24
**especially** [3] - 25:3, 29:5, 74:17

**ESQ** [6] - 1:12, 1:13, 1:15, 1:15, 1:17, 1:17
**essentially** [1] - 14:6
**established** [1] - 14:11
**estate** [2] - 36:7, 37:19
**estimated** [1] - 74:10
**evening** [1] - 97:9
**event** [2] - 18:8, 22:1
**eventually** [7] - 14:9, 23:19, 46:23, 62:20, 78:2, 80:21, 92:18
**evidence** [31] - 3:9, 4:5, 10:14, 10:20, 11:17, 11:24, 17:8, 26:2, 33:12, 33:19, 33:24, 34:4, 40:2, 42:23, 42:25, 43:23, 47:6, 48:25, 54:19, 73:11, 82:6, 82:7, 84:20, 84:22, 85:25, 87:12, 87:24, 92:24, 94:19, 99:14, 99:21
**exact** [1] - 89:17
**exactly** [3] - 17:1, 41:6, 55:23
**examination** [2] - 78:8, 98:24
**example** [4] - 20:4, 20:9, 48:22, 99:9
**exception** [1] - 10:3
**excess** [1] - 16:22
**exchange** [1] - 63:5
**exchanges** [1] - 49:3
**excitement** [1] - 24:7
**EXCUSED** [5] - 34:7, 67:25, 68:3, 97:12, 97:16
**excuses** [2] - 9:7, 9:24
**executed** [1] - 65:7
**exercise** [2] - 14:12, 49:9
**Exhibit** [40] - 39:17, 42:10, 42:25, 43:11, 43:24, 47:1, 47:7, 47:9, 48:13, 49:11, 49:13, 49:15, 53:18, 57:5, 57:21, 57:23, 59:4, 60:7, 60:12, 60:16, 61:19, 61:23, 61:25, 64:6, 64:19, 76:23, 77:2, 82:5, 84:18, 84:23, 85:15, 85:25, 86:3, 87:13, 87:24, 88:1, 89:25, 94:11, 94:20, 95:2
**exhibit** [12] - 42:11, 43:3, 48:17, 60:18, 60:24, 82:19, 85:1,

90:11, 94:10, 98:9, 98:11, 98:12
**Exhibits** [2] - 54:19, 54:21
**exhibits** [6] - 48:24, 59:25, 97:21, 98:8, 98:16, 100:8
**expect** [1] - 18:7
**expeditious** [1] - 14:16
**expenses** [3] - 47:14, 48:7, 48:11
**experience** [8] - 5:13, 18:8, 18:10, 25:1, 44:11, 45:11, 91:14, 91:25
**experiencing** [1] - 75:21
**explain** [11] - 32:7, 33:1, 44:3, 47:11, 51:15, 52:15, 53:1, 60:18, 62:1, 63:16, 99:2
**explained** [2] - 33:13, 99:12
**expressed** [1] - 95:4
**extend** [1] - 39:5
**extensive** [1] - 45:10
**extent** [1] - 75:10
**exterior** [5] - 12:22, 13:1, 13:20, 38:4, 38:6

## F

**fact** [7] - 5:6, 9:20, 11:9, 26:5, 54:14, 85:11, 86:13
**factors** [1] - 32:6
**familiar** [7] - 14:19, 80:21, 80:24, 81:2, 81:5, 81:12
**familiarize** [1] - 45:13
**family** [2] - 36:8, 36:11
**far** [4] - 27:2, 49:3, 75:24, 81:19
**fast** [2] - 34:10
**father** [1] - 35:18
**feasible** [1] - 52:3
**February** [22] - 5:1, 5:2, 12:9, 37:24, 42:16, 42:18, 43:5, 43:7, 43:12, 43:17, 44:4, 44:17, 44:21, 44:24, 44:25, 48:2, 48:3, 56:17, 72:15, 78:19, 79:16, 84:15
**Federal** [3] - 15:19, 33:7, 96:22
**fees** [1] - 74:9

**felt** [1] - 75:9
**fences** [1] - 46:12
**few** [4] - 70:1, 88:21, 97:20, 100:9
**FHFC** [1] - 16:12
**fiduciary** [4] - 17:25, 18:1, 80:16, 89:7
**field** [2] - 68:19, 70:5
**fifty** [1] - 20:12
**figure** [2] - 25:7, 26:11
**file** [1] - 29:25
**FILED** [1] - 101:8
**final** [2] - 34:9, 79:5
**finally** [2] - 25:20, 36:13
**financially** [1] - 93:21
**financing** [1] - 12:8
**fine** [3] - 26:18, 96:21, 97:25
**finish** [2] - 20:11, 51:13
**finished** [4] - 12:11, 27:24, 38:25, 72:4
**firm** [2] - 6:7, 6:8
**first** [14] - 10:1, 11:18, 12:17, 22:13, 34:25, 38:16, 44:16, 45:24, 46:10, 49:18, 57:24, 88:22, 92:12, 92:15
**five** [8] - 21:16, 21:21, 30:1, 67:19, 67:20, 71:16, 71:17, 97:19
**fixed** [2] - 24:4, 24:9
**FL** [1] - 1:20
**flash** [1] - 69:6
**floor** [2] - 46:17, 71:19
**flooring** [6] - 6:4, 13:7, 38:6, 46:24, 51:10, 51:11
**Florida** [5] - 35:10, 35:15, 36:18, 38:21, 62:9
**FLORIDA** [1] - 1:1
**flow** [2] - 81:10, 81:20
**focus** [2] - 58:11, 70:18
**focusing** [2] - 75:14, 75:21
**folks** [1] - 100:7
**following** [4] - 42:4, 48:23, 49:24, 93:8
**FOR** [3] - 1:12, 1:14, 1:16
**force** [3] - 5:15, 5:22, 6:20
**foregoing** [1] - 101:3
**form** [6] - 33:5, 37:9, 61:14, 65:19, 66:23, 67:2
**formed** [1] - 36:1

**former** [1] - 53:3
**forms** [1] - 66:21
**Fort** [1] - 64:16
**forth** [1] - 87:10
**forward** [10] - 18:18, 18:23, 23:4, 29:4, 29:17, 49:5, 58:16, 59:1, 77:8, 86:23
**foundation** [1] - 59:18
**four** [4] - 20:9, 56:20, 71:16, 71:17
**framing** [1] - 35:24, 35:25, 37:2
**fraudulent** [1] - 74:22
**Friday** [1] - 57:8
**front** [4] - 14:20, 15:2, 32:1, 98:17
**frustrated** [2] - 74:1, 75:7
**fulfilled** [2] - 30:12, 31:1
**full** [2] - 35:4, 60:23
**fund** [1] - 28:21
**funding** [2] - 15:17, 15:19
**furnish** [2] - 14:14, 14:15
**furnishing** [1] - 16:15
**furthering** [1] - 14:13
**FYI** [1] - 62:13

**G**

**G-mail** [1] - 90:14
**Geico** [1] - 83:15
**general** [23] - 4:7, 4:8, 4:11, 5:18, 12:4, 12:21, 14:24, 21:2, 31:13, 31:22, 32:11, 35:19, 36:25, 37:1, 35:23, 57:18, 58:21, 62:19, 67:6, 71:19, 80:1, 81:16, 83:1
**General** [68] - 1:6, 4:1, 4:19, 4:24, 5:9, 5:18, 6:9, 6:16, 7:3, 7:13, 7:23, 8:21, 8:25, 9:1, 9:6, 9:12, 9:13, 9:24, 10:2, 10:9, 10:11, 10:24, 11:1, 12:3, 12:4, 13:15, 13:17, 13:24, 31:16, 32:16, 32:18, 37:21, 38:11, 42:8, 42:13, 43:8, 45:14, 45:21, 50:25, 51:23, 51:25, 52:4, 52:6, 53:7, 53:10, 54:9, 55:9, 55:13, 56:18, 56:24, 59:11, 59:24, 60:5, 60:20,

61:1, 61:5, 61:13, 62:4, 62:16, 63:13, 66:1, 66:13, 67:14, 67:16, 68:17, 72:8, 73:25, 87:6
**generally** [3] - 37:11, 67:13, 71:16
**generic** [2] - 39:19, 90:7
**gentleman** [2] - 5:10, 85:11
**gentlemen** [9] - 3:4, 3:14, 11:3, 11:14, 31:4, 34:2, 67:19, 72:22, 96:15
**George** [1] - 26:6
**given** [3] - 16:8, 38:9, 56:8
**GL** [1] - 58:1
**GNP** [2] - 13:23, 14:1
**Golden** [71] - 1:3, 3:15, 3:24, 4:12, 6:14, 6:19, 6:20, 7:2, 7:10, 9:2, 17:6, 18:25, 19:4, 19:5, 25:22, 30:14, 62:6, 62:17, 62:19, 62:22, 62:25, 63:2, 63:6, 63:12, 63:14, 66:8, 66:10, 66:15, 67:9, 68:16, 68:21, 68:22, 68:23, 69:15, 70:7, 74:17, 76:19, 77:8, 77:10, 77:13, 77:25, 78:5, 84:5, 85:4, 85:8, 85:9, 85:11, 85:21, 86:5, 86:13, 86:17, 87:7, 87:7, 88:7, 88:22, 89:1, 90:13, 90:15, 92:17, 92:24, 93:12, 93:15, 93:18, 93:21, 94:5, 95:5, 95:8, 95:19, 96:4, 96:10, 99:8
**greatly** [1] - 3:18
**grew** [1] - 35:18
**ground** [2] - 5:5, 5:10
**group** [1] - 16:2
**growing** [2] - 23:5, 23:6
**guarantee** [1] - 14:2
**guaranteed** [2] - 14:4, 14:6
**guess** [1] - 56:12
**gutted** [1] - 13:7
**guy** [2] - 18:6, 24:25
**guys** [1] - 11:9

**H**

**half** [3] - 42:1, 55:25, 72:14
**hallway** [1] - 68:2
**hand** [1] - 10:14
**handed** [3] - 78:13, 82:3, 84:17
**handled** [1] - 80:11
**handling** [1] - 56:24
**hard** [3] - 32:24, 70:3, 98:9
**head** [2] - 23:19, 31:12
**hear** [32] - 3:5, 3:7, 3:19, 3:21, 4:4, 4:18, 9:16, 9:17, 10:2, 10:5, 10:6, 10:11, 10:15, 11:16, 14:18, 14:19, 15:7, 16:5, 18:1, 18:7, 18:16, 20:19, 24:25, 26:2, 26:5, 26:16, 28:13, 31:16, 31:19, 33:12, 34:14, 34:18
**heard** [4] - 31:15, 32:19, 33:19, 70:11
**hearing** [2] - 3:9, 97:6
**hears** [1] - 19:1
**hearsay** [9] - 40:3, 40:4, 59:17, 60:15, 71:24, 74:16, 94:22, 94:23
**HELD** [1] - 1:9
**held** [1] - 37:7
**help** [3] - 38:20, 38:24, 39:11
**helped** [1] - 65:19
**hereby** [1] - 101:3
**high** [2] - 37:13, 37:20
**highlighted** [3] - 40:18, 50:8, 58:11
**hire** [3] - 28:6, 29:13, 92:17
**hired** [5] - 5:20, 5:21, 15:5, 45:3, 92:18
**hires** [1] - 24:24
**hoists** [1] - 46:16
**hold** [2] - 36:24, 55:16
**holding** [1] - 11:2
**Home** [1] - 47:24
**home** [2] - 96:18, 97:4
**Homes** [1] - 35:14
**Honor** [18] - 3:13, 30:2, 35:8, 40:7, 40:12, 49:10, 49:12, 56:15, 61:8, 73:10, 75:12, 75:20, 78:9, 79:15, 91:10, 94:12, 98:14, 99:7
**HONORABLE** [1] - 1:9

**horrible** [1] - 96:17
**hotels** [1] - 36:17
**hour** [3] - 31:8, 42:1, 67:21
**hours** [4] - 69:5, 71:16, 71:17, 98:25
**houses** [1] - 36:8
**hundred** [3] - 20:13, 51:9, 51:11
**hundreds** [1] - 93:13
**hung** [1] - 13:2

**I**

**idea** [3] - 19:14, 69:19, 71:20
**ideally** [2] - 20:16, 22:1
**identification** [9] - 57:5, 57:6, 59:4, 61:19, 76:22, 78:14, 85:15, 87:14, 89:25
**identify** [2] - 42:10, 52:5
**identifying** [1] - 60:18
**imagine** [2] - 8:16, 19:17
**immediate** [1] - 71:13
**immediately** [9] - 5:22, 25:13, 39:6, 41:4, 46:18, 63:7, 63:15, 63:17, 66:2
**impeachment** [1] - 91:18
**important** [11] - 12:13, 13:10, 14:18, 15:1, 17:9, 17:13, 22:13, 22:23, 29:12, 79:19, 79:22
**improper** [4] - 9:8, 73:10, 73:11, 91:17
**IN** [2] - 34:21, 100:12
**inaudible** [1] - 33:6
**inaudible** [1] - 58:2
**incident** [1] - 74:6
**include** [2] - 6:3, 81:14
**included** [2] - 24:19, 25:22
**including** [2] - 25:21, 27:24
**incorrect** [1] - 21:21
**incorrectly** [1] - 50:22
**increase** [4] - 6:2, 55:10, 56:23, 74:9
**increased** [10] - 6:6, 6:17, 7:13, 55:19, 55:22, 56:1, 56:18, 56:22, 56:25, 58:8
**Indeed** [1] - 39:20

**indicate** [1] - 42:22
**indicated** [1] - 53:5
**industry** [5] - 5:12, 5:14, 35:17, 35:18, 67:7
**inform** [3] - 40:20, 71:22, 76:15
**information** [9] - 17:11, 23:11, 23:12, 23:13, 49:21, 49:23, 62:8, 81:7, 83:5
**informed** [6] - 6:8, 8:13, 41:6, 41:24, 57:1, 63:13
**initial** [4] - 30:4, 41:25, 47:12, 53:23
**inquiry** [1] - 32:4
**inside** [1] - 13:6
**inspect** [1] - 4:16
**inspected** [4] - 8:21, 8:24, 71:18, 71:23
**inspection** [5] - 7:4, 10:20, 71:4, 71:11, 72:4
**inspections** [3] - 71:15, 71:22, 72:2
**inspector** [5] - 11:1, 71:1, 71:3, 71:5, 71:9
**Institute** [1] - 66:19
**instituted** [1] - 93:5
**instruct** [1] - 75:4
**instructing** [1] - 62:7
**Insurance** [5] - 1:6, 4:3, 31:11, 31:17, 31:19
**insurance** [8] - 31:20, 32:10, 32:12, 49:24, 57:19, 58:1, 62:10, 83:5
**insurers** [1] - 83:15
**integral** [1] - 65:20
**intended** [1] - 50:17
**intention** [2] - 62:20, 90:19
**intentionally** [1] - 24:14
**interest** [36] - 14:13, 14:17, 15:14, 16:21, 17:3, 17:16, 18:16, 18:17, 19:4, 19:5, 23:25, 62:25, 63:19, 63:25, 64:3, 64:10, 65:11, 65:13, 65:14, 79:23, 80:18, 88:11, 88:17, 88:25, 89:7, 89:10, 90:13, 90:18, 93:9, 95:5, 95:8, 95:18, 95:20, 95:23, 96:3, 96:10

**interested** [2] - 40:11, 41:3
**interestingly** [1] - 18:15
**interests** [3] - 18:12, 89:12, 89:14
**interim** [1] - 62:21
**interior** [6] - 3:25, 5:22, 6:3, 6:4, 38:5, 46:23
**interrupt** [1] - 75:2
**interview** [2] - 15:8, 39:14
**investigate** [1] - 33:2
**investigation** [1] - 33:8
**investment** [1] - 36:7
**invoice** [2] - 51:1, 51:4
**invoiced** [3] - 51:6, 60:23
**invoicing** [1] - 66:18
**involved** [12] - 16:1, 32:6, 33:9, 68:4, 69:16, 71:8, 72:7, 72:10, 86:23, 92:11, 92:20
**involvement** [7] - 10:21, 69:14, 70:10, 70:15, 70:19, 82:24, 83:21
**involving** [1] - 73:13
**issue** [13] - 9:11, 24:8, 28:14, 29:6, 32:1, 55:16, 61:5, 74:3, 75:15, 82:12, 95:22, 98:7, 99:15
**issued** [2] - 4:2, 66:6
**issues** [6] - 28:15, 30:4, 33:20, 56:14, 58:25, 73:7
**item** [5] - 20:4, 20:5, 20:9, 21:24, 27:24
**items** [6] - 20:2, 20:3, 20:13, 26:10, 46:25, 52:2
**itself** [3] - 17:3, 79:4, 88:13

**J**

**January** [1] - 37:23
**job** [48] - 4:15, 5:5, 5:8, 5:10, 5:21, 7:12, 7:18, 7:24, 8:10, 8:11, 9:18, 10:3, 10:4, 15:4, 15:25, 16:2, 16:3, 19:14, 21:3, 22:10, 24:1, 24:18, 25:11, 27:19, 29:3, 31:13, 38:17,

41:21, 43:4, 46:19, 68:21, 71:3, 72:24, 73:4, 73:5, 73:22, 73:24, 75:14, 75:16, 75:17, 75:23, 76:2, 76:9, 76:16, 77:7, 81:22
**jobs** [2] - 12:6, 12:7
**Joey** [3] - 48:3, 48:4, 98:20
**JONATHAN** [1] - 1:17
**Jonathan** [1] - 31:10
**Jorge** [1] - 24:25
**JR** [1] - 1:15
**Judge** [3] - 3:17, 98:3, 100:5
**judge** [2] - 10:18, 10:19
**JUDGE** [1] - 1:10
**judgment** [2] - 11:4, 14:13
**July** [5] - 7:8, 7:17, 9:20, 9:21, 23:4
**June** [8] - 7:8, 18:23, 19:9, 29:8, 95:3, 95:7, 95:18, 95:25
**juror** [1] - 96:22
**jurors** [5] - 11:9, 50:7, 51:15, 60:18, 97:15
**JURY** [3] - 34:7, 67:25, 97:12
**jury** [26] - 3:1, 3:4, 11:14, 34:22, 35:16, 38:15, 42:11, 45:4, 46:8, 47:16, 49:9, 52:15, 54:23, 55:12, 58:17, 63:16, 66:14, 69:10, 69:14, 71:17, 73:18, 95:1, 97:5, 98:17, 99:12

**K**

**KATHLEEN** [1] - 1:9
**Keating** [4] - 31:11, 31:12, 33:1, 33:6
**keating** [1] - 32:7
**keep** [4] - 25:15, 30:21, 31:9, 58:3
**keeps** [1] - 25:15
**KEITH** [1] - 1:15
**Kelsey** [1] - 31:5
**KELSEY** [1] - 1:17
**kept** [1] - 9:5
**keys** [1] - 72:25
**kind** [6] - 14:20, 38:2, 38:22, 48:5, 65:14, 91:1
**kinds** [1] - 3:25
**kitchen** [2] - 6:4, 51:9

**kitchens** [1] - 38:5
**knowing** [2] - 27:12, 97:7
**knowledge** [2] - 49:1, 91:2
**known** [5] - 85:8, 85:9, 86:4
**knows** [1] - 79:25

**L**

**labor** [19] - 5:14, 5:15, 5:22, 6:20, 7:18, 15:9, 16:15, 41:7, 41:20, 47:22, 48:8, 50:16, 51:8, 52:10, 56:4, 63:11, 65:17, 93:24
**ladies** [9] - 3:3, 3:13, 11:3, 11:14, 31:4, 34:1, 67:19, 72:21, 96:15
**land** [1] - 31:24
**language** [1] - 95:17
**large** [7] - 36:11, 36:15, 36:17, 76:3, 80:4
**larger** [2] - 12:17, 45:8
**largest** [1] - 35:25
**last** [8] - 8:13, 25:21, 31:7, 41:25, 44:16, 61:9, 72:24, 82:17
**late** [11] - 4:23, 9:7, 22:6, 23:22, 36:1, 36:10, 36:13, 37:1, 37:23, 46:1, 98:8
**lawsuit** [2] - 33:9, 33:10
**lawyers** [1] - 33:9
**lay** [1] - 59:18
**layers** [1] - 10:21
**lays** [1] - 67:1
**lead** [1] - 75:10
**leading** [7] - 40:23, 43:7, 61:8, 61:9, 61:17, 68:11, 68:15
**least** [1] - 81:19
**leave** [2] - 33:22, 49:6
**leaving** [3] - 7:24, 72:18, 75:23
**led** [2] - 22:14, 73:1
**left** [8] - 9:10, 17:20, 23:22, 24:14, 24:21, 29:2, 72:16
**legal** [1] - 56:7
**lender** [6] - 4:14, 7:4, 10:25, 15:18, 71:1, 72:2
**length** [1] - 39:14
**lengthy** [1] - 39:14

**less** [1] - 97:19
**letter** [8] - 39:19, 40:4, 40:5, 40:8, 44:5, 72:24, 87:19, 88:20
**level** [3] - 20:17, 54:17, 81:25
**Level** [17] - 15:24, 16:3, 16:4, 16:6, 16:8, 50:15, 50:24, 51:1, 51:12, 52:10, 54:1, 63:11, 78:25, 79:2, 79:6, 79:8, 79:11
**liability** [2] - 11:10, 83:5
**license** [6] - 6:7, 6:8, 58:20, 62:10, 62:20, 83:2
**licensed** [7] - 6:13, 44:8, 56:2, 56:3, 56:5, 62:19
**licenses** [1] - 36:24
**licensing** [4] - 57:1, 58:24, 59:1, 82:25
**lien** [30] - 29:10, 29:22, 29:25, 30:3, 30:5, 50:1, 50:4, 50:19, 53:15, 53:22, 54:9, 54:24, 55:4, 55:6, 55:20, 55:21, 56:16, 78:18, 78:21, 78:23, 78:25, 79:3, 79:8, 79:14, 79:17, 79:19, 79:22, 80:7, 80:10, 84:14
**lien'd** [1] - 31:25
**liens** [1] - 79:23
**lift** [1] - 46:16
**light** [2] - 17:14, 82:12
**line** [11] - 20:1, 20:5, 20:9, 20:13, 26:10, 27:24, 51:20, 52:2, 68:8, 91:19, 97:1
**lines** [1] - 91:22
**liquidated** [1] - 80:25
**list** [7] - 39:9, 46:25, 48:17, 98:9, 98:11, 98:12, 99:19
**listed** [2] - 39:20, 48:24
**listen** [4] - 11:24, 79:13, 86:9, 87:3
**literally** [2] - 12:22, 67:8
**litigation** [3] - 93:12, 93:18, 93:22
**LLC** [3] - 1:6, 40:21, 60:21
**lo** [1] - 27:19
**local** [2] - 5:3, 45:6

**locally** [1] - 45:5
**located** [1] - 73:22
**Logunova** [25] - 17:19, 18:8, 18:13, 19:4, 64:11, 64:23, 65:12, 65:18, 65:19, 66:12, 87:17, 89:1, 89:11, 90:13, 90:18, 90:19, 90:23, 91:13, 91:24, 92:2, 92:8, 92:15, 95:9, 98:19, 98:24
**look** [3] - 15:8, 48:14, 97:2
**looked** [1] - 26:10
**looking** [2] - 15:3, 77:2
**looks** [3] - 43:17, 47:23, 90:7
**loss** [1] - 32:13
**Louisiana** [1] - 4:24
**Luis** [5] - 18:6, 85:12, 86:13, 86:19, 92:19
**lumber** [2] - 35:22

**M**

**mail** [40] - 27:5, 27:6, 43:12, 43:15, 43:20, 43:22, 44:3, 44:16, 44:21, 47:2, 47:4, 47:11, 47:13, 49:3, 49:4, 49:18, 57:7, 57:10, 57:16, 58:11, 59:3, 61:25, 63:5, 77:6, 82:9, 83:4, 85:19, 85:23, 86:16, 86:19, 86:22, 86:24, 87:4, 87:17, 87:22, 90:3, 90:7, 90:14, 94:16
**mails** [1] - 57:24
**maintain** [1] - 60:15
**major** [1] - 7:22
**manage** [6] - 38:20, 41:17, 45:3, 90:19, 90:24, 92:3
**managed** [4] - 35:21, 74:2, 76:9, 92:12
**management** [18] - 5:3, 5:14, 16:19, 16:21, 19:19, 19:20, 25:18, 39:21, 41:7, 42:7, 42:12, 42:20, 45:4, 45:6, 61:6, 65:16, 80:13
**manager** [35] - 5:20, 15:5, 15:6, 15:9, 15:12, 15:14, 15:22, 15:23, 17:23, 21:3,

23:5, 23:24, 24:22, 24:25, 25:2, 26:6, 35:14, 36:15, 36:19, 36:22, 44:13, 45:7, 45:8, 45:13, 66:13, 68:9, 68:16, 71:13, 80:6, 80:19, 80:21, 81:5, 81:22, 89:5, 95:25
**managing** [2] - 37:5, 92:16
**manner** [3] - 7:19, 14:16, 22:21
**March** [19] - 6:21, 6:25, 7:7, 7:14, 17:12, 17:14, 19:9, 29:7, 30:4, 57:8, 57:25, 58:10, 59:3, 62:2, 63:5, 65:6, 65:22, 86:16
**mark** [1] - 13:25
**marked** [10] - 39:17, 47:1, 48:13, 53:18, 64:6, 78:14, 82:4, 85:14, 87:14, 89:24
**marker** [1] - 82:19
**market** [1] - 36:20
**match** [1] - 5:18
**material** [1] - 14:15
**materials** [2] - 16:15, 47:24
**math** [3] - 21:2, 22:10, 24:4
**matter** [7] - 40:6, 57:18, 58:18, 86:20, 90:13, 101:4
**maximum** [3] - 14:2, 14:4, 14:6
**mean** [2] - 16:18, 50:9
**means** [7] - 13:24, 14:2, 18:1, 28:17, 80:18, 95:21
**meant** [1] - 85:6
**meanwhile** [1] - 58:14
**mechanical** [1] - 45:11
**meeting** [3] - 38:16, 40:20, 41:25
**member** [1] - 37:5
**membership** [1] - 64:10
**memorializing** [1] - 47:11
**mention** [1] - 86:22
**mentor** [1] - 100:4
**messages** [1] - 87:10
**met** [4] - 36:21, 38:14, 38:17, 39:13
**Meyers** [1] - 64:16
**mIAMI** [1] - 1:2

**Miami** [8] - 1:19, 1:20, 12:6, 12:7, 15:4, 36:19, 74:9, 97:8
**Mick** [70] - 5:11, 5:12, 5:20, 6:8, 8:9, 8:12, 8:17, 10:12, 15:5, 15:21, 15:22, 16:7, 17:19, 18:12, 18:15, 18:24, 19:3, 19:7, 21:3, 23:5, 23:22, 23:24, 24:21, 27:5, 35:1, 35:6, 35:9, 39:10, 39:12, 40:4, 40:10, 42:10, 48:22, 49:1, 53:15, 57:24, 60:17, 61:10, 61:13, 62:24, 68:4, 68:7, 68:20, 69:4, 69:14, 70:10, 70:18, 73:14, 73:17, 74:4, 77:2, 77:23, 77:25, 78:11, 79:13, 79:16, 80:4, 81:15, 82:9, 83:11, 85:23, 86:7, 86:9, 87:3, 90:1, 90:12, 95:3, 97:13, 98:25
**mick** [4] - 15:7, 18:4, 68:1, 80:12
**MICK** [1] - 2:3
**Mick's** [6] - 5:16, 5:25, 8:13, 15:25, 17:21, 62:13
**mick's** [2] - 69:2, 99:3
**microphone** [4] - 6:10, 34:11, 34:19, 36:4
**mid** [3] - 35:21, 36:1, 36:10
**might** [5] - 20:4, 20:5, 21:10, 58:21, 98:3
**mill** [1] - 35:21
**million** [8] - 4:25, 5:7, 8:2, 38:9, 55:22, 55:25, 74:12, 83:15
**Milos** [5] - 26:6, 26:7, 92:17, 92:18, 92:20
**minute** [1] - 25:22
**minutes** [8] - 30:1, 34:4, 67:20, 69:8, 97:18, 97:19, 97:20, 100:9
**mistake** [1] - 50:22
**mistaken** [1] - 95:17
**mistakes** [1] - 27:1
**mix** [1] - 47:13
**mixed** [1] - 36:16
**modern** [1] - 31:23
**moment** [2] - 16:9, 88:12
**Monday** [1] - 62:14

**money** [13] - 11:2, 14:7, 18:17, 28:4, 28:11, 30:7, 30:21, 30:25, 31:2, 32:15, 78:3, 93:19, 94:5
**Monica** [3] - 71:10, 71:19, 71:22
**monitor** [1] - 95:1
**Monster** [1] - 39:20
**month** [10] - 8:20, 19:16, 20:22, 21:15, 21:21, 25:17, 45:18, 69:18, 70:2
**monthly** [1] - 6:24
**months** [4] - 8:1, 19:14, 19:15, 72:14
**morning** [1] - 97:8, 100:10
**most** [3] - 66:18, 74:8, 99:5
**motivation** [1] - 74:5
**mouth** [1] - 69:2
**move** [20] - 8:11, 23:4, 23:22, 27:11, 27:18, 40:1, 42:25, 43:23, 47:6, 48:18, 49:5, 54:18, 57:20, 59:14, 60:12, 64:18, 69:4, 90:10, 94:19, 98:1
**moved** [1] - 35:24
**moves** [2] - 85:25, 87:24
**moving** [3] - 18:23, 58:16, 59:1
**MR** [73] - 3:13, 6:12, 11:13, 30:2, 35:1, 35:8, 40:1, 40:3, 40:6, 40:23, 42:24, 43:2, 43:23, 43:25, 47:6, 47:8, 48:19, 49:10, 49:12, 54:18, 54:20, 56:7, 56:15, 57:4, 57:20, 57:22, 59:14, 59:17, 60:12, 60:15, 61:8, 61:17, 61:22, 64:18, 64:20, 68:10, 68:15, 73:10, 74:3, 74:13, 74:19, 74:25, 75:3, 75:12, 75:18, 75:20, 75:24, 76:22, 76:24, 77:21, 77:23, 78:7, 78:9, 82:5, 84:21, 85:25, 86:2, 87:24, 87:25, 91:10, 91:16, 91:22, 94:12, 94:19, 94:22, 97:19, 98:3, 98:5, 98:14, 98:19, 98:23, 99:7, 99:16
**MS** [1] - 31:4

**MS.** [1] - 71:24
**multi** [1] - 36:11

**N**

**name** [11] - 3:14, 4:15, 5:11, 17:19, 24:25, 26:6, 35:4, 47:17, 58:15, 78:25, 85:12
**named** [1] - 18:6
**Naples** [1] - 64:16
**nature** [1] - 20:14
**necessarily** [3] - 48:19, 80:3, 99:23
**necessary** [1] - 7:18
**need** [19] - 20:23, 23:11, 23:13, 28:22, 32:4, 32:25, 34:12, 56:2, 73:13, 73:14, 74:16, 75:5, 75:7, 75:10, 76:10, 81:8
**needed** [15] - 38:19, 39:8, 41:8, 41:17, 41:19, 41:20, 41:22, 41:23, 42:20, 45:23, 46:15, 46:25, 73:4, 83:2
**needs** [2] - 21:22, 43:8
**negotiate** [4] - 51:24, 53:7, 53:10, 65:25
**negotiated** [1] - 52:8
**negotiating** [2] - 66:2, 66:10
**negotiation** [2] - 66:7, 68:5
**negotiations** [2] - 18:22, 66:4
**never** [18] - 16:8, 27:22, 28:8, 28:13, 28:24, 29:1, 29:2, 29:3, 30:9, 61:4, 78:2, 79:17, 84:7, 84:9, 84:14, 87:6, 88:5
**new** [4] - 16:20, 27:20, 44:25, 61:12
**New** [7] - 12:5, 20:25, 21:5, 35:21, 36:14, 48:4, 57:15
**news** [1] - 69:6
**next** [17] - 20:11, 21:15, 24:24, 28:1, 42:2, 42:3, 46:14, 49:25, 51:12, 56:20, 64:1, 68:8, 69:1, 76:3, 77:24, 94:10, 100:9
**nickle** [1] - 30:13
**night's** [1] - 97:4
**non** [1] - 3:21

**normal** [4] - 20:19, 22:3, 33:2, 33:8
**North** [1] - 1:19
**note** [2] - 34:2, 78:15
**nothing** [2] - 8:3, 74:17
**notice** [6] - 9:11, 9:14, 9:19, 24:13, 29:18, 61:6
**nowhere** [1] - 86:22
**number** [5] - 13:20, 52:19, 52:20, 73:12, 98:8
**Number** [1] - 1:2
**numbers** [6] - 14:23, 21:1, 51:24, 52:3, 52:16, 66:24

## O

**object** [5] - 40:3, 48:7, 48:10, 54:14, 56:7
**objection** [40] - 40:23, 42:24, 43:1, 43:2, 43:25, 44:1, 47:8, 47:10, 48:18, 49:11, 49:12, 54:18, 54:20, 57:22, 59:16, 59:17, 60:14, 60:15, 61:8, 61:14, 61:17, 61:21, 61:22, 63:14, 64:20, 71:24, 73:10, 74:3, 74:13, 75:18, 75:24, 76:24, 77:21, 84:21, 86:1, 86:2, 87:25, 91:16, 94:21, 94:22
**obtained** [1] - 80:7
**obviously** [2] - 49:2, 97:24
**occur** [3] - 4:23, 56:17, 73:21
**occurred** [3] - 8:8, 73:15, 91:8
**occurring** [2] - 48:2, 75:14
**occurs** [5] - 7:7, 7:8
**October** [9] - 9:10, 9:22, 27:11, 27:12, 27:18, 27:21, 28:12, 29:3
**OF** [1] - 1:1
**offer** [7] - 39:5, 39:7, 73:4, 73:6, 75:17, 76:9, 83:15
**offered** [1] - 77:7
**office** [12] - 20:25, 48:4, 50:6, 51:5, 57:14, 68:17, 69:22, 73:22, 76:3, 76:7, 80:11

**OFFICER** [4] - 3:2, 34:23, 69:11, 100:11
**old** [1] - 35:20
**on's** [1] - 98:12
**once** [6] - 39:13, 57:2, 71:13, 72:4, 72:7, 89:19
**one** [39] - 9:16, 9:17, 13:20, 15:13, 15:25, 19:11, 19:12, 20:2, 20:4, 20:11, 22:8, 24:20, 25:4, 25:11, 25:24, 27:6, 27:20, 27:21, 28:13, 29:9, 31:19, 33:18, 34:9, 35:25, 38:20, 44:13, 44:15, 51:9, 52:8, 55:6, 55:24, 66:25, 71:6, 79:5, 91:13, 91:25, 92:15, 93:6, 97:14
**ones** [2] - 49:3, 79:5
**opened** [1] - 86:13
**opening** [3] - 3:5, 3:8, 3:11
**operation** [1] - 67:2
**operations** [1] - 28:21
**opinion** [1] - 92:8
**opinions** [1] - 56:7
**opportunity** [1] - 22:4
**opposite** [1] - 17:8
**option** [1] - 9:10
**order** [7] - 34:9, 42:21, 53:16, 66:16, 67:5, 92:15, 94:9
**ordering** [1] - 49:6
**orders** [12] - 22:16, 22:24, 23:3, 23:10, 23:12, 23:14, 27:15, 52:1, 55:17, 66:6, 66:8, 66:11
**original** [1] - 55:14
**originally** [1] - 74:10
**Orlando** [2] - 35:10, 35:14
**Orleans** [5] - 12:5, 20:25, 21:5, 48:4, 57:15
**outlined** [1] - 38:18
**outlines** [1] - 51:20
**outset** [1] - 44:13
**outside** [2] - 12:24, 97:14
**outstanding** [1] - 93:24
**overall** [1] - 13:9
**overbilled** [6] - 10:15, 10:16, 26:13, 26:14, 28:10, 30:22, 30:25
**overbilling** [4] - 25:25,

27:13, 27:23, 30:10
**overhead** [4] - 14:1, 30:16, 47:23, 48:8
**Overruled** [3] - 40:24, 60:16, 61:18
**overruled** [3] - 76:1, 77:22, 95:2
**overruns** [1] - 8:2
**owe** [5] - 28:11, 30:7, 30:13, 30:25, 94:2
**owed** [1] - 93:12
**owes** [3] - 31:2, 93:15, 93:19
**own** [5] - 17:16, 30:5, 37:4, 67:10, 89:19
**owned** [9] - 16:7, 18:4, 18:6, 83:14, 85:8, 85:9, 85:11, 86:5, 86:8
**owner** [53] - 4:9, 4:14, 4:18, 5:6, 7:6, 7:19, 9:8, 10:13, 11:1, 13:16, 13:21, 13:22, 14:11, 14:13, 15:16, 17:18, 20:7, 20:15, 20:18, 20:22, 21:8, 22:2, 22:7, 22:22, 23:7, 23:10, 23:19, 24:3, 24:5, 24:8, 25:16, 25:20, 25:23, 28:1, 28:4, 28:9, 29:15, 30:9, 31:15, 31:24, 32:11, 44:25, 45:15, 63:3, 72:7, 79:25, 80:1, 80:22, 81:11, 81:15, 81:17, 81:23, 88:14
**owner's** [3] - 14:7, 14:17, 79:23
**owners** [4] - 10:7, 27:22, 45:17, 81:6
**ownership** [11] - 5:25, 16:19, 44:25, 62:17, 62:25, 63:24, 93:9, 95:5, 95:8, 95:23, 96:9
**owns** [4] - 5:13, 5:14, 16:21

## P

**pack** [1] - 83:7
**pads** [1] - 34:3
**page** [17] - 40:17, 43:12, 44:16, 49:18, 51:12, 54:4, 61:25, 62:12, 66:25, 67:1, 82:2, 82:18, 82:19, 83:7, 85:14, 91:20, 91:22

**pages** [1] - 57:25
**paid** [47] - 6:1, 7:9, 7:10, 8:25, 9:3, 9:4, 9:20, 10:7, 11:1, 11:4, 11:5, 11:18, 11:20, 11:22, 14:3, 21:17, 22:2, 22:8, 22:22, 26:15, 27:9, 28:8, 28:16, 28:20, 28:23, 28:24, 29:1, 29:3, 29:24, 29:25, 30:9, 30:17, 30:20, 32:18, 33:23, 47:19, 53:16, 60:5, 66:16, 72:7, 78:2, 80:1, 88:7, 94:1
**paint** [1] - 20:9
**panels** [4] - 13:2, 19:12, 38:4, 38:6
**paperwork** [1] - 58:16
**parent** [1] - 16:18
**Parks** [1] - 35:14
**parsed** [1] - 55:15
**part** [19] - 16:1, 22:23, 40:10, 40:14, 52:18, 58:11, 62:23, 65:20, 66:4, 66:7, 71:2, 72:4, 80:4, 81:16, 81:19, 81:22, 89:15, 98:7
**participation** [1] - 70:23
**particular** [10] - 13:22, 14:5, 14:7, 15:17, 16:10, 20:5, 22:18, 24:22, 66:23, 74:8
**particularly** [1] - 97:22
**parties** [4] - 11:11, 28:19, 30:12, 49:6
**PARTINGTON** [20] - 1:15, 11:13, 30:2, 40:3, 40:23, 43:2, 43:25, 47:8, 48:19, 49:10, 49:12, 56:7, 73:10, 74:3, 74:13, 75:18, 75:24, 77:21, 99:7, 99:16
**Partington** [2] - 32:20, 33:13
**partner** [2] - 44:8, 96:19
**parts** [2] - 55:16
**party** [5] - 16:16, 16:17, 32:10, 81:3, 88:14
**Pasadena** [1] - 36:19
**passes** [1] - 68:9
**past** [1] - 67:8
**PATRICIA** [2] - 1:18, 101:8

**patricia_sanders@ flsd.uscourts.gov** [1] - 1:21
**Patrick** [1] - 35:6
**pay** [24] - 4:18, 4:20, 4:22, 9:1, 9:25, 11:24, 17:9, 27:14, 28:10, 28:15, 28:16, 28:20, 28:23, 32:4, 32:15, 32:25, 44:5, 54:12, 59:24, 60:2, 74:9, 80:9, 93:18, 94:5
**paying** [7] - 9:15, 10:10, 11:2, 23:16, 29:16, 32:3, 61:14
**payment** [83] - 3:21, 4:6, 4:9, 4:11, 4:13, 4:16, 6:23, 6:24, 7:1, 7:5, 7:6, 7:9, 8:20, 8:25, 9:6, 9:12, 9:20, 10:16, 10:22, 20:18, 20:21, 20:23, 21:18, 22:6, 22:9, 22:13, 22:23, 22:25, 23:23, 24:1, 24:5, 24:9, 24:13, 24:17, 24:19, 25:7, 25:16, 25:20, 25:24, 26:20, 26:22, 27:1, 27:8, 27:20, 28:1, 28:5, 28:9, 28:12, 28:25, 29:2, 29:3, 29:9, 29:24, 30:11, 31:1, 32:1, 32:19, 32:24, 33:15, 49:22, 52:13, 55:7, 60:8, 60:20, 61:1, 66:14, 67:5, 67:10, 67:13, 67:15, 68:5, 68:17, 69:15, 70:9, 70:11, 70:23, 72:5, 72:8, 72:10, 92:21, 93:3, 93:4
**payments** [4] - 8:18, 19:22, 66:17, 79:24
**payout** [1] - 93:7
**pays** [1] - 80:1
**penalty** [1] - 46:2
**pencil** [2] - 69:19, 69:21
**pending** [1] - 62:23
**people** [16] - 10:22, 25:18, 29:10, 38:22, 40:11, 41:3, 41:18, 46:16, 47:17, 47:25, 49:22, 69:8, 91:2, 91:4, 94:16, 100:6
**per** [6] - 47:19, 58:5, 63:23, 82:14, 82:21, 84:2

**percent** [15] - 16:22, 20:11, 20:12, 21:11, 21:12, 21:14, 21:15, 21:16, 30:19, 51:10, 89:17, 89:19, 93:9
**percentage** [4] - 19:23, 20:8, 23:9, 25:8
**percentages** [2] - 21:4, 21:9
**perfect** [2] - 5:18, 21:10
**perform** [11] - 6:13, 6:19, 14:16, 41:19, 46:17, 46:21, 46:22, 46:25, 54:15, 54:17, 66:16
**performance** [3] - 7:12, 31:22, 37:13
**performed** [10] - 4:5, 4:13, 6:1, 9:21, 11:6, 32:21, 32:22, 33:16, 59:21, 92:25
**performing** [4] - 7:20, 44:22, 46:19, 83:3
**performs** [1] - 33:23
**perhaps** [2] - 39:11, 56:13
**period** [4] - 19:16, 22:7, 47:19, 55:4
**permit** [1] - 74:9
**permits** [1] - 74:11
**person** [7] - 16:14, 16:22, 44:9, 57:14, 68:8, 79:25, 97:1
**personal** [5] - 18:9, 49:1, 83:13, 83:16, 89:3
**personally** [1] - 3:16
**personnel** [5] - 15:3, 39:21, 41:17, 46:11, 68:19
**persons** [1] - 40:11
**perspective** [2] - 18:20, 33:21
**pertains** [2] - 53:2, 58:23
**Pete** [104] - 1:6, 1:17, 4:1, 4:19, 4:20, 4:24, 5:9, 5:18, 6:8, 6:16, 7:3, 7:13, 7:22, 8:21, 8:25, 9:1, 9:6, 9:11, 9:13, 9:24, 10:2, 10:9, 10:11, 10:24, 11:1, 12:3, 12:4, 13:15, 13:17, 13:24, 31:13, 31:15, 32:16, 32:18, 32:23, 37:21, 37:23, 38:11, 42:8, 42:13, 43:8, 44:17,

45:14, 45:17, 45:21, 48:4, 49:21, 50:25, 51:5, 51:23, 51:24, 52:4, 52:6, 53:7, 53:10, 54:9, 55:9, 55:13, 56:1, 56:17, 56:24, 58:6, 58:12, 58:18, 58:21, 58:23, 59:11, 59:21, 59:24, 60:5, 60:8, 60:20, 61:1, 61:5, 61:13, 62:4, 62:16, 62:18, 63:1, 63:13, 63:18, 64:24, 65:13, 65:25, 66:13, 67:14, 67:15, 67:16, 67:17, 68:17, 69:22, 72:7, 73:1, 73:3, 73:25, 74:2, 77:6, 82:14, 82:22, 83:2, 84:3, 86:25, 87:6, 95:3
**Pete's** [4] - 52:1, 53:12, 65:1, 80:11
**picked** [1] - 96:21
**picks** [1] - 34:17
**PJ** [4] - 38:18, 52:1, 53:12, 63:1
**PJ's** [1] - 70:8
**place** [6] - 4:17, 5:4, 24:22, 71:15, 76:2, 93:5
**plaintiff** [8] - 1:4, 3:12, 31:25, 32:2, 32:23, 33:4, 97:23, 99:1
**PLAINTIFF** [1] - 1:12
**Plaintiff's** [11] - 40:2, 40:9, 53:18, 54:19, 54:21, 59:4, 61:19, 61:23, 61:25, 76:23, 77:2
**plaintiffs** [1] - 35:1
**plans** [1] - 68:5
**pleased** [2] - 6:1, 7:19
**plumbing** [1] - 45:11
**plus** [10] - 13:22, 13:25, 14:4, 14:5, 14:21, 30:16, 88:9, 88:22, 89:21, 95:11
**point** [7] - 33:9, 42:2, 55:9, 86:15, 95:3, 99:22, 99:23
**pointing** [2] - 47:21, 54:23
**points** [1] - 87:12
**policy** [2] - 15:13, 83:13
**pool** [1] - 48:16
**portion** [2] - 74:18, 94:7
**portions** [1] - 50:8

**position** [7] - 32:15, 35:13, 36:14, 36:22, 37:7, 39:8, 80:9
**possible** [2] - 31:9, 69:25
**potential** [2] - 63:19, 63:25
**potentially** [3] - 75:16, 75:23, 95:23
**poured** [1] - 46:15
**precisely** [1] - 14:23
**predicate** [1] - 60:17
**prefabricated** [1] - 13:2
**premarked** [1] - 43:11
**preparation** [6] - 41:4, 41:21, 46:14, 46:18, 64:17, 92:20
**prepare** [3] - 46:10, 67:9, 96:2
**prepared** [11] - 50:4, 50:5, 51:4, 51:5, 64:14, 64:15, 85:21, 86:16, 88:19, 88:20, 96:6
**preparing** [3] - 43:15, 43:20, 43:21
**present** [1] - 17:2
**presented** [3] - 4:5, 6:15, 17:12
**president** [5] - 35:12, 37:5, 49:19, 59:20, 68:23
**prevails** [2] - 93:18, 93:21
**prevent** [1] - 79:23
**prevented** [1] - 22:10
**previous** [4] - 53:4, 59:25, 60:24, 83:7
**previously** [1] - 91:17
**price** [5] - 14:2, 14:4, 14:6, 51:18, 51:21
**priced** [1] - 50:18
**prices** [2] - 53:7, 53:13
**principal** [1] - 62:20
**printed** [1] - 50:8
**privilege** [1] - 31:5
**problem** [13] - 5:2, 6:6, 17:4, 22:12, 25:9, 25:10, 25:23, 29:16, 33:16, 63:22, 64:2, 74:23, 100:5
**problems** [2] - 13:4, 23:2
**procedure** [1] - 66:17
**procedures** [1] - 66:15
**proceed** [4] - 35:7, 48:17, 62:21, 75:13
**proceedings** [1] -

101:4
**process** [19] - 7:1, 7:7, 10:20, 20:19, 22:3, 24:12, 25:12, 25:18, 33:8, 33:10, 57:1, 66:15, 69:16, 70:1, 70:11, 70:24, 71:2, 72:5, 86:23
**product** [5] - 20:14, 23:3, 31:14, 31:17, 32:8
**products** [1] - 31:20
**professional** [1] - 7:19
**profit** [4] - 14:1, 30:16, 47:23, 94:6
**progress** [2] - 50:2, 52:13
**prohibited** [1] - 81:3
**prohibits** [1] - 15:16
**Project** [1] - 3:22
**project** [152] - 4:15, 5:17, 5:20, 7:21, 8:1, 8:2, 8:5, 8:24, 12:3, 13:9, 13:10, 15:4, 15:5, 15:9, 15:12, 15:14, 15:17, 15:22, 15:23, 15:24, 16:16, 17:23, 19:15, 19:18, 19:22, 20:1, 21:3, 21:4, 23:5, 23:23, 23:24, 24:22, 24:24, 25:2, 25:3, 25:10, 26:5, 31:24, 35:14, 36:15, 36:19, 36:22, 36:23, 37:22, 37:24, 38:2, 38:7, 38:12, 38:15, 38:18, 38:20, 38:24, 39:13, 39:21, 40:20, 41:7, 41:15, 41:17, 41:19, 42:3, 42:7, 42:12, 42:20, 44:12, 44:13, 44:14, 44:15, 45:3, 45:4, 45:6, 45:7, 45:8, 45:12, 45:13, 45:15, 46:1, 46:5, 46:7, 46:9, 46:10, 47:12, 47:18, 49:23, 54:15, 59:22, 61:3, 61:6, 61:7, 61:15, 62:22, 63:6, 63:8, 63:21, 64:4, 64:25, 65:16, 65:23, 66:7, 66:13, 66:16, 66:18, 67:8, 68:8, 68:16, 69:22, 70:2, 70:21, 71:2, 71:5, 71:8, 72:13, 72:19, 73:7, 74:1, 74:10, 74:11, 76:9, 77:15, 77:19, 79:12,

79:20, 79:24, 80:1, 80:6, 80:8, 80:13, 80:19, 80:21, 80:22, 81:5, 81:22, 82:24, 83:22, 84:11, 89:5, 89:8, 90:20, 90:24, 91:15, 92:1, 92:3, 92:9, 92:12, 92:16, 93:1, 93:25, 94:3, 95:24, 95:25
**projection** [2] - 69:19, 70:3
**projects** [14] - 12:10, 12:15, 13:11, 13:12, 15:3, 19:22, 22:16, 28:3, 38:1, 38:3, 66:18, 66:22, 79:10, 92:11
**prompted** [1] - 75:15
**proof** [1] - 33:5
**properly** [1] - 27:15
**properties** [4] - 36:9, 36:16, 45:1
**property** [1] - 36:20
**proposal** [3] - 55:14, 67:2, 67:3
**proposals** [2] - 85:21, 86:16
**protect** [1] - 79:23, 80:18, 89:7
**prove** [1] - 100:1
**provide** [8] - 15:9, 17:22, 37:12, 53:15, 54:9, 63:11, 65:2, 65:4
**provided** [7] - 4:6, 37:18, 42:19, 55:6, 65:3, 65:7, 65:10
**provides** [1] - 80:15
**providing** [3] - 16:14, 44:18, 53:25
**provision** [8] - 14:7, 15:15, 16:10, 23:7, 28:17, 81:2, 81:10, 88:14
**provisions** [2] - 42:21, 80:25
**public** [3] - 15:19, 34:9, 95:1
**purchase** [1] - 87:20
**purchased** [3] - 31:14, 31:16, 83:1
**purpose** [1] - 62:1
**purposes** [7] - 16:17, 64:4, 78:14, 85:15, 87:14, 89:25, 99:21
**pursuant** [2] - 80:15, 95:14
**put** [18] - 8:1, 19:12, 22:24, 46:11, 61:13,

61:23, 63:18, 74:11,
76:20, 76:22, 77:12,
79:24, 80:10, 84:19,
84:24, 91:2, 94:25,
99:20
**puts** [3] - 17:17, 67:4,
99:13
**putting** [2] - 99:17,
99:23
**PVGC** [55] - 14:3,
15:3, 17:21, 17:25,
18:13, 19:20, 20:7,
20:19, 20:22, 23:13,
23:16, 23:20, 24:2,
24:4, 24:8, 24:24,
25:18, 25:23, 26:2,
26:4, 27:23, 27:25,
28:6, 28:19, 28:24,
29:20, 30:7, 30:8,
30:9, 30:12, 30:25,
62:25, 63:20, 78:22,
78:23, 79:9, 79:17,
80:16, 80:19, 80:22,
81:6, 81:11, 81:13,
81:14, 81:23, 82:1,
85:3, 86:16, 86:19,
88:5, 89:5, 90:20,
93:13, 94:16
**PVGC's** [3] - 18:20,
88:13, 89:7

## Q

**qualifications** [2] -
91:14, 92:1
**qualified** [4] - 90:23,
90:25, 92:3, 92:8
**quantified** [1] - 93:6
**quantities** [9] - 10:16,
69:24, 70:4, 70:17,
70:20, 70:22, 71:20,
71:23, 72:1
**quantity** [3] - 51:18,
51:21, 69:23
**questions** [8] - 11:16,
11:17, 27:2, 60:17,
75:6, 78:7, 78:18,
80:12
**quick** [2] - 31:9, 34:2
**quickly** [1] - 54:17
**quit** [2] - 27:16, 27:17
**quite** [2] - 8:16, 54:16

## R

**raised** [1] - 27:2
**rate** [2] - 91:13, 91:24
**rates** [1] - 47:22
**rating** [1] - 92:4
**reach** [2] - 99:17,

100:9
**read** [6] - 15:2, 82:17,
83:8, 83:11, 91:20,
97:2
**readmitted** [1] - 84:24
**ready** [2] - 58:20, 97:9
**real** [2] - 36:7, 37:19
**realize** [2] - 27:1, 27:2
**really** [5] - 4:23, 34:10,
69:6, 90:2, 96:22
**reason** [3] - 9:14,
10:8, 50:18
**reasons** [6] - 12:11,
15:13, 17:13, 24:20,
29:12, 99:10
**rec** [1] - 69:21
**rec'd** [1] - 69:19
**receive** [1] - 60:4
**received** [3] - 67:15,
70:22, 72:23
**recently** [1] - 74:8
**RECESS** [3] - 34:21,
69:9, 100:12
**recognize** [14] - 39:17,
39:22, 49:16, 53:19,
54:4, 55:1, 59:4,
64:7, 77:3, 85:17,
87:14, 90:1, 90:6,
94:14
**recognized** [1] - 27:13
**record** [4] - 6:11, 35:5,
37:17, 60:7
**records** [2] - 40:14,
97:22
**REDIRECT** [1] - 2:2
**referenced** [2] - 60:19,
73:17
**references** [2] - 51:8,
60:20
**referencing** [3] -
41:10, 50:24, 58:7
**referred** [1] - 13:4
**referring** [1] - 82:25
**refused** [2] - 4:20,
4:22
**refute** [1] - 10:14
**regard** [2] - 57:25,
75:10
**regarding** [10] - 37:24,
39:13, 41:1, 56:18,
57:16, 58:8, 58:18,
75:16, 75:23, 77:12
**regards** [1] - 100:2
**registration** [1] - 62:9
**regulations** [1] - 16:12
**rehab** [1] - 38:3
**rehabilitation** [1] -
15:20
**reimbursed** [1] - 13:25
**reiterate** [1] - 33:20

**related** [8] - 16:16,
16:17, 19:13, 81:3,
83:5, 88:13, 93:25,
96:3
**relationship** [9] - 6:18,
14:10, 17:4, 18:24,
22:14, 32:10, 32:11,
40:21, 98:6
**relative** [1] - 73:15
**relaying** [1] - 25:17
**release** [3] - 30:3,
52:12, 53:22
**releases** [3] - 29:10,
29:22, 30:5
**relevance** [1] - 74:13
**relocated** [5] - 35:20,
36:10, 36:13, 36:14,
36:18
**reluctantly** [1] - 73:3
**rely** [2] - 91:3
**remember** [3] - 24:12,
91:20, 92:5
**removal** [1] - 12:22
**remove** [5] - 20:4,
24:10, 38:3, 51:8,
51:10
**removed** [3] - 12:23,
13:7, 51:11
**renamed** [1] - 38:1
**renovate** [1] - 38:5
**renovation** [4] - 4:25,
12:21, 38:7
**renovations** [1] -
12:16
**rental** [1] - 36:20
**rep** [2] - 98:21, 99:1
**rephrase** [1] - 75:19
**replace** [3] - 20:6,
38:4, 38:6
**replaced** [3] - 13:1,
13:8, 82:13
**replacing** [2] - 12:23,
46:24
**report** [1] - 71:3
**REPORTED** [1] - 1:18
**Reporter** [1] - 1:19
**reporter** [1] - 76:6
**reports** [1] - 92:24
**represent** [1] - 3:15
**representative** [1] -
31:11
**representing** [1] -
31:5
**request** [4] - 56:23,
57:17, 89:12, 96:6
**requested** [5] - 12:6,
45:17, 53:15, 64:24,
65:13
**requesting** [1] - 33:14
**requests** [1] - 33:6

**require** [1] - 6:7
**required** [5] - 28:21,
51:19, 56:5, 69:18,
82:13
**requirement** [1] -
19:19
**requisition** [1] - 70:2
**requisitions** [2] -
69:17, 70:8
**reside** [1] - 35:9
**reskin** [1] - 38:3
**resolution** [1] - 58:25
**resolved** [1] - 58:25
**resources** [5] - 5:16,
38:19, 38:21, 38:23,
41:14
**respect** [4] - 29:20,
91:13, 91:25, 98:6
**respond** [3] - 9:13,
41:12, 42:5
**responding** [1] -
44:17
**responds** [1] - 58:10
**response** [6] - 9:19,
43:21, 63:16, 64:1,
82:18, 96:6
**responsibility** [3] -
11:10, 29:15, 32:17
**responsible** [1] - 6:23
**rest** [3] - 28:7, 97:5,
98:2
**resubmit** [2] - 24:10,
27:3
**result** [2] - 23:1, 72:2
**resulted** [1] - 7:23
**resume** [5] - 39:15,
39:19, 39:25, 40:9,
40:17, 97:10
**retail** [1] - 36:9
**retained** [2] - 88:10,
89:11
**retelling** [1] - 68:25
**return** [2] - 34:3, 89:12
**returned** [1] - 89:14
**reversed** [1] - 14:23
**reversionary** [2] -
95:18, 95:20
**review** [7] - 20:17,
22:4, 69:23, 70:20,
80:9, 80:10, 98:16
**reviewed** [1] - 4:8
**revised** [1] - 72:2
**revising** [1] - 71:23
**rise** [8] - 3:2, 34:6,
34:20, 34:23, 67:24,
69:11, 97:11, 100:11
**Robert** [9] - 5:11,
5:20, 5:24, 6:8, 8:9,
10:12, 15:5, 35:1,
35:6

**ROBERT** [1] - 2:3
**role** [1] - 80:6
**roles** [1] - 44:12
**room** [3] - 97:5, 97:7,
100:7
**roommate** [1] - 96:19
**rooms** [3] - 20:10,
97:14
**routine** [1] - 22:12
**routinely** [2] - 22:6,
22:9
**RP** [1] - 47:13
**RPR** [2] - 1:18, 101:8
**rumors** [2] - 18:24,
19:1
**run** [1] - 9:3
**running** [1] - 5:5

## S

**S.E** [1] - 63:23
**Saddler** [14] - 57:7,
57:11, 57:13, 58:10,
62:1, 62:2, 62:4,
62:7, 62:12, 82:18,
83:4, 83:24, 85:3,
85:19
**SANDERS** [3] - 1:18,
101:6, 101:8
**sanders** [2] - 6:11,
34:17
**Sanders** [1] - 37:17
**satisfy** [1] - 65:1
**saw** [1] - 45:18
**scale** [2] - 91:13,
91:25
**schedule** [13] - 19:18,
20:2, 21:1, 50:10,
51:13, 51:22, 52:24,
53:1, 53:4, 53:5,
55:15, 67:3
**scheduled** [1] - 51:16
**schedules** [1] - 21:24
**scope** [27] - 6:2, 6:6,
6:13, 6:17, 13:8,
17:15, 18:21, 22:17,
23:4, 23:6, 23:11,
51:20, 55:10, 55:19,
56:18, 56:22, 56:23,
56:25, 58:5, 58:8,
82:21, 84:2, 84:4,
84:8, 84:9, 92:11
**scramble** [1] - 5:10
**screen** [3] - 49:15,
82:8, 84:25
**screens** [3] - 44:2,
61:24, 77:1
**scrutinize** [1] - 10:23
**seated** [3] - 3:3, 34:24,
69:12

**second** [2] - 54:4, 82:19
**secret** [1] - 23:16
**section** [2] - 16:17, 40:18
**sections** [1] - 55:15
**SECURITY** [8] - 3:2, 34:6, 34:20, 34:23, 67:24, 69:11, 97:11, 100:11
**see** [33] - 10:20, 12:24, 14:9, 17:13, 17:24, 18:20, 21:6, 21:17, 27:5, 27:25, 29:7, 29:13, 29:18, 29:19, 29:21, 30:3, 40:17, 43:13, 45:16, 47:14, 47:21, 50:2, 51:2, 51:13, 52:13, 52:24, 54:23, 55:20, 62:14, 76:1, 94:25, 97:9, 97:21
**seek** [1] - 94:19
**seeking** [2] - 10:16, 39:21
**seem** [1] - 65:14
**Seitz** [1] - 100:5
**selection** [1] - 3:4
**send** [4] - 20:24, 21:2, 50:18, 85:23
**sending** [1] - 87:22
**sends** [1] - 69:21
**senior** [10] - 5:20, 35:14, 36:14, 36:19, 36:22, 45:6, 45:9, 45:13, 66:13, 80:12
**Senior** [12] - 12:20, 38:1, 51:17, 52:23, 53:3, 53:6, 53:23, 79:10
**sense** [2] - 21:17, 99:24
**sent** [12] - 20:17, 21:7, 22:1, 24:3, 24:5, 49:20, 62:11, 69:3, 78:23, 79:6, 87:10, 88:5
**sentence** [1] - 82:17
**sentences** [2] - 36:4, 39:2
**separate** [1] - 13:13
**September** [10] - 9:5, 26:19, 26:20, 26:22, 27:10, 27:14, 27:21, 28:12, 29:1
**sequence** [1] - 67:4
**series** [1] - 66:21
**seriously** [1] - 76:11
**serve** [2] - 15:4, 92:9
**service** [1] - 34:9

**services** [9] - 16:15, 17:23, 37:19, 39:20, 42:7, 42:19, 42:20, 44:22, 80:13
**serving** [2] - 80:19, 95:24
**setup** [1] - 46:22
**seven** [2] - 34:3, 69:8
**seventies** [1] - 37:1
**several** [13] - 5:13, 43:10, 44:9, 45:17, 56:20, 57:2, 63:18, 65:9, 66:3, 73:7, 74:6, 74:7, 87:11
**shall** [2] - 16:13, 16:18
**shares** [1] - 88:8
**shopping** [3] - 36:9, 36:12, 36:17
**short** [3] - 19:11, 33:8, 39:9
**shortly** [1] - 62:11
**show** [7] - 17:8, 26:7, 33:14, 33:19, 57:4, 59:3, 61:19
**showed** [1] - 33:15
**showing** [7] - 39:17, 42:10, 43:11, 47:1, 48:13, 53:18, 64:6
**shows** [4] - 15:25, 16:5, 18:21, 47:17
**sic** [1] - 90:25
**side** [2] - 3:7, 46:16
**sidebar** [2] - 74:14, 75:13
**sided** [1] - 78:14
**sides** [1] - 34:13
**sign** [1] - 64:12
**signature** [2] - 54:5, 78:24
**signed** [7] - 17:21, 18:23, 54:7, 78:22, 84:7, 84:9, 96:12
**significant** [4] - 44:10, 44:24, 46:24, 94:7
**significantly** [1] - 56:22
**signs** [1] - 46:12
**similar** [1] - 67:2
**simple** [5] - 3:20, 6:3, 11:14, 31:9, 33:18
**simply** [1] - 62:9
**single** [3] - 23:8, 36:8, 84:14
**sit** [3] - 11:9, 26:7, 99:19
**site** [21] - 4:15, 8:5, 8:10, 8:24, 15:4, 21:3, 22:11, 24:18, 29:3, 38:17, 40:21, 41:21, 43:4, 45:3,

46:18, 54:15, 71:3, 71:11, 71:15, 73:23, 75:14
**sites** [1] - 39:21
**sitting** [4] - 49:9, 92:23, 93:24, 94:5
**six** [1] - 72:14
**size** [3] - 19:18, 20:10, 70:1
**Skiljevic** [7] - 26:6, 26:7, 26:12, 26:13, 92:17, 92:18, 92:20
**skill** [1] - 14:13
**slabs** [1] - 46:15
**slide** [3] - 83:8, 83:10, 83:16
**slightly** [1] - 45:10
**slow** [6] - 34:12, 34:18, 36:3, 37:16, 39:10, 76:5
**small** [1] - 76:3
**smaller** [1] - 45:10
**smoothly** [1] - 6:22
**soda** [1] - 67:22
**sole** [1] - 37:5
**solved** [1] - 19:2
**someone** [3] - 28:6, 29:4, 29:13, 50:5, 71:14
**sometimes** [1] - 21:20
**somewhere** [1] - 55:24
**son** [2] - 38:18, 53:12
**sorry** [3] - 17:20, 18:2, 20:16
**sort** [2] - 17:1, 33:13
**sorted** [1] - 27:3
**sought** [1] - 75:15
**sounds** [1] - 28:17
**sOUTHERN** [1] - 1:1
**SOV** [2] - 50:8, 50:10
**Spaces** [1] - 40:21
**speaking** [4] - 31:7, 34:10, 34:11, 34:14
**specific** [1] - 15:15
**specifically** [4] - 41:3, 46:21, 65:18, 80:15
**specifics** [1] - 8:7
**specified** [1] - 11:21
**speed** [1] - 58:14
**spending** [1] - 14:7
**spends** [1] - 13:25
**spent** [1] - 47:18
**spoken** [1] - 58:12
**spouse** [1] - 96:18
**Square** [1] - 35:14
**stack** [4] - 78:13, 82:2, 84:17, 94:9
**staff** [2] - 41:21, 91:3

**staffing** [1] - 43:8
**standard** [1] - 67:7
**standpoint** [1] - 32:5
**stands** [1] - 28:24
**start** [15] - 5:3, 5:22, 7:11, 16:5, 18:24, 34:4, 34:14, 34:15, 39:8, 42:3, 42:17, 46:19, 49:18, 63:23, 78:15
**start-ups** [1] - 63:23
**started** [14] - 6:22, 12:9, 15:8, 25:12, 37:13, 42:18, 46:7, 46:18, 48:2, 58:16, 66:2, 72:15, 85:7, 92:18
**starting** [2] - 43:12, 83:11
**starts** [5] - 4:23, 9:24, 15:24, 16:3, 43:17
**State** [4] - 15:19, 35:21, 36:25, 62:9
**state** [1] - 35:4
**statement** [4] - 3:8, 33:18, 50:12, 96:12
**statements** [1] - 3:11
**states** [1] - 58:12
**STATES** [2] - 1:1, 1:10
**States** [1] - 1:19
**stating** [1] - 40:14
**status** [2] - 62:17, 96:3
**stay** [2] - 97:20, 98:15
**step** [4] - 67:9, 68:1, 97:13
**still** [5] - 9:19, 58:24, 62:23, 75:18, 99:14
**stockholder** [1] - 16:20
**stop** [3] - 67:18, 74:23
**stopped** [1] - 8:18
**story** [6] - 3:22, 12:19, 12:21, 13:1, 19:11, 22:5
**straightened** [1] - 28:6
**stress** [1] - 8:5
**strike** [1] - 88:11
**structure** [1] - 13:21
**sub** [1] - 37:14
**subcontract** [6] - 7:14, 9:11, 16:8, 18:23, 29:9, 29:13
**subcontracted** [1] - 3:24
**subcontractor** [22] - 7:22, 13:3, 13:19, 15:12, 15:15, 15:22, 16:14, 17:5, 18:21,

19:10, 20:7, 22:18, 22:20, 23:8, 23:23, 24:13, 29:11, 31:25, 33:23, 69:20, 81:13, 95:23
**subcontractors** [9] - 6:17, 15:25, 16:1, 16:2, 20:15, 20:22, 73:8, 81:18, 81:20
**subcontractors'** [1] - 25:6
**subcontracts** [6] - 9:23, 10:2, 10:8, 28:14, 65:25, 66:11
**subdivisions** [1] - 36:8
**subject** [1] - 57:18
**submissions** [1] - 80:9
**submit** [5] - 9:8, 20:15, 67:5, 67:12, 68:16
**submits** [2] - 6:24, 69:17
**submitted** [21] - 4:9, 8:19, 27:10, 27:16, 27:22, 28:13, 29:2, 33:4, 52:4, 52:17, 56:16, 56:21, 67:13, 70:9, 70:21, 78:3, 78:19, 79:9, 79:14, 79:17, 84:14
**submitting** [6] - 6:23, 48:7, 48:10, 66:17, 68:5, 87:19
**subs** [2] - 5:4, 72:8
**subsequent** [1] - 88:25
**subsidiary** [1] - 16:18
**substantial** [3] - 12:17, 24:2, 26:24
**substantially** [1] - 27:9
**sudden** [1] - 9:24
**sued** [2] - 32:24, 33:6
**sufficient** [2] - 5:4, 14:14
**suggested** [1] - 17:9
**Suite** [1] - 1:19
**sum** [1] - 30:8
**summary** [1] - 66:25
**superintendent** [11] - 15:4, 41:19, 44:14, 44:15, 45:8, 45:9, 68:20, 69:23, 70:4, 70:13, 92:9
**superintendent's** [2] - 70:12, 70:16
**superintendents** [2] - 68:20, 71:6

**superior** [1] - 71:13
**supervision** [1] - 14:14
**supplier** [1] - 16:14
**suppliers** [2] - 5:4, 72:8
**supply** [2] - 14:15, 58:15
**support** [2] - 78:3, 91:1
**supposed** [4] - 19:2, 20:20, 25:8, 29:22
**surety** [11] - 31:6, 31:17, 31:21, 31:24, 32:3, 32:8, 32:11, 32:13, 32:19, 33:2
**Surety** [1] - 31:12
**surety's** [1] - 32:5
**surround** [1] - 38:4
**surrounding** [1] - 24:7
**suspect** [1] - 98:24
**Sustained** [1] - 71:25
**sustained** [1] - 73:12
**SWORN** [1] - 35:3
**system** [1] - 93:4
**Systems** [1] - 37:15

**T**

**tab** [4] - 84:17, 87:13, 89:24, 94:9
**TAKEN** [1] - 69:9
**tall** [1] - 13:2
**TAYLOR** [34] - 1:12, 3:13, 6:12, 35:1, 35:8, 40:1, 40:6, 42:24, 43:23, 47:6, 54:18, 56:15, 57:4, 57:20, 59:14, 60:12, 64:18, 68:10, 68:15, 74:19, 74:25, 75:3, 75:12, 75:20, 76:22, 77:23, 78:7, 84:21, 86:2, 87:25, 91:16, 94:22, 98:19, 98:23
**Taylor** [17] - 3:14, 13:4, 32:20, 34:24, 35:7, 39:11, 56:10, 59:18, 67:18, 69:13, 78:18, 80:12, 82:10, 88:16, 91:19, 98:5, 99:25
**TD** [1] - 60:10
**team** [5] - 45:4, 45:6, 69:22, 70:21, 93:6
**Technologies** [13] - 17:22, 17:25, 37:4, 37:9, 37:11, 37:13, 37:22, 42:13, 44:18, 63:20, 65:19, 89:3,

89:5
**technology** [1] - 37:14
**Ted** [6] - 44:6, 44:7, 44:9, 44:14, 45:2, 45:9
**temporary** [6] - 58:4, 82:20, 82:23, 83:18, 83:20, 83:21
**ten** [5] - 16:22, 27:19, 69:3, 91:13, 91:25
**tenants** [1] - 81:8
**tend** [1] - 34:13
**tense** [1] - 8:6
**term** [3] - 14:1, 14:19, 16:17
**terminate** [1] - 9:23
**terminated** [7] - 8:12, 9:22, 10:11, 10:8, 72:20, 75:9, 76:13
**terminating** [1] - 76:16
**termination** [1] - 73:2
**terms** [7] - 12:21, 14:18, 14:25, 49:7, 66:3, 81:5, 81:14
**testified** [7] - 38:14, 45:2, 56:22, 59:20, 78:21, 80:24, 86:4
**testify** [4] - 5:11, 8:7, 9:16, 70:11
**testifying** [1] - 85:1
**testimony** [7] - 59:22, 72:1, 73:11, 74:25, 86:11, 97:6, 98:20
**text** [1] - 87:10
**THE** [126] - 1:9, 3:1, 3:3, 6:10, 11:12, 30:1, 31:3, 34:1, 34:8, 34:22, 34:24, 35:2, 35:6, 35:7, 36:3, 37:16, 39:1, 39:10, 40:4, 40:8, 40:12, 40:14, 40:15, 40:16, 40:24, 40:25, 42:23, 43:1, 43:3, 43:19, 43:21, 44:1, 47:5, 47:9, 48:15, 48:23, 49:11, 49:13, 54:21, 56:9, 57:6, 57:18, 57:19, 57:23, 58:3, 59:10, 59:16, 59:18, 60:14, 60:16, 61:9, 61:11, 61:12, 61:18, 61:21, 61:23, 62:24, 63:1, 63:4, 64:21, 67:18, 68:1, 68:4, 68:13, 68:22, 69:10, 69:12, 70:18, 70:20, 71:25, 73:12, 74:4, 74:6, 74:14,

74:23, 75:2, 75:4, 75:13, 75:19, 76:1, 76:2, 76:5, 76:7, 76:25, 77:22, 77:24, 78:8, 78:10, 79:13, 79:15, 82:4, 82:7, 84:19, 84:23, 86:1, 86:3, 86:9, 86:10, 87:3, 87:5, 88:1, 90:4, 90:7, 90:8, 90:9, 90:10, 91:11, 91:19, 91:23, 92:5, 92:7, 94:11, 94:13, 94:21, 94:24, 96:15, 97:13, 97:17, 97:20, 98:4, 98:11, 98:15, 98:22, 99:4, 99:11, 99:25
**theoretically** [1] - 69:25
**third** [5] - 11:23, 40:17, 43:17, 58:10, 59:3
**thirty** [1] - 22:2
**thousands** [1] - 93:13
**thread** [1] - 82:9
**three** [11] - 8:1, 13:1, 19:14, 19:15, 19:16, 21:21, 32:10, 36:21, 39:2, 44:23, 56:20
**three-month** [1] - 19:16
**tight** [2] - 12:10, 24:2
**timeframe** [1] - 24:21
**timeline** [1] - 12:10
**timely** [2] - 10:6, 22:21
**timetable** [1] - 24:3
**timid** [2] - 68:12, 68:13
**Timothy** [1] - 3:14
**TIMOTHY** [1] - 1:12
**tired** [1] - 31:8
**TM** [3] - 37:24, 38:17, 53:3
**today** [7] - 5:11, 12:13, 28:24, 92:23, 93:24, 94:5, 96:20
**together** [1] - 64:15
**tomorrow** [3] - 98:17, 98:18, 100:10
**tonight** [3] - 49:5, 96:18, 99:6
**took** [5] - 26:9, 36:22, 44:25, 66:2, 76:2
**tool** [1] - 40:12
**top** [2] - 62:12, 82:19
**topic** [1] - 69:4
**Torres** [4] - 18:6, 85:12, 86:13, 92:19
**total** [4] - 30:8, 51:21,

52:7, 55:19
**towards** [1] - 21:13
**tower** [4] - 45:9, 52:22, 55:6
**Tower** [20] - 3:21, 12:17, 12:20, 36:23, 37:22, 38:1, 38:2, 38:8, 38:12, 51:17, 52:23, 53:3, 53:5, 53:6, 53:24, 55:5, 77:15, 79:10, 93:25
**towers** [4] - 3:22, 5:1, 12:16
**Towers** [1] - 45:9
**toxic** [3] - 8:4, 74:20, 77:19
**tractor** [1] - 35:19
**trade** [1] - 23:15
**traditional** [1] - 15:18
**traffic** [2] - 96:17, 97:8
**trail** [1] - 34:14
**trailer** [5] - 73:22, 73:25, 75:16, 75:23, 76:2
**transaction** [2] - 88:14, 89:21
**transactions** [1] - 81:3
**transcription** [1] - 101:4
**transfer** [9] - 59:8, 59:11, 59:15, 60:3, 60:4, 60:21, 63:24, 65:13, 88:25
**transferred** [4] - 65:11, 90:13, 90:17, 95:11
**transfers** [1] - 18:12
**transmission** [1] - 57:10
**TRIAL** [1] - 1:9
**trial** [8] - 3:6, 4:4, 11:3, 12:14, 32:7, 32:8, 69:7, 96:22
**true** [2] - 88:10, 92:23
**trust** [1] - 14:10
**truth** [1] - 40:6
**try** [4] - 25:7, 31:8, 75:19, 96:16
**trying** [2] - 68:10, 97:8
**turn** [9] - 40:17, 72:24, 82:2, 83:7, 84:17, 85:14, 87:13, 89:24, 94:9
**turned** [3] - 9:5, 30:5, 32:24
**turns** [2] - 16:4, 19:13
**twenties** [1] - 35:21
**twice** [1] - 71:14
**two** [32] - 3:22, 5:1, 6:21, 8:1, 8:14,

11:16, 11:17, 11:20, 12:15, 12:18, 13:12, 13:13, 15:13, 15:15, 19:11, 19:15, 24:20, 24:21, 27:16, 27:17, 28:18, 43:12, 55:6, 57:24, 57:25, 61:25, 66:23, 78:14, 79:8, 79:14, 98:25
**two-sided** [1] - 78:14
**type** [2] - 20:5, 56:5
**types** [2] - 14:5, 36:16
**typically** [1] - 22:2

**U**

**ultimately** [9] - 7:23, 8:9, 13:3, 15:5, 21:22, 30:20, 78:22, 84:5, 89:14
**under** [8] - 8:5, 9:11, 13:12, 13:13, 16:12, 61:6, 61:7, 84:11
**understood** [2] - 76:6, 98:13
**undertake** [2] - 91:14, 92:1
**underway** [1] - 25:4
**unhappy** [1] - 76:8
**uninhibited** [1] - 62:22
**UNINTELLIGIBLE** [1] - 37:15
**unintelligible** [1] - 76:4
**unit** [2] - 36:20, 51:18
**UNITED** [1] - 1:1
**uNITED** [1] - 1:10
**United** [1] - 1:19
**units** [5] - 12:18, 12:20, 51:9, 51:11, 51:18
**unless** [2] - 69:1, 74:14
**up** [39] - 9:6, 12:2, 13:25, 15:25, 16:5, 18:21, 20:1, 20:17, 21:7, 22:1, 24:3, 26:17, 26:19, 29:8, 30:4, 31:7, 34:15, 34:17, 35:18, 43:7, 44:2, 46:9, 46:11, 46:16, 49:15, 55:22, 58:3, 58:14, 61:24, 76:22, 76:25, 82:7, 84:19, 84:24, 93:8, 97:2, 98:2, 98:17, 100:10
**ups** [1] - 63:23
**upstream** [3] - 13:16, 13:22, 27:22

## V

**valuable** [4] - 88:9, 88:23, 89:22, 95:12
**value** [3] - 20:3, 20:6, 38:7
**values** [14] - 20:2, 21:2, 21:24, 50:10, 51:13, 51:22, 52:24, 53:1, 53:4, 53:6, 55:15, 67:1, 67:3, 67:4
**VAN** [1] - 1:13
**VANESSA** [1] - 1:13
**vanish** [1] - 21:16
**variation** [1] - 79:9
**variety** [2] - 12:11, 99:9
**various** [3] - 40:11, 66:6, 94:16
**vehicles** [2] - 83:14, 83:16
**verbal** [1] - 87:2
**verdict** [2] - 11:4, 99:21
**verified** [2] - 24:19, 70:4
**verifies** [1] - 21:4
**verify** [3] - 21:5, 68:21, 71:20
**vicari** [3] - 15:7, 15:11, 32:3
**Vicari** [139] - 1:6, 1:17, 4:1, 4:19, 4:20, 4:24, 5:9, 5:18, 5:24, 6:8, 6:16, 6:18, 7:3, 7:13, 7:22, 8:5, 8:9, 8:12, 8:14, 8:21, 8:25, 9:1, 9:6, 9:12, 9:13, 9:24, 10:2, 10:9, 10:11, 10:24, 11:1, 12:3, 12:4, 13:15, 13:17, 13:24, 15:8, 15:21, 16:6, 17:4, 17:14, 19:1, 25:17, 31:13, 31:15, 32:16, 32:18, 32:23, 36:21, 37:21, 37:23, 38:11, 38:14, 38:16, 38:17, 39:4, 39:5, 39:12, 40:5, 40:20, 41:2, 41:12, 41:14, 41:25, 42:8, 42:13, 43:8, 43:13, 43:16, 44:3, 44:17, 45:14, 45:17, 45:21, 48:10, 49:21, 50:25, 51:23, 51:24, 52:4, 52:6, 53:7, 53:10, 54:9, 55:9, 55:13, 55:14, 56:18, 56:24,

58:18, 59:11, 59:21, 59:24, 60:5, 60:8, 60:20, 61:1, 61:5, 61:13, 62:4, 62:16, 63:13, 65:2, 66:1, 66:13, 67:14, 67:15, 67:16, 67:17, 68:6, 68:8, 68:17, 69:3, 72:8, 73:1, 73:5, 73:8, 73:14, 73:18, 73:25, 74:2, 74:15, 75:8, 75:16, 75:22, 76:8, 76:12, 76:15, 77:9, 78:2, 83:2, 86:25, 87:2, 87:6, 95:3, 95:22
**vicari's** [1] - 57:14
**Vicari's** [5] - 48:4, 50:5, 51:5, 69:22, 96:1
**violation** [1] - 88:13
**voice** [1] - 58:3
**volatile** [1] - 73:8
**volume** [2] - 55:19, 56:1
**vs** [1] - 1:5

## W

**wages** [1] - 44:6
**wait** [3] - 39:1, 99:10
**waiting** [1] - 11:8
**waive** [1] - 29:25
**waiver** [10] - 50:19, 52:12, 53:22, 53:25, 54:9, 54:24, 55:4, 55:20, 79:3, 84:14
**waivers** [17] - 50:2, 50:4, 53:15, 55:6, 55:21, 56:16, 78:19, 78:21, 78:23, 78:25, 79:8, 79:14, 79:17, 79:19, 79:22, 80:7, 80:10
**walk** [4] - 4:15, 25:7, 71:5, 71:19
**walked** [2] - 26:9, 76:7
**walking** [2] - 71:8, 97:15
**walks** [2] - 68:20, 69:23
**wall** [1] - 38:4
**wants** [1] - 99:25
**warned** [1] - 74:24
**water** [1] - 67:22
**week** [5] - 5:2, 10:6, 30:24, 42:4, 69:7
**weekend** [1] - 98:12
**weeks** [5] - 45:17, 65:9, 66:3, 73:7,

74:6
**whatsoever** [2] - 38:21, 96:10
**whey** [1] - 9:14
**wide** [1] - 75:25
**wiggle** [1] - 97:7
**WILLIAMS** [1] - 1:9
**willing** [1] - 58:20
**wire** [7] - 59:8, 59:11, 59:15, 60:3, 60:4, 60:8, 60:21
**wish** [1] - 99:10
**withdraw** [1] - 26:25
**withdrawn** [1] - 27:10
**witness** [12] - 9:16, 9:17, 34:25, 39:11, 48:20, 57:4, 68:11, 68:22, 68:25, 74:19, 76:4, 91:17
**WITNESS** [21] - 35:3, 35:6, 40:12, 40:15, 40:25, 43:21, 57:19, 61:11, 63:1, 68:3, 70:20, 74:6, 76:2, 76:7, 79:15, 86:10, 87:5, 90:7, 90:9, 92:7, 97:16
**witnessed** [1] - 74:15
**witnesses** [6] - 4:4, 8:7, 10:19, 68:14, 75:5, 98:18
**woman** [1] - 17:19
**wondering** [1] - 4:23
**word** [2] - 34:18, 95:10
**words** [2] - 34:13, 69:1
**workers** [3] - 14:15, 64:25, 94:2
**works** [6] - 20:14, 20:20, 32:9, 48:4, 57:14, 62:13
**World** [10] - 1:6, 1:15, 4:3, 31:6, 31:11, 31:17, 31:19, 32:3, 32:25, 33:1
**worry** [1] - 9:4
**write** [3] - 57:25, 58:1, 90:8
**writing** [5] - 61:13, 76:20, 77:12, 87:6, 87:9
**wrote** [2] - 27:6, 27:9

## Y

**year** [1] - 11:7
**years** [6] - 5:12, 25:1, 35:20, 36:21, 44:9, 67:8

**York** [2] - 35:21, 36:14
**yourself** [6] - 43:13, 43:15, 45:13, 57:8, 62:1, 62:2
**yourselves** [1] - 97:7

## Z

**Zpaces** [117] - 5:21, 6:1, 6:2, 6:7, 6:15, 6:20, 8:15, 8:17, 10:3, 10:4, 10:5, 10:10, 10:13, 16:5, 16:6, 17:11, 17:15, 18:4, 18:13, 18:19, 23:17, 29:5, 29:8, 29:20, 29:21, 30:3, 35:12, 41:10, 41:15, 44:9, 46:20, 46:21, 46:22, 46:25, 49:18, 49:22, 49:23, 50:14, 52:10, 52:11, 54:1, 54:15, 55:7, 55:10, 56:2, 57:1, 58:20, 59:12, 59:20, 59:24, 60:5, 60:8, 60:10, 60:21, 61:1, 61:2, 61:7, 61:14, 62:5, 62:18, 62:20, 63:2, 63:8, 63:14, 63:20, 64:3, 65:16, 76:19, 77:8, 77:10, 77:13, 77:16, 78:1, 78:18, 79:2, 79:3, 79:6, 79:8, 79:11, 79:16, 82:13, 82:23, 82:25, 83:1, 83:21, 84:7, 84:9, 84:11, 85:4, 85:6, 85:7, 85:8, 85:9, 86:5, 86:8, 86:23, 86:25, 87:7, 88:2, 88:7, 88:11, 88:17, 88:22, 89:1, 89:17, 89:19, 90:12, 90:18, 93:9, 93:10, 93:15, 93:19, 93:24, 94:6
**Zpaces'** [1] - 83:5